# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA      :
                          :    Hon. Anne E. Thompson
       v.                  :
                          :    Criminal No. 19-029 (AET)
                          :
GEORGE GILMORE             :
                          :

## MEMORANDUM OF LAW OF THE UNITED STATES IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY BY DEFENDANT'S PROPOSED EXPERT WITNESS

RACHAEL A. HONIG
ATTORNEY FOR THE UNITED STATES
Acting Under Authority Conferred By
28 U.S.C. § 515
United States Attorney's Office
District of New Jersey
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

MATTHEW J. SKAHILL
Deputy U.S. Attorney

JIHEE G. SUH
Assistant U.S. Attorney

THOMAS F. KOELBL
Trial Attorney
United States Department of Justice-Tax Division

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

   I.   DR. SIMRING'S OPINIONS ARE UNRELIABLE........................................................ 10

   II.  DR. SIMRING'S OPINIONS DO NOT "FIT" BECAUSE THEY FAIL TO
        NEGATE *MENS REA*................................................................................. 11

   III. DR. SIMRING'S OPINIONS DO NOT ASSIST THE TRIER OF FACT TO
        UNDERSTAND THE EVIDENCE OR DETERMINE A FACT IN ISSUE.................. 14

   IV. DR. SIMRING'S PROPOSED TESTIMONY IS A CONDUIT FOR IMPROPER
        INADMISSIBLE HEARSAY UNDER RULE 703 AND ALSO WILL CONFUSE
        THE ISSUES AND INVITE JURY NULLIFICATION IMPROPER UNDER
        RULE 403 ............................................................................................... 17

CONCLUSION................................................................................................................ 21

## TABLE OF AUTHORITIES

CASES                                                                                                   PAGE(S)

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .................................................................................. 4, 5, 7, 16

*Heller v. Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir. 1999) ................................................................................ 5

*In re Paoli R.R. Yard CB Litig.*,
    35 F.3d 717 (3d Cir. 1994) .................................................................................. 5

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ................................................................................ 5

*Langbord v. U.S. Dep't of,*
    *Treas.*, 832 F.3d 170 (3d Cir. 2016) ................................................................ 17, 18

*Spies v. United States,*
    317 U.S. 492 (1943) ........................................................................................... 15

*United States v. Baroni,*
    909 F.3d 550 (3d Cir. 2018) ................................................................................ 13

*United States v. Baxt,*
    74 F. Supp. 2d 436 (D.N.J. 1999) ................................................................ 2, 6, 7, 11

*United States v. Blackwell,*
    459 F.3d 739 (6th Cir. 2006) ................................................................................ 6

*United States v. Boykoff,*
    186 F. Supp. 2d 347 (S.D.N.Y. 2002) ................................................................ 10

*United States v. Carr,*
    424 F.3d 213 (2d Cir. 2005) ................................................................................ 20

*United States v. Childress,*
    58 F.3d 693 (D.C. Cir. 1995) ................................................................................ 12

*United States v. Cocchiola,*
    No. 08-1976, 2009 U.S. App. LEXIS 28329, at *6-7 (3d Cir. Dec. 23, 2009) ......................... 5

*United States v. DeMuro,*
    677 F.3d 550 (3d Cir. 2012) ................................................................................ 20

*United States v. Desmond,*
    670 F.2d 414 (3d Cir. 1982) ............................................................................. 20, 21

*United States v. Ford,*
   481 F.3d 215 (3d Cir. 2007) ................................................................. 5

*United States v. Gallardo,*
   497 F.3d 727 (7th Cir. 2007) ............................................................... 6

*United States v. Johnson,*
   587 F.3d 625 (4th Cir. 2009) ............................................................. 19

*United States v. LiButti,*
   Crim. No. 92-611, 1994 WL 774646 (D.N.J. Feb. 8, 1994).............................. passim

*United States v. Mathis,*
   264 F.3d 321 (3d Cir. 2001) ................................................................. 5

*United States v. Poet,*
   315 F. App'x. 389 (3d Cir. 2009) ...................................................... 19

*United States v. Pohlot,*
   827 F.2d 889 (3d Cir. 1987) ....................................................... passim

*United States v. Powers,*
   59 F.3d 1460 (4th Cir. 1995) ............................................................... 6

*United States v. Prince-Oyibo,*
   320 F.3d 494 (4th Cir. 2003) ............................................................... 5

*United States v. Scholl,*
   166 F.3d 964 (9th Cir. 1999) ............................................................... 7

*United States v. Serfling,*
   504 F.3d 672 (7th Cir. 2007) ............................................................... 6

*United States v. Shorter,*
   618 F. Supp. 255 (D.D.C. 1985)........................................................... 7

*United States v. Thomas,*
   116 F.3d 606 (2d Cir. 1997) ............................................................. 20

*United States v. Tolliver,*
   451 F. App'x 97 (3d Cir. 2011) ........................................................ 19

*United States v. US Infrastructure, Inc.,*
   576 F.3d 1195 (11th Cir. 2009) ........................................................... 6

*United States v. Velasquez,*
   64 F.3d 844 (3d Cir. 1995) ................................................................. 4

*United States v. Washington,*
    705 F.2d 489 (D.C. Cir. 1983) ............................................................................... 20

**STATUTES**

26 U.S.C. § 7201 ............................................................................................................ 2

26 U.S.C. § 7202 ............................................................................................................ 2

26 U.S.C. § 7206 ............................................................................................................ 2

**RULES**

F.R.E. 403 ............................................................................................................ 1, 9, 20

F.R.E. 702 ............................................................................................................... 1, 4, 5

F.R.E. 703 ..................................................................................................... 1, 9, 17, 18

**OTHER**

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)
    (DSM-5)26 U.S.C. § 7201 ......................................................................................... 12

Stacey A. Tovino, *The DSM-5: Implications for Health Law,*
    2015 Utah. L. Rev. 767, 771 (2015) ......................................................................... 12

## INTRODUCTION

The United States respectfully submits this memorandum of law in support of its motion to exclude the opinions in the report of Dr. Steven S. Simring, retained by defendant George Gilmore as an expert witness. Dr. Simring's opinions are the latest in a series of attempts by tax fraud defendants like Gilmore to excuse or justify their criminal conduct by attributing it to a psychological impairment, rather than conscious intent.

Gilmore's effort should be rejected. Dr. Simring's proposed testimony does not meet the standard for admissible expert opinion under F.R.E. 702 because his opinions (1) are not reliable, (2) do not offer a legally permissible defense of lack of *mens rea* and therefore (3) do not "fit" the facts of this case. In addition, Dr. Simring's proposed testimony is a conduit for inadmissible hearsay improper under F.R.E. 703 and poses a substantial risk of confusing the jury and inviting jury nullification improper under F.R.E. 403. For these reasons, his testimony should be excluded in its entirety. In the alternative, the Court should conduct a *Daubert* hearing regarding Dr. Simring's proposed opinions at which their inadmissibility will be confirmed.

## BACKGROUND

Gilmore, a name partner in the law firm of Gilmore and Monahan P.A. in Toms River, New Jersey, has been charged with multiple tax crimes:

- Evading the payment of personal federal income taxes by: (a) using his law firm's bank and credit card accounts to pay for personal expenses; (b) falsely classifying income received from his law firm as "shareholder loans"; and (c) and otherwise making misrepresentations to, and filing false tax returns with, the Internal Revenue Service (the "IRS") (Count 1);

- Making and subscribing to false federal personal income tax returns for calendar years 2013 and 2014, primarily by concealing income that he received from his law firm (Counts 2 and 3);

1

- Willful failure to pay federal payroll taxes of his law firm for certain quarters in calendar year 2016 (Counts 4 and 5); and

- Making false statements and representations to a bank, including concealing his substantial tax debt to the IRS, in connection with a loan application (Count 6).

Each of the charges in the January 10, 2019 Indictment is a specific intent crime. For Counts 1 through 5, the Government must prove that Gilmore acted willfully. 26 U.S.C. §§ 7201, 7202 & 7206(1). Conduct is willful if it is a voluntary and intentional violation of a known legal duty. *See* Third Circuit Model Criminal Jury Instructions, 6.26.7201-4. Conduct is not willful if it is the result of negligence, mistake, accident, or a good faith misunderstanding of the requirements of the law. *Id.* Count 6 has two *mens rea* elements: (1) knowledge of the falsity of the information submitted to the bank; and (2) the intent to influence the action of the bank. *See United States v. Baxt*, 74 F. Supp. 2d 436, 440 (D.N.J. 1999).

On February 7, 2019, Gilmore provided notice of his intent to rely on expert opinion testimony from Dr. Simring that purportedly bears on Gilmore's guilt because it relates to a mental disease or defect and/or mental condition. That notification included providing the Government with Dr. Simring's November 30, 2018 report. (Exhibit 1 submitted under separate cover to the Court and defense counsel).

According to Dr. Simring, Gilmore suffers from "hoarding disorder," a "[p]ersistent difficulty discarding or parting with possessions" that "results in the accumulation of possessions that … congest and clutter active living areas and substantially compromises their intended use." (Exhibit 1 p. 5). Based on this diagnosis, he opines that:

2

> George Gilmore does not present as someone whose failure to pay his tax bill is entirely intentional and voluntary.  It is my opinion, to a reasonable degree of medical probability, that Mr. Gilmore suffers from a pathological hoarding disorder, as defined by the DSM-5, that significantly reduced his mental capacity to commit the offense.

(*Id*. p. 6).

Dr. Simring's report suffers from multiple obvious and incurable flaws that make his opinions inadmissible under the well-settled standards that govern experts.  To begin, before being notified of his potential criminal exposure, it does not appear that Gilmore ever was diagnosed with, or sought treatment for, a hoarding disorder.  But even had Gilmore truly been suffering from this disorder during the relevant time period, Dr. Simring does not explain how that would cause Gilmore to pay *some* bills, including mortgage payments for multiple homes and credit card bills, but not others, such as his federal tax bill.  Nor does he explain how a hoarding diagnosis, characterized by an inability to discard possessions in ways that compromise living areas and interferes with the quality of life, connects in any logical way to an inability to pay a single bill: federal taxes.  That obvious disconnect is underscored by Gilmore's multiple decisions, during the relevant time period, to spend vast sums of money on other items completely unrelated to those he supposedly hoards, despite knowing that money, unrelated to his "hoarding" expenditures, could be used to pay the federal taxes he owed.

Dr. Simring's opinions also are obviously incomplete.  He does not opine on whether or how a hoarding disorder possibly could affect Gilmore's mental state when he committed his multiple, other related criminal acts, including using his law firm's accounts to pay for personal expenses, falsely classifying income received from his law firm as "shareholder loans," making misrepresentations to the IRS, filing false tax returns, or making false

statements in connection with a loan application.  Instead, his ultimate opinion is the *ipse dixit* conclusion that Gilmore's hoarding disorder "goes a long way to explaining . . . otherwise irrational behavior of declaring taxes but not paying them, at the same time spending money to add to his collections and to complete construction of a luxury home." (*Id.* p. 7).

Simply put, none of Dr. Simring's opinions is connected to the *mens rea* at issue in this case: Gilmore's intentional and voluntary failure to pay his tax bill and commit other related crimes, including multiple affirmative misrepresentations.

## ARGUMENT

Federal Rule of Evidence 702 governs the admissibility of expert testimony.[1]  As the Third Circuit has explained, Rule 702 has three major requirements: "(1) the proffered witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995).

The first requirement – that the proposed witness be an expert – is not at issue for purposes of this motion.  The second and third – "the reliability or trustworthiness of the expert's testimony and that "the evidence is relevant or 'fits' under the facts of the case" – plainly are.  *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993)).  Dr. Simring's report flunks both.

---

[1] The rule provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.

"Reliability" refers to the requirement that the expert's testimony be valid and rest on "good grounds" as opposed to "subjective belief or unsupported speculation." *In re Paoli R.R. Yard CB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 589-90). District courts must carefully examine an expert's conclusions to ensure "whether they could reliably flow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999); *see* Fed. R. Evid. 702.

The fit requirement focuses both on relevance and an evaluation of the danger of unfair prejudice under F.R.E. 403. As to relevance, the expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Ford*, 481 F.3d 215, 218 (3d Cir. 2007) (quoting *United States v. Prince-Oyibo*, 320 F.3d 494, 504 (4th Cir. 2003)). If expert evidence "does not relate to an issue in the case," by definition it is not helpful and should not be admitted. *Ford*, 481 F.3d at 219 n.6 (quoting *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999)).

As to the danger of unfairly prejudicing a jury, courts recognize that irrelevant and therefore unhelpful expert testimony nonetheless will imbue the party proffering the expert with an aura of special reliability or credibility. *United States v. Mathis*, 264 F.3d 321, 339 (3d Cir. 2001) (identifying that as one of the risks that requires district courts to perform their gatekeeping function). For that reason, the Third Circuit has emphasized that district courts must "pay[] special attention to the relevance prong of *Daubert*" in determining the admissibility of expert testimony. *Ford*, 481 F.3d at 219 n.6. District courts do not abuse their discretion when they exclude expert testimony that, as here, neither relates to an actual disputed issue in the case, *e.g.*, *United States v. Cocchiola*, No. 08-1976, 2009 U.S. App. LEXIS 28329, at *6-7 (3d Cir.

Dec. 23, 2009) (not precedential); *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1211-12 (11th Cir. 2009); *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007); *United States v. Blackwell*, 459 F.3d 739, 753-54 (6th Cir. 2006), nor bears any logical connection to the facts of the case, *e.g.*, *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007); *United States v. Powers*, 59 F.3d 1460, 1471-73 (4th Cir. 1995).

Reliability and fit are particularly significant concerns when an expert opinion is offered to support the argument that a defendant's supposed mental illness is offered to negate the *mens rea* element of an offense. *See United States v. Pohlot*, 827 F.2d 889, 896-97 (3d Cir. 1987). There is a "strong danger of misuse" of "psychiatric testimony," and district courts must examine such proffered testimony carefully to ensure that it will aid the jury and is "grounded in sufficient scientific support to warrant use in the courtroom." *Id.* at 905 (quotations omitted).

Accordingly, in this Circuit, expert testimony offered to negate *mens rea* "is admissible only . . . to demonstrate that a defendant actually lacked the requisite *mens rea* at the time an alleged offense was committed," not to mitigate the defendant's responsibility on the grounds that it "deprived him of the capacity to form intent or prevented him from engaging in normal reflection." *Baxt*, 74 F. Supp. 2d at 440. "Defenses of justification and excuse, such as 'diminished capacity' and 'diminished responsibility' defenses, are not acceptable theories of lack of *mens rea*." *Id.* That makes the burden for admitting expert psychiatric testimony "a substantial one" that "falls squarely on the defendant." *Id.*

In the context of psychological expert testimony, the Third Circuit and courts in this District have been especially vigilant in ensuring, as the Supreme Court required in *Daubert*, that

6

district courts play "a gatekeeping role." 509 U.S. at 597. The proper exercise of that role

means, as the Third Circuit explained,

> [o]nly in the rare case . . . will even a legally insane defendant actually lack the
> requisite *mens rea* purely because of mental defect. . . . *Even the most*
> *psychiatrically ill have the capacity to form intentions*, and the existence of intent
> usually satisfies any mens rea requirement. . . . Mens rea is generally satisfied . . .
> by *any showing of purposeful activity, regardless of its psychological origins.*

*Pohlot*, 827 F.2d at 900-04 (emphasis added).

Thus, in *Baxt*, for example, the court held that "expert testimony . . . is not admissible to

mitigate the defendant's responsibility simply because the defendant's alleged mental illness

deprived him of the capacity to form intent or prevented him from engaging in normal

reflection." *Baxt*, 74 F. Supp. 2d at 440 (citing *Pohlot*, 827 F.2d at 890, 903-04). As the court

observed, "[t]hat Baxt may have been overcome by certain passions that are the product of his

mental illness" did not negate *mens rea* because his conduct, "even if influenced by Bipolar

Disorder and Multiple Sclerosis," remained purposeful. 74 F. Supp. 2d at 441-42 (citing

*Pohlot,* 827 F.2d at 904).

Gilmore may be the first defendant accused of tax-related crimes to assert a "hoarding"

defense, but Dr. Simring's opinions are indistinguishable from those offered in other tax cases to

support the justifications *Pohlot* prohibits. Courts consistently have excluded expert

psychological opinions about gambling addictions offered to explain failures to pay taxes and

related misrepresentations. *United States v. LiButti*, Crim. No. 92-611, 1994 WL 774646 (D.N.J.

Feb. 8, 1994) (Simandle, J.); *see also United States v. Scholl*, 166 F.3d 964, 971 (9th Cir. 1999)

(affirming exclusion of expert testimony concerning compulsive gambling because of lack of

"fit" between testimony and issue of willfulness and because of risk of confusion); *United States*

7

*v. Shorter*, 618 F. Supp. 255, 260-261 (D.D.C. 1985) (excluding expert testimony concerning gambling disorder because of lack of causal link between disorder and crimes charged).

*LiButti* is directly on point.  LiButti sought to introduce expert psychiatric testimony that his gambling disorder caused him falsely to believe that "a debt must be paid in full," and that he "lacked the intent to fail to pay taxes due to his compulsion to arrange all financial affairs to promote and preserve his gambling addiction." *LiButti*, 1994 WL 774646, at *2.

That testimony was neither reliable nor a "fit" with the facts of the case.  It was excluded because the expert's opinions had no "scientific or experiential basis to . . . negat[e] a compulsive gambler's specific intent to fail to pay taxes. . . . [and therefore] lack[ed] a reliable scientific or experimental basis [making it] inadmissible under Rule 702." *Id.* at *12.  Moreover, in language that is directly relevant to Gilmore's lifestyle, it held, "[T]his opinion does not fit the facts. Mr. LiButti had a substantial income from which he could have paid taxes but chose to expend on items not related to gambling . . . His highly consumptive lifestyle was fueled by funds that did not go just toward 'gambling,'" *id.*, or, as in this case, collecting an overabundance of expensive items, many of which (as is clear from the photographs attached to Dr. Simring's report) Gilmore segregated and displayed.  "Thus, important elements of defendant's life were not related to [LiButti's] gambling disorder. The goodness of 'fit' required by Rule 702 [wa]s lacking." *Id.*

Judge Simandle also noted that:

> *the pathological* gambling *lifestyle issue does not relate to* the issue of intent *to avoid tax obligations as much as it is offered as an excuse or justification for failing to meet tax obligations.*  Under this thesis, Mr. LiButti's negative hierarchy placing taxpaying last on the list would be the reflection of some mental defect rather than what it is: *the product of a decision motivated by the compulsion* to gamble. In a concrete example, the theory offers no explanation why Mr. LiButti

8

> would seemingly have been compelled to order $330,000 in furnishings for [a] million-dollar residence ... [moreover] [s]ince Mr. LiButti *paid his business expenses as well as his gambling debts* (and there has been no allegation that Mr. LiButti ever cheated a business client), his failure to pay taxes as any other business expense is likewise unexplained by the pathological gambling lifestyle theory.

*Id.* at *13 (emphasis added). The court concluded:

> Many people suffer from addictive disorders similar to compulsive gambling, such as drug addiction. There is no more of a negation of *mens rea* to evade payment of taxes or to fail to pay taxes for the compulsive gambler who feels compelled to lose his money at the gaming tables than there is for the drug addict who feels compelled to lose his money at the crack house. In either case, the lifestyle associated with the addiction cannot excuse non-payment.

*Id.*[2]

Under Judge Simandle's rationale, Dr. Simring's testimony also must be excluded. As explained below, his testimony is unreliable because it is based on demonstrably incorrect factual assumptions. It does not "fit' this case, either by offering a legally acceptable theory of lack of *mens rea* or in terms of "fitting" the facts at issue. Finally, Dr. Simring's testimony is improper: (1) because of its liberal inclusion of inadmissible hearsay, which would not be admissible because it fails to overcome the presumption against the admission of such evidence called for by F.R.E. 703, and (2) because of the substantial risk that it confuses the issues for the jury and invites jury nullification inappropriate under F.R.E. 403.

---

[2] The court permitted LiButti's expert to testify as to one narrow issue not applicable here: that his compulsive gambling disorder may have caused him to gamble available funds, rather than making a partial payment toward his tax debt, to seek to gain funds for a full lump sum payment of the tax debt. *Libutti*, 1994 WL 774646, at *14.

9

## I.   DR. SIMRING'S OPINIONS ARE UNRELIABLE.

Dr. Simring's proposed opinions fail Rule 702's reliability test.  Because his conclusions rest on certain incorrect factual assumptions central to this case, his report "exhibits no awareness of the true nature of the charges" against Gilmore.  *See United States v. Boykoff*, 186 F. Supp. 2d. 347, 349 (S.D.N.Y. 2002), *aff'd*, 67 F. App'x 15 (2d Cir. 2003).  Opinions that are divorced from the facts flunk *Daubert*'s reliability requirement and should be excluded.

Dr. Simring assumes that this case involved the allegation "simply that Mr. Gilmore willfully failed to pay his taxes, even though he always reported them accurately." (Exhibit 1 p. 2).  Dr. Simring also assumes that there "is no suggestion that [the defendant] has engaged in any fraudulent practices or that he has failed to acknowledge his tax obligations." (*Id.*).  Dr. Simring also considers it "[s]ignificant" that "the IRS has not suggested that [the defendant] failed to report any income." (*Id.*).

These assumptions are wrong.  The Indictment alleges far more than Gilmore's failure to pay his taxes; it alleges he, *inter alia*, filed false tax returns, falsely classified income as "shareholder loans," and made multiple affirmative misrepresentations to the IRS and a bank. (*See* Indictment p. 4).  The Indictment includes more than just a charge of failure to pay delinquent income taxes.

These charges, and the factual allegations in the Indictment, directly contradict Dr. Simring's fundamental assumption that Gilmore failed to pay only his taxes but engaged in no other misconduct, let alone deliberate misconduct like making multiple affirmative misrepresentations.  Because his opinions are based on these incorrect factual assumptions and fail to address multiple allegations in the Indictment, they fail *Daubert*'s reliability test.  *Boykoff*,

10

186 F. Supp. 2d. at 349.

## II.    DR. SIMRING'S OPINIONS DO NOT "FIT" BECAUSE THEY FAIL TO NEGATE *MENS REA*.

Even accepted at face value notwithstanding these glaring omissions, Dr. Simring's

opinions do not support a legally acceptable theory of lack of *mens rea* and should be excluded.

He opines – as explicitly stated in his report – that Gilmore's hoarding disorder caused him to

have a diminished capacity but in so doing, relies on wholly conclusory statements.  (Exhibit 1

pp. 6-7).  Because he is unable to establish any link between the hoarding disorder and *mens rea*,

his opinions are impermissible under *Daubert* and should be excluded.

Dr. Simring never actually asserts, let alone demonstrates, that Gilmore lacked the

requisite *mens rea* at the time the offenses alleged in the Indictment were committed.  Rather, he

concludes that Gilmore cannot be classified as "someone whose failure to pay his tax bill is

entirely intentional and voluntary" because his hoarding disorder "significantly reduced his

mental capacity."  (Exhibit 1 p. 6).  That is a paradigmatic diminished capacity defense.  It is

inadequate, as a matter of the law in this Circuit, to negate *mens rea*.  *Pohlot*, 827 F.2d at 904;

*Baxt*, 74 F. Supp. 2d at 440.  Instead, it reflects, at best, a "lack of self-reflection" that "does not

mean a lack of intent and does not negate mens rea."  *Pohlot*, 827 F.2d at 906.

Relatedly, Dr. Simring's testimony is entirely conclusory.  That provides an independent

basis for exclusion.  "Conclusory statements by a defendant about the link between psychiatric

evidence and the defendant's *mens rea* at the time the alleged crime was committed do not

render the evidence admissible."  *See Baxt*, 74 F. Supp. 2d at 440.  "A court's focus in assessing

the admissibility of expert psychiatric testimony should be 'on the proffered link or relationship

between the specific psychiatric evidence offered and the mens rea at issue in the case.'"  *Id.*

11

(quoting *United States v. Childress*, 58 F.3d 693, 730 (D.C. Cir. 1995)). Dr. Simring never makes that link.

For example, Dr. Simring first opines that Gilmore's "sudden increase in discretionary income allowed him to indulge a long-standing interest in collecting expensive objects, which he could never afford before." (Exhibit 1 p. 3). He then describes the items Gilmore enjoys collecting, including Japanese art, Coca-Cola machines, and sports memorabilia, noting that when Gilmore "ran out of space, he simply utilized more space in buildings he owned or in other buildings." (*Id.* pp. 3-5). He further explains that Gilmore's acquisitions "were almost always expensive" and that he "was usually able to pay by credit card or to work out terms of payment." (*Id.* p. 4). Based on this, Dr. Simring concludes that Gilmore has a hoarding disorder. (*Id.* p. 5).

Hoarders usually do not compulsively acquire solely expensive, collectible items, then spend even more on separate storage facilities for those items. That's not hoarding—that's collecting. *Cf.* Stacey A. Tovino, *The DSM-5: Implications for Health Law*, 2015 Utah. L. Rev. 767, 771 (2015) ("Under the DSM-5, a clinician may diagnose an individual with hoarding disorder if the individual meets six criteria. First, the individual must have persistent difficulty discarding or parting with possessions, *regardless of their actual value*.") (emphasis added); Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) (DSM-5): *Obsessive-Compulsive and Related Disorders* ("Hoarding disorder is characterized by persistent difficulty discarding or parting with possessions, regardless of their actual value, as a result of a strong perceived need to save the items and to distress associated with discarding them. Hoarding disorder differs from normal collecting"). Indeed, as Dr. Simring otherwise

12

appears to have recognized, hoarding is characterized as accumulations that "congest and clutter active living areas," rendering them unusable. (Exhibit 1 p. 6).

Even assuming, however, that Gilmore nonetheless has some form of hoarding disorder, Dr. Simring summarily states that it is his "opinion, that George Gilmore does not present as someone whose failure to pay his tax bill is entirely intentional and voluntary." (*Id.* p. 6). But nowhere does he explain how a hoarding disorder precludes a hoarder from forming the requisite "intent[]" to elect not to pay his tax bill. Nor does he explain how his hoarding diagnosis leads to his conclusion that Gilmore's failure to pay a tax debt was not "entirely" a willful act. He offers no explanation at all of how a supposed difficulty in discarding possessions negates the otherwise intentional decision not to pay his federal taxes as opposed to other bills and financial obligations, then lie about his tax obligations and other, related issues.

At best, Dr. Simring's opinions really boil down to the improper conflation of motive and intent. Gilmore may have been motivated to spend money that otherwise would have been available to pay his federal tax bill on expensive items he had a passion to collect. That, however, says nothing about his intent not to pay federal taxes. Dr. Simring's entire report improperly conflates those two, distinct concepts in an entirely conclusory manner. *United States v. Baroni*, 909 F.3d 550, 583-85 (3d Cir. 2018) ("Intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind with which the particular act is done.").

For all of these reasons, Dr. Simring's opinion is precisely the type of "misuse" of psychiatric testimony about which the Third Circuit warned in *Pohlot*. 827 F.2d at 905. The "use of psychiatric evidence to negate *mens rea* may easily slide into wider usage that opens up

13

the jury to theories of defense more akin to justification." *Id.*; *LiButti*, 1994 WL 774646, at *5. Dr. Simring's proposed opinions would have exactly that effect in this case. They should be excluded.

### III. DR. SIMRING'S OPINIONS DO NOT ASSIST THE TRIER OF FACT TO UNDERSTAND THE EVIDENCE OR DETERMINE A FACT IN ISSUE.

Beyond their failure to negate *mens rea*, Dr. Simring's proffered opinions also fail to "fit" the facts of this case. They neither assist the trier of fact to understand the evidence nor determine a fact in issue.

Dr. Simring does not explain how a hoarding disorder – a difficulty discarding possessions that results in the accumulation of possessions – translates into an inability to pay debts, and a federal tax debt in particular. None of the diagnostic criteria relied on by Dr. Simring suggests that hoarders are unable to pay for the things as a result of their condition, and Dr. Simring does not explain how a hoarding disorder connects to an inability to pay debts. He provides no explanation as to how or why a hoarding disorder would cause Gilmore to pay the other significant debts that he incurred but not his federal tax bill.

The same flaw resulted in the exclusion of the expert opinions in *LiButti*. There, the defendant used his income for significant non-gambling spending. *LiButti*, 1994 WL 774646, at *12-13. Here, notwithstanding his expensive acquisitions, Gilmore had a substantial income from which he could have paid taxes. Instead, he chose to spend on non-hoarding expenditures, including the construction and remodeling of his homes, one of which included high-end features such as an infinity swimming pool, pool cabana, and slate roof; mortgage payments on his multiple homes; and vacations in Colorado. (*See* Indictment Count 1 ¶ 4) That reflects deliberate decisions as to how to spend significant income. Dr. Simring does not

14

address Gilmore's non-hoarding spending at all, which includes Gilmore's ability and decisions to pay all other debts, both business and personal, while also handling the financial affairs of his law firm. Dr. Simring's opinions completely ignore that Gilmore manifests control of his financial obligations in every aspect of his life, other than failing to pay his federal tax debts.

Again, *LiButti* is directly on point. As Judge Simandle explained, "LiButti had a substantial income from which he could have paid taxes but chose to expend on items not related to gambling." *LiButti*, 1994 WL 774646, at *12. LiButti had a "highly consumptive lifestyle [that] was fueled by funds that did not go toward gambling." *Id.* LiButti paid debts other than his taxes, including his gambling debts themselves and business expenses, and his failure to pay his taxes "as any other business expense" simply could not be explained by the gambling disorder theory. *Id.* If Gilmore's tax debts "were at the bottom of the hierarchy," it is because, he, like LiButti, "put them there." *Id.*

Importantly, Dr. Simring's opinion on the effect of Gilmore's purported hoarding disorder on its face does not exclude tax evasion as one of Gilmore's motives. The Government's burden in proving willfulness in a tax evasion case is to show that the defendant voluntarily and intentionally violated a known legal duty; it does not also have to show that the defendant's affirmative acts were carried out for no other purpose besides tax evasion. *See Spies v. United States*, 317 U.S. 492, 500 (1943) ("If the tax-evasion motive plays any part in [the commission of an affirmative act] the offense [of tax evasion] may be made out even though the conduct may also serve other purposes such as concealment of other crime."). Dr. Simring's opinion is limited in just this way: he concludes that Gilmore's failure to pay his tax bill was "*not*

15

. . . *entirely* intentional and voluntary" and that his purported hoarding disorder "*goes a long way*" to explaining his behavior. (Exhibit 1 pp. 6-7) (emphasis added). Dr. Simring offers, at best, a partial motive for Gilmore's actions, and a partial motive has no probative value. And evidence that has no probative value is, by definition, unhelpful under Rule 702. *Daubert*, 509 U.S. at 591 ("'Expert testimony which does not relate to any issue in the case is not relevant, and *ergo*, non- helpful'" under Rule 702.) (citation omitted).

Moreover, because Dr. Simring's opinions address only Count 1 of the six-count Indictment, they are not relevant – and not helpful to the jury in evaluating – the allegations that Gilmore filed false tax returns (Counts 2 and 3), failed to pay federal payroll taxes (Counts 4 and 5), and made false statements in relation to a loan application (Count 6). They do not address – and therefore provide no assistance to the trier of fact in evaluating – the allegations that Gilmore used his law firm's account to pay for personal expenses, falsely classified income received from his law firm as "shareholder loans," made misrepresentations to the IRS, or filed false tax returns. Indeed, Dr. Simring's report mistakenly asserts (contrary to the allegations in the Indictment) that "[e]verything Mr. Gilmore did was done out in the open." (*Id.* p. 7). Just as expert testimony concerning a gambling addiction is not relevant to "alleged evasion of payment by allegedly committing four willful acts of concealing assets from the IRS," *LiButti*, 1994 WL 774646, at *11, Dr. Simring's opinion, that a hoarder might declare his taxes but not pay them, is not relevant to the allegations of lies and concealment in the Indictment. Simply put, even if Gilmore's hoarding condition rendered him incapable of paying the taxes that he declared on his tax returns, that says nothing at all about his intent to evade payment of the taxes that he owed but tried to conceal.

In sum, like a gambling disorder, a hoarding disorder "does not relate to the issue of intent to avoid tax obligations as much as it is offered as an excuse or justification for failing to meet tax obligations." *See id.*, 1994 WL 774646, at *13.  It in no way explains – let alone excuses – willfully filing false tax returns, willfully failing to pay federal payroll taxes, or knowingly making false statements on a loan application.  The "fit" between Dr. Simring's opinions and the facts at issue in this case is lacking and they should be excluded.

### IV. DR. SIMRING'S PROPOSED TESTIMONY IS A CONDUIT FOR IMPROPER INADMISSIBLE HEARSAY UNDER RULE 703 AND ALSO WILL CONFUSE THE ISSUES AND INVITE JURY NULLIFICATION IMPROPER UNDER RULE 403.

Dr. Simring's opinions also should be excluded for the independent reason that any miniscule probative value they may have is substantially outweighed by the danger that they will confuse and mislead the jury.  His report includes numerous otherwise inadmissible hearsay assertions unrelated to his analysis that, were they presented to the jury, would confuse the issues in this case and invite jury nullification.

An expert may rely on inadmissible evidence only if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," Fed. R. Evid. 703, and "only if the[] probative value in helping the jury evaluate the opinion substantially outweighs the[] prejudicial effect." *Id.*; *see Langbord v. U.S. Dep't of Treas.*, 832 F.3d 170, 195 (3d Cir. 2016) (en banc) (abuse of discretion to allow expert to offer hearsay where probative value was substantially outweighed by the cumulative nature of the evidence and speculation and characterizations by the out-of-court declarants).  In fact, the Advisory Committee Notes to the 2000 Amendments to Rule 703 indicate that the district court exercises a

significant gatekeeping role in evaluating the presentation of inadmissible hearsay to the jury

through an expert's opinion testimony.  In this regard, the Advisory Committee provided:

> When information is reasonably relied upon by an expert and yet is admissible
> only for the purpose of assisting the jury in evaluating an expert's opinion, a trial
> court applying this Rule must consider the information's probative value in
> assisting the jury to weigh the expert's opinion on the one hand, and the risk of
> prejudice resulting from the jury's potential misuse of the information for
> substantive purposes on the other. The information may be disclosed to the jury,
> upon objection, only if the trial court finds that the probative value of the
> information in assisting the jury to evaluate the expert's opinion substantially
> outweighs its prejudicial effect. If the otherwise inadmissible information is
> admitted under this balancing test, the trial judge must give a limiting instruction
> upon request, informing the jury that the underlying information must not be used
> for substantive purposes. See Rule 105. In determining the appropriate course, the
> trial court should consider the probable effectiveness or lack of effectiveness of a
> limiting instruction under the particular circumstances.

Fed. R. Evid. 703 2000 Ad. Comm. Notes.  The Advisory Committee punctuated its concern of

policing against the potential misuse of inadmissible hearsay in this setting by stating: "The

[2000] amendment provides a *presumption against disclosure* to the jury of information used as

the basis of an expert's opinion and not admissible for any substantive purpose, when that

information is offered by the proponent of the expert." *Id.* (emphasis added).  That presumption

against disclosure of otherwise inadmissible evidence has not been overcome by Gilmore here.

Dr. Simring's opinions are replete with inadmissible hearsay, including Gilmore's own

statements.  For example, Dr. Simring emphasizes Gilmore's purported good faith belief that he

did not file any false tax returns: "He told me that he has never filed a false tax return"; "Mr.

Gilmore has always reported his federal and state income tax accurately.  He told me that he

would never dream of hiding income or taking any other illegal steps to evade taxes." (Exhibit 1

pp. 2, 5).  Testimony from Dr. Simring on these subjects appears to be nothing more than a

conduit for presenting to the jury inadmissible hearsay evidence in support of either a good faith

defense or a basis for inviting nullification by having the jury second-guess the Government's charging decisions. *See United States v. Tolliver*, 451 F. App'x 97, 105 (3d Cir. 2011) (not precedential) (decision over whether to permit expert to testify about otherwise inadmissible hearsay is a question of whether the expert is giving an independent judgment or merely acting as a transmitter for inadmissible hearsay); *United States v. Poet*, 315 F. App'x. 389, 391-92 (3d Cir. 2009) (not precedential) (finding no error in this Court's exclusion of expert testimony on the grounds that defendant's state of mind was difficult to establish through testimony of someone other than defendant); *see also United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) ("It is appropriate for district courts to recognize the risk that a particular expert might become nothing more than a transmitter of testimonial hearsay and exercise their discretion in a manner to avoid such abuses."). These hearsay statements are completely inadmissible.

Other evidence, whether hearsay or not, is completely irrelevant to Dr. Simring's diagnosis. In this regard, Dr. Simring also remarks on past tax debts of Gilmore's, and the fact that those debts were resolved civilly, not criminally: "This is not the first time Mr. Gilmore has been behind in paying taxes. In the past, however, he has always been able to work out a payment plan with the IRS. Despite his best efforts, he has not been able to work out a plan this time"; "In the past, he has always been able to work out payment plans with the state and federal governments." (Exhibit 1 pp. 2, 5). Finally, Dr. Simring also repeatedly references purported efforts to resolve this case through methods other than prosecution: "He has tried to arrange a payout plan to satisfy his federal tax obligations, but has not been successful"; "The federal government has not offered him a payment plan, but it did place liens on all of his real property. The federal government has now secured Justice Department approval to charge him criminally

19

with willful failure to pay income taxes"; "Mr. Gilmore has agreed to sell everything he owns, including real estate, in order to satisfy his tax obligation." (*Id.* pp. 1, 5, 7). Dr. Simring never connects any of these assertions to his diagnosis. There is no suggestion that such statements are the type of information that experts in Dr. Simring's field "would reasonably rely on" in diagnosing Gilmore with a hoarding disorder.

Any probative value that these statements may have is substantially outweighed by their danger of unfair prejudice. Fed. R. Evid. 403. Testimony from Dr. Simring that Gilmore "would never dream" of evading his taxes and concerning civil collection alternatives to prosecution clearly engender sympathy for Gilmore, suggesting that the case is not truly worthy of criminal prosecution. *See, e.g., United States v. DeMuro*, 677 F.3d 550, 565 (3d Cir. 2012) (existence of IRS civil remedies irrelevant to criminal liability). They are statements that would invite jury nullification—resolution of the case on grounds other than factual guilt.

That poses the very sort of "danger of . . . confusion of the issues" and "waste of time" that Rule 403 was designed to prevent. Courts "'categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.'" *United States v. Carr*, 424 F.3d 213, 220 (2d Cir. 2005) (quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997)). This is so because jury nullification relies on a jury's violation of its sworn duty to follow and apply the law as instructed by the Court. Indeed, verdicts premised on jury nullification "are lawless, a denial of due process and constitute an exercise of erroneously seized power." *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983); *see United States v. Desmond,* 670 F.2d 414,

417 (3d Cir. 1982) (finding that, while a jury may not be punished for nullification, it is long-settled that the jury's duty is to follow the law) (citations omitted).

## CONCLUSION

Dr. Simring's proposed opinions are not reliable and do not "fit" the issues in this case. Rather than providing evidence useful to the jury in evaluating Gilmore's *mens rea*, those opinions support an impermissible defense of justification, excuse, or jury nullification and, to boot, conflate motive and intent.  Moreover, Dr. Simring's proposed testimony is a conduit for inadmissible hearsay and any probative value of Dr. Simring's proposed testimony is substantially outweighed by the danger that it will confuse and mislead the jury.  Accordingly, the Court should exclude Dr. Simring's testimony in its entirety, or, alternatively, conduct a *Daubert* hearing for a more in-depth evaluation of his opinions and his bases for them.

Respectfully submitted,

RACHAEL A. HONIG
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

By:     /s/ Matthew J. Skahill
        /s/ Jihee G. Suh
        MATTHEW J. SKAHILL
        Deputy U.S. Attorney
        JIHEE G. SUH
        Assistant U.S. Attorney

        /s/ Thomas F. Koelbl
        THOMAS F. KOELBL
        Trial Attorney
        U.S. Department of Justice-Tax Division

Dated:  March 4, 2019

21