# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 3:19-cr-00029-AET** |
| **vs.** | |
| **GEORGE GILMORE,** | <u>**Oral Argument Requested**</u> |
| **Defendant.** | |

---

## OMNIBUS BRIEF IN SUPPORT OF
## DEFENDANT'S  RULE 29 AND RULE 33 MOTIONS

---

**MARINO, TORTORELLA & BOYLE, P.C.**
**437 Southern Boulevard**
**Chatham, New Jersey 07928–1488**
**(973) 824–9300**
*Attorneys for Defendant*
*George Gilmore*

**On the Brief:**

    **Kevin H. Marino, Esq.**
    **John D. Tortorella, Esq.**
    **John A. Boyle, Esq.**
    **Erez Davy, Esq.**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................v

PRELIMINARY STATEMENT ............................................................................1

LEGAL ARGUMENT ...........................................................................................8

I.    GILMORE IS ENTITLED TO A JUDGMENT OF ACQUITTAL ON
      COUNTS 4 AND 5 BECAUSE THE GOVERNMENT FAILED TO
      NEGATE HIS GOOD FAITH REGARDING THE PAYMENT OF
      HIS FIRM'S PAYROLL TAXES. ................................................................8

      A.  The Court Must Enter A Judgment Of Acquittal Because No Rational
          Jury Could Have Found Proof Of Guilt Beyond A Reasonable Doubt. ..........8

      B.  To Prove Willfulness Under 26 U.S.C. § 7202, The Government Had
          To Negate Gilmore's Good-Faith Belief That Failing To Pay Payroll
          Taxes By The Statutory Deadline Was Not Unlawful Or Criminal. ..............9

      C.  The Evidence At Trial Demonstrated That Gilmore Believed In Good
          Faith That Failing To Pay Over Payroll Taxes By The Return-Filing
          Deadline Was Not Unlawful Or Criminal.......................................................13

      D.  The IRS Itself Did Not Believe That Gilmore's Late Payments Were
          Unlawful Or Criminal. ...................................................................................21

II.   ALTERNATIVELY, THE COURT SHOULD GRANT GILMORE A
      NEW TRIAL ON COUNTS 4 AND 5 PURSUANT TO RULE 33.............27

      A.  Gilmore Is Entitled To A New Trial On Counts 4 And 5 Because The
          Jury's Verdict On Those Counts Is Contrary To The Weight Of The
          Evidence. ........................................................................................................27

      B.  Gilmore Is Entitled To A New Trial On Counts 4 And 5 Because The
          Court Erroneously Refused To Instruct The Jury That To Establish
          Willfulness, The Government Had To Prove That Gilmore Did Not
          Have A Good-Faith Belief That His Conduct Was Not Criminal Under
          The Federal Tax Laws.....................................................................................28

III.   GILMORE IS ENTITLED TO A JUDGMENT OF ACQUITTAL ON COUNT 6 BECAUSE NO RATIONAL JURY COULD HAVE FOUND BEYOND A REASONABLE DOUBT THAT HE KNOWINGLY MADE A FALSE STATEMENT FOR THE PURPOSE OF INFLUENCING OFB'S ACTION ON HIS LOAN APPLICATION. ..............................................................35

A.   The Trial Evidence Does Not Support A Finding Beyond A Reasonable Doubt That Gilmore's Statement Regarding Outstanding Federal Debts Was Knowingly False Or Made For The Purpose Of Influencing OFB's Lending Decision. ...........................................36

B.   The Trial Evidence Does Not Support A Finding Beyond A Reasonable Doubt That Gilmore's Statement Regarding Other Liabilities Was Knowingly False Or Made For The Purpose Of Influencing OFB's Lending Decision. ...........................................41

IV.   ALTERNATIVELY, GILMORE IS ENTITLED TO A NEW TRIAL ON COUNT 6. ...................................................44

A.   The Government Violated Gilmore's Right To Due Process By Failing To Correct The Bank Officer's False Testimony In Support Of That Count Of Conviction. ....................................................44

B.   One Of The Alternative Theories On Which The Court Submitted Count 6 To The Jury—Gilmore's Purportedly False Statement About Federal Debt—Was Fundamentally Ambiguous And Therefore Insufficient To Justify A Conviction. .............................................48

V.   THE COURT SHOULD GRANT GILMORE A JUDGMENT OF ACQUITTAL ON COUNT 1 ..........................................56

A.   The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Acted With The Intent To Evade Payment Of His Tax Liabilities Permanently. ...................................................58

B.   The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Acted With The Intent To Evade Or Defeat Payment Of His Taxes Either Permanently Or Temporarily. ............................59

1.   The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Willfully Misclassified His Shareholder Loans. .....................59

2.    The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Wrote A Check Or Agreed To Make Good-Faith Payments With The Intent To Mislead Or Conceal Anything From The IRS........64

CONCLUSION ......................................................................................................68

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Beggs v. Rossi*,
  994 F. Supp. 114 (D. Conn. 1997) ....................................................................55

*Borough of Westville v. City of Philadelphia*,
  89 F. Supp. 3d 636 (D.N.J. 2015).................................................................53

*Bryan v. United States*,
  524 U.S. 184 (1998) ........................................................ 30, 31, 32, 33

*Cheek v. United States*,
  498 U.S. 192 (1991) ..................................................................... passim

*Dunlap v. Douglass*,
  No. 14-cv-0054, 2014 U.S. Dist. LEXIS 112864 (S.D. Ohio Aug. 14, 2014).....54

*Edwards v. United States*,
  375 F.2d 862 (9th Cir. 1967).......................................................... 58, 59

*Giglio v. United States*,
  405 U.S. 150 (1972) ..................................................................... 45, 46

*Greenberg v. United States*,
  46 F.3d 239 (3d Cir. 1994) .............................................................9

*Haskell v. Superintendent Greene SCI*,
  866 F.3d 139 (3d Cir. 2017) ...........................................................45

*Lambert v. Blackwell*,
  387 F.3d 210 (3d Cir. 2004) ...........................................................45

*McLain v. McLain*,
  No. 16-cv-36, 2018 U.S. Dist. LEXIS 36696 (D. Mont. Jan. 17, 2018)..............33

*Meriwether v. Garrett*,
  102 U.S. 472 (1880) ........................................................................53

*Mortland v. IRS*,
  No. A-03-CA-115, 2003 U.S. Dist. LEXIS 12671 (W.D. Tex. June 24, 2003) ..54

*Napue v. Illinois*,
   360 U.S. 264 (1959) ..................................................................................... 45, 46

*Pollice v. Nat'l Tax Funding, L.P.*,
   225 F.3d 379 (3d Cir. 2000) ................................................................................54

*Ratzlaf v. United States*,
   501 U.S. 135 (1994) ............................................................................................32

*Soto v. Scaringelli*,
   189 N.J. 558 (2007) ............................................................................................53

*Spies v. United States*,
   317 U.S. 492 (1943) ............................................................................................57

*St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*,
   898 F.3d 351 (3d Cir. 2018) ................................................................................54

*United States v. Agurs*,
   427 U.S. 97 (1976) ..............................................................................................45

*United States v. Ashworth*,
   836 F.2d 260 (6th Cir. 1988) ..............................................................................27

*United States v. Atl. States Cast Iron Pipe Co.*,
   No. 03-cr-852, 2007 U.S. Dist. LEXIS 56562 (D.N.J. Aug. 2, 2007) ................56

*United States v. Bishop*,
   412 U.S. 346 (1973) ............................................................................................58

*United States v. Bryant*,
   556 F. Supp. 2d 378 (D.N.J. 2008)......................................................................50

*United States v. Caraballo-Rodriguez*,
   726 F.3d 418 (3d Cir. 2013) ..................................................................................8

*United States v. Copple*,
   24 F.3d 535 (3d Cir. 1994) ..................................................................................28

*United States v. Culliton*,
   328 F.3d 1074 (9th Cir. 2003) ............................................................................50

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994) ........................................................... 9, 40

*United States v. Dansker*,
  537 F.2d 40 (3d Cir. 1976) ................................................................. 49

*United States v. De Niro*,
  392 F.2d 753 (6th Cir. 1968) .............................................................. 58

*United States v. Dobson*,
  419 F.3d 231 (3d Cir. 2005) ............................................................... 28

*United States v. El-Ghazali*,
  142 F. App'x 44 (3d Cir. 2005) ......................................................... 35

*United States v. Farnsworth*,
  302 F. App'x 110 (3d Cir. 2008) ....................................................... 57

*United States v. Fisher*,
  607 F. App'x 645 (9th Cir. 2015) ...................................................... 58

*United States v. George*,
  386 F.3d 383 (2d Cir. 2004) ............................................................... 32

*United States v. Goberman*,
  458 F.2d 226 (3d Cir. 1972) ............................................................... 36

*United States v. Harmon*,
  681 F. App'x 152 (3d Cir. 2017) ....................................................... 45

*United States v. Harris*,
  498 F.2d 1164 (3d Cir. 1974) ............................................................. 46

*United States v. Hinnant*,
  529 F. App'x 217 (3d Cir. 2013) ....................................................... 57

*United States v. Hird*,
  913 F.3d 332 (3d Cir. 2019) ............................................................... 49

*United States v. Hoffecker*,
  530 F.3d 137 (3d Cir. 2008) ............................................................... 46

*United States v. Huebner*,
    48 F.3d 376 (9th Cir. 1994) ........................................................................58

*United States v. Johnson*,
    302 F.3d 139 (3d Cir. 2002) .......................................................................27

*United States v. Kay*,
    513 F.3d 432 (5th Cir. 2007) ................................................................ 31, 32

*United States v. Korey*,
    472 F.3d 89 (3d Cir. 2007) .........................................................................28

*United States v. Lacey*,
    219 F.3d 779 (8th Cir. 2000) ......................................................................27

*United States v. Lattimore*,
    127 F. Supp. 405 (D.D.C. 1955) ................................................................50

*United States v. Lighte*,
    782 F.2d 367 (2d Cir. 1986) .......................................................................50

*United States v. Long*,
    534 F.2d 1097 (3d Cir. 1976) .....................................................................49

*United States v. Lynch*,
    735 F. App'x 780 (3d Cir. 2018) ..................................................... 9, 10, 11, 29

*United States v. Matsinger*,
    191 F.2d 1014 (3d Cir. 1951) ......................................................................9

*United States v. McGill*,
    964 F.2d 222 (3d Cir. 1992) ............................................................ 29, 57, 64

*United States v. McIntyre*,
    612 F. App'x 77 (3d Cir. 2015) ...................................................................57

*United States v. McKee*,
    506 F.3d 225 (3d Cir. 2007) ......................................................... 9, 29, 40, 64

*United States v. Miller*,
    595 F. App'x 166 (3d Cir. 2014) .................................................................29

*United States v. Mitchell,*
    145 F.3d 572 (3d Cir. 1998) ...............................................................34

*United States v. Morales,*
    902 F.2d 604 (7th Cir. 1990) ...........................................................27

*United States v. Murphy,*
    323 F.3d 102 (3d Cir. 2003) ...............................................................55

*United States v. Naegele,*
    341 B.R. 349 (D.D.C. 2006) ...............................................................51

*United States v. Onque,*
    169 F. Supp. 3d 555 (D.N.J. 2015) .....................................................28

*United States v. Paris,*
    578 F. App'x 146 (3d Cir. 2014) ..........................................................57

*United States v. Quinn,*
    No. 09-cr-20075, 2011 U.S. Dist. LEXIS 10506 (D. Kan. Feb. 3, 2011) ...........10

*United States v. Race,*
    632 F.2d 1114 (4th Cir. 1980) ...........................................................50

*United States v. Rigas,*
    605 F.3d 194 (3d Cir. 2010) ...............................................................60

*United States v. Romano,*
    938 F.2d 1569 (2d Cir. 1991) .............................................. 57, 65, 66

*United States v. Ryan,*
    828 F.2d 1010 (3d Cir. 1987) ................................................. passim

*United States v. Santos,*
    20 F.3d 280 (7th Cir. 1994) ...............................................................27

*United States v. Schlosser,*
    749 F. App'x 145 (3d Cir. 2019) ..........................................................29

*United States v. Serafini,*
    167 F.3d 812 (3d Cir. 1999) ................................................. 49, 50

*United States v. Slawik*,
  548 F.2d 75 (3d Cir. 1977) ...................................................................49

*United States v. Stadtmauer*,
  620 F.3d 238 (3d Cir. 2010) ........................................................ 29, 46

*United States v. Starnes*,
  583 F.3d 196 (3d Cir. 2009) .................................................... 30, 31, 32

*United States v. Thayer*,
  201 F.3d 214 (3d Cir. 1999) ...................................................................9

*United States v. Tiangco*,
  225 F. Supp. 3d 274 (D.N.J. 2016).........................................................28

*United States v. Vitillo*,
  490 F.3d 314 (3d Cir. 2007) ...................................................................34

*United States v. Watts*,
  72 F. Supp. 2d 106 (E.D.N.Y. 1999)................................................ 51, 52

*United States v. Wells*,
  519 U.S. 482 (1997) ...............................................................................36

*Williams v. United States*,
  458 U.S. 279 (1982) ...............................................................................35

**<u>Statutes</u>**

15 U.S.C. § 1692a(5) ................................................................................54

15 U.S.C. § 78ff ......................................................................................33

18 U.S.C. § 1014 ............................................................................. passim

18 U.S.C. § 152 .......................................................................................51

26 U.S.C. § 6151 .....................................................................................10

26 U.S.C. § 6672 ............................................................................. 14, 33

26 U.S.C. § 7201 ............................................................................. passim

26 U.S.C. § 7202 ................................................................... 9, 10, 11, 33

26 U.S.C. § 7206....................................................................................60

26 U.S.C. § 7402(a) ..............................................................................20

**Rules & Regulations**

Fed. R. Crim. P. 29............................................................................ passim

Fed. R. Crim. P. 33............................................................................ passim

**Journals & Treatises**

26 Moore's Federal Practice—Criminal Procedure § 633.02 (2019).....................28

**Other Authorities**

Comment, Third Circuit Model Jury Instructions § 5.05 ........................................32

Comment, Third Circuit Model Jury Instructions § 6.26.7201–4 ................... 30, 31

Internal Revenue Manual, § 1.11.2.2.................................................................21

Internal Revenue Manual, § 5.12.2.2................................................................22

Internal Revenue Manual, § 9.1.3.3.3.1 ..............................................................9

Third Circuit Model Criminal Jury Instructions,
    Instruction No. 6.26.7201 ..........................................................................57

Third Circuit Model Jury Instructions,
    Instruction No. 6.26.7201–3 .......................................................................57

Defendant, George Gilmore ("Gilmore"), respectfully submits this omnibus brief in support of his motion for a judgment of acquittal under Rule 29 and his motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

Following the jury's mixed verdict in this case, George Gilmore has been presented to the world as a tax cheat and a bank fraudster.  Although the jury unanimously rejected the Government's core allegation—that Gilmore filed false tax returns by not characterizing his shareholder loans as income—its findings that he willfully failed to pay payroll taxes on two occasions in 2016 and lied to secure a home mortgage in 2015 have literally ruined his life.  In light of those verdicts, Gilmore was forced to withdraw from the law firm he has run for thirty-eight years, to surrender his law license despite an unblemished professional record of more than forty years, and to resign from a political position he held with distinction for twenty-two years.  But George Gilmore did not willfully fail to pay his law firm's payroll taxes for two quarters in 2016, and he did not lie to Ocean First Bank ("OFB") to secure a mortgage in 2015.  Viewing the undisputed evidence in the light most favorable to the Government, and giving the prosecution the benefit of every reasonable inference from that evidence, the jury's verdicts on those adjuncts to the Government's failed tax-evasion prosecution were not rational and must be set aside under Rule 29.

1

As for the payroll-tax charges in Counts 4 and 5 of the Superseding Indictment (the "Indictment"), Gilmore's law firm, Gilmore & Monahan, P.A. ("G&M"), handled its payroll-tax obligations in precisely the same way for nearly twenty years. G&M would file its Form 941 payroll-tax return on the date it was due without paying those taxes; the IRS would send the firm a balance-due notice shortly thereafter; and the firm would pay its overdue payroll taxes ten days later—just in time to avoid the filing of a federal tax lien—with interest and penalties. And for that entire period of more than eighteen years, the IRS accepted G&M's 10th-day payment approach as sufficient to obviate the need for even civil remedies, much less criminal prosecution, for failure to pay payroll taxes. For as the IRS well knew, Gilmore wasn't trying to evade his payroll tax obligations. He intended to pay late, as he always did, and to pay the price for doing so: interest and penalties. According to the Indictment, Gilmore's payroll-tax crimes were complete on the dates his firm's quarterly payroll taxes were due and not paid. Thus, the only question presented to the jury on Counts 4 and 5 was whether the Government proved, beyond a reasonable doubt, that George Gilmore did something he knew the law forbade when he failed to pay his firm's payroll taxes on those dates—April 30, 2016, for Count 4 and July 31, 2016, for Count 5—as opposed to at some later date, with interest and penalties. Because no rational jury could have found that the Government negated his good-faith belief that it was not a crime to pay his payroll

taxes after those return-filing dates, with accrued interest and penalties—as the IRS allowed him to do for nearly twenty years—he did not willfully commit those crimes on those dates, as the Indictment charges.  As a result, Gilmore is entitled to a judgment of acquittal on Counts 4 and 5.

As for the false-statement charge in Count 6, Gilmore is entitled to a judgment of acquittal under Rule 29 because he did not conceal his tax liability or existing debts to secure a loan in 2015 from OFB—the bank that repeatedly loaned him and his law firm money for more than twenty-five years—(a) by stating that he was not delinquent on any federal debt and (b) by not disclosing a 2007 loan made to, and being repaid by, his law firm.  Viewed in the light most favorable to the prosecution, although Gilmore clearly owed back taxes when he applied for the OFB mortgage, the evidence did not support a finding that he made a false statement when he answered "No" to a question on the Uniform Residential Loan Application ("URLA") that asked whether he was delinquent or in default on any federal debt. The term "federal debt" is a "fundamentally ambiguous" term that is <u>not</u> commonly understood to refer to tax liabilities.  The Supreme Court held more than one hundred years ago that taxes are not debts.  Consistent with that holding, the examples of federal debt listed on the instructions for answering the delinquency question on the URLA that are published by the government-sponsored entity that issues the form are all loans issued by governmental entities.   Taxes owed to the IRS are

conspicuously absent from that list, and cases interpreting the Federal Debt Collection Act make clear that back taxes are not considered federal debts. Accordingly, Gilmore's negative answer to a question about whether he was delinquent on federal debt cannot fairly be read as a false denial that he owed back taxes.  That alone dooms the jury's guilty verdict on Count 6.

Moreover, the trial evidence clearly showed that Gilmore disclosed the existence of his tax liability to OFB.  He told the bank in writing that one of the loan's purposes was to pay taxes.  He authorized the bank to secure his IRS tax-return transcript, which he had every reason to believe would disclose that his 2013 taxes had not been paid.  The bounced check for $493,526 that he wrote to pay his 2013 taxes was an OFB check that was dishonored by OFB—the bank from which he supposedly concealed his outstanding tax liability for that year—and was clearly reflected as such on his OFB bank-account statement.  And although, when confronted with a memorandum of his 2017 interview with the prosecution team, OFB loan originator Bradley Hoyt ("Hoyt") said that he could not recall stating that Gilmore had disclosed his tax liability when he applied for the loan, Hoyt admitted he had no reason to believe that statement was inaccurate.  Viewing this evidence in the light most favorable to the prosecution, no rational jury could have concluded that Gilmore intentionally concealed the unpaid status of his 2013 taxes from OFB

for the purpose of influencing its lending decision, much less that he concealed a delinquent federal debt by doing so.

Nor was Gilmore properly found guilty of making the second allegedly false statement charged in Count 6—failing to disclose a $400,000 loan from Dale Orlovsky ("Orlovsky").  To prove that loan was a personal obligation and thus should have been disclosed on Gilmore's mortgage loan application, the prosecution introduced a promissory note signed by the Gilmores and several loan repayment checks written on their personal checking account in 2018.  But as the trial evidence showed, the Orlovsky loan was made by a check written to G&M, not to the Gilmores personally, and was repaid by G&M from 2007, when it was made, until 2018—with firm checks the prosecution did not highlight for the jury—including the period when Gilmore's OFB loan application was pending.  Hoyt testified that the liabilities shown on Gilmore's loan application "populate automatically from the credit report" secured by the bank, not by Gilmore, and agreed that a commercial loan would not appear on a borrower's personal loan application because a commercial entity (here, G&M) repays such loans from its funds.  The 2007 Orlovsky loan was undisputedly paid to, and being repaid by, G&M when Gilmore's mortgage loan application was made and for years before and after that application was granted.  Under these circumstances, it was simply not rational to conclude that

Gilmore's failure to disclose that loan was an intentional falsehood designed to convince the bank to grant him a mortgage.

Apart from being factually unsupportable, the jury's guilty verdict on Count 6 cannot stand because of a fundamental legal infirmity. Count 6 alleged that Gilmore made two different false statements on the URLA, one by denying that he was delinquent on a federal debt and the other by failing to disclose existing loans. But as explained above, the alleged "federal debt" false statement was insufficient to sustain a guilty verdict because it was based on Gilmore's answer to a fundamentally ambiguous question. Because there is no way to determine whether the jury's general verdict on Count 6 was predicated on Gilmore's negative answer to the federal-debt question, that verdict cannot stand.

Even were the Court to credit the jury's verdict on Counts 4 through 6 under the deferential Rule 29 standard—and it should not—Gilmore would be entitled to a new trial on those counts under Rule 33 because that verdict was contrary to the objectively weighed evidence, the standard that governs the Court's decision-making on a Rule 33 motion. Moreover, a new trial would also be required under Rule 33 because, as explained below, the Court improperly instructed the jury on willfulness and good faith. Finally, a new trial would be required on Count 6 because the Government relied on Hoyt's false testimony to secure a guilty verdict on that count. Hoyt's testimony that Gilmore did not disclose his tax liability when he

applied for the OFB mortgage directly contradicted Hoyt's own 2017 statement to prosecutors that Gilmore had expressly disclosed that liability at the time of the application.   The prosecutors were well aware of Hoyt's statement that Gilmore disclosed his tax liability when he applied for the loan; they were present when it was made.  Yet they did not rise to correct that misstatement, as the law required.

As for Count 1—on which the jury failed to return a verdict but which the Government plans to re-try—Gilmore is entitled to a judgment of acquittal because the prosecution failed to introduce legally sufficient evidence that he acted with the intent to evade payment of his tax liabilities.  The jury rejected the allegation that animates three of the five affirmative acts of concealment alleged in that count— *viz.*, that Gilmore should have reported his shareholder loans from G&M as income. And there is no evidence to demonstrate that Gilmore undertook the other two alleged affirmative acts of concealment—bouncing a check to the IRS and failing to make good-faith payments in the manner requested by an IRS revenue officer — with the intent to mislead the IRS or conceal assets from it.  The undisputed evidence showed that (a) the bounced check was the product of a mistaken belief, shared by Gilmore and his partner, Thomas Monahan ("Monahan"), that a $660,000 bridge loan would be approved to cover their checks to the IRS, and (b) the IRS knew about the failed payment within the one-week cycle after it was made.  The evidence also showed that Gilmore did not mislead the IRS about the good-faith payments he had

hoped to make in 2015, but instead offered the IRS substantially more money—the $422,000 in his deferred compensation account—which the IRS refused to accept because of a pending criminal investigation.

For the reasons outlined above and amplified below, the Court should enter a judgment of acquittal on Counts 4, 5, 6, and 1 or, in the alternative, order a new trial on Counts 4, 5, and 6.

## LEGAL ARGUMENT

I.   **GILMORE IS ENTITLED TO A JUDGMENT OF ACQUITTAL ON COUNTS 4 AND 5 BECAUSE THE GOVERNMENT FAILED TO NEGATE HIS GOOD FAITH REGARDING THE PAYMENT OF HIS FIRM'S PAYROLL TAXES.**

### A. The Court Must Enter A Judgment Of Acquittal Because No Rational Jury Could Have Found Proof Of Guilt Beyond A Reasonable Doubt.

On a Rule 29 motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). On such a motion, the Court must view the evidence in the light most favorable to the prosecution and "determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (*en banc*). Because "a conviction based on speculation and surmise alone cannot stand" and "the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt, . . . the government must do more than introduce evidence 'at least as consistent with innocence as with

8

guilt.'" *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994); *accord, United States v. McKee*, 506 F.3d 225, 235 (3d Cir. 2007); *United States v. Matsinger*, 191 F.2d 1014, 1016 (3d Cir. 1951).

The Court must enter a judgment of acquittal on Counts 4 and 5 of the Indictment because no rational jury could have found the requisite willfulness for a conviction under 26 U.S.C. § 7202. As the evidence demonstrated, Gilmore believed in good faith that not paying his law firm's payroll taxes on the deadline for filing its quarterly returns was not unlawful or criminal conduct as long as he paid those taxes with interest and penalties before imposition of a federal tax lien.

**B. To Prove Willfulness Under 26 U.S.C. § 7202, The Government Had To Negate Gilmore's Good-Faith Belief That Failing To Pay Payroll Taxes By The Statutory Deadline Was Not Unlawful Or Criminal.**

Counts 4 and 5 of the Indictment charged Gilmore with violating 26 U.S.C. § 7202 by willfully failing to pay his law firm's payroll taxes for two fiscal quarters, one ending on March 31, 2016, and the other on June 30, 2016. To secure a conviction under § 7202, the Government "must prove beyond a reasonable doubt that (1) [Gilmore] was a person required to 'collect, account for, and pay over' the firms' employment taxes, (2) [Gilmore] failed to do so, and (3) that failure was willful." *United States v. Lynch*, 735 F. App'x 780, 788 (3d Cir. 2018) (quoting *Greenberg v. United States*, 46 F.3d 239, 244 (3d Cir. 1994)); *see also United States v. Thayer*, 201 F.3d 214, 220 (3d Cir. 1999); Internal Revenue Manual, § 9.1.3.3.3.1.

With respect to the failure-to-pay element, the Third Circuit has explained that 26 U.S.C. § 7202 "applies to taxes 'imposed by this title,' and [26 U.S.C. § 6151] makes clear that 'when a return of tax is required under this title or regulations, the person required to make such return . . . shall pay such tax at the time and place fixed for filing the return.'" *Lynch*, 735 F. App'x at 789 (citing *United States v. Quinn*, No. 09-cr-20075, 2011 U.S. Dist. LEXIS 10506 (D. Kan. Feb. 3, 2011)).  Thus, if payroll taxes are not paid by the due date for filing the corresponding quarterly return, the payment is late and the responsible person has failed to pay it over.  If the non-payment was willful, the crime is complete.  *Lynch*, 735 F. App'x at 789 (recognizing that "where a payment is late, the responsible person has by definition failed to pay it over and if that failure was willful, that person has violated § 7202"); *see also United States v. Centeno*, 793 F.3d 378, 390 (3d Cir. 2015) (holding that a crime is complete "when each element of the offense has occurred").

As the Indictment alleges, employers are required to file an "Employer's Quarterly Federal Tax Return" on the last day of the month following the end of a quarter—April 30, 2016, and July 31, 2016, for the two quarters at issue in this case. (Indictment, Counts 4 and 5, ¶¶ 2(b).)  Thus, according to the Indictment, the criminal conduct charged in Counts 4 and 5 was complete when Gilmore failed to cause G&M's payroll taxes for those quarters of 2016 to be paid over on their respective due dates.  (Indictment, Counts 4 and 5, ¶ 4.)  Accordingly, the validity

of the jury's guilty verdict on Counts 4 and 5 turns on whether Gilmore's failure to do so was "willful."

Demonstrating "willfulness" for a § 7202 conviction "requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). Critically, as the Supreme Court has explained, "carrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." *Cheek*, 498 U.S. at 202. Thus, if the Government fails to disprove that a defendant "'had a good faith belief that he was not violating the tax code, regardless of whether that belief was objectively reasonable,'" it fails to establish that he acted willfully. *Lynch*, 735 F. App'x at 788–89 ("The burden remains on the Government to disprove the defendant's good faith.").

Here, the Court correctly instructed the jury that (a) "[w]illfully means a voluntary and intentional violation of a known legal duty," (4/12/19 Tr. at 33:16–17); (b) "[t]he defendant's conduct was not willful if he acted . . . due to a good faith misunderstanding of the requirements of the law," (*id.* at 33:18–20); and (c) "a good faith belief or good faith understanding is one that is honestly and genuinely held," (*id.* at 33:21–22). As demonstrated in Section II.B, the Court erred by instructing

11

the jury that, to have a good-faith belief that he was not violating the tax laws, Gilmore had to believe that "the tax laws did not make his conduct **_unlawful_**," (4/12/19 Tr. at 45:10–11 (emphasis added)), because the Court should have instructed the jury that Gilmore only had to believe in good faith that the tax laws did not make his conduct **_criminal_**.  But regardless of whether Gilmore had to believe in good faith that his conduct was not criminal or, more broadly, that it was not unlawful, the record evidence demonstrates that (a) he believed in good faith that he was not violating the tax code by failing to pay G&M's payroll taxes by the return due date (which he virtually never did), provided he paid them later with interest and penalties (which he did nearly every quarter for eighteen years); and (b) the Government failed to present evidence to negate that good-faith belief.

The evidence at trial proved that Gilmore believed in good faith that he was not violating the tax code by not paying G&M's payroll taxes on the filing due date, provided he ultimately paid those taxes with interest and penalties.  Gilmore held that good-faith belief as a result of his nearly two-decade interaction with the IRS, during which he regularly paid the firm's payroll taxes late, with interest and penalties, and the IRS never suggested that doing so was unlawful or criminal.  The ICS history transcripts (the "IRS transcripts") introduced at trial demonstrate that the IRS affirmatively led Gilmore to believe that (a) it was not criminal or unlawful to fail to pay over payroll taxes on the initial return-filing deadline; and (b) he would

only be engaging in unlawful or criminal conduct if the IRS imposed additional requirements to ensure payment compliance and he failed to fulfill those requirements.

### C. The Evidence At Trial Demonstrated That Gilmore Believed In Good Faith That Failing To Pay Over Payroll Taxes By The Return-Filing Deadline Was Not Unlawful Or Criminal.

At trial, the Government introduced the complete IRS transcripts for the Gilmores (GX27 and GX28) and G&M (GX41 and GX42), which memorialize all of the IRS's communications with and observations about those taxpayers. (4/5/19 Tr. at 21:19–23:14.) Those transcripts demonstrate that for twenty years before the two quarters at issue in the Indictment, (a) Gilmore consistently failed to pay the firm's payroll taxes by the return filing date; and (b) the IRS worked cooperatively with him to get those payroll taxes paid without ever suggesting that paying them late with interest and penalties (as opposed to not paying them at all) was unlawful, much less criminal. When the IRS first began actively monitoring G&M in 1997, the assigned revenue officer noted that the firm had, in the preceding years, repeatedly failed to pay its payroll taxes by the return due date. (GX42 at 1 (11/6/97 entry).) On November 13, 1997, the revenue officer imposed various deadlines for payment of the past-due tax amounts and advised Gilmore that the IRS might pursue enforcement actions, levies, asset seizure, and the assessment of a Trust Fund

13

Recovery Penalty ("TFRP")[1] if the firm did not comply with those deadlines.  (GX42 at 2–3 (11/13/97 entry).)

The IRS transcripts further reveal that for the next twelve years, Gilmore routinely failed to pay G&M's payroll taxes by the return-filing date, and that the assigned revenue officer consistently worked with him to secure those late payments with interest and penalties.  Those interactions led Gilmore to believe in good faith that failing to pay over payroll taxes on the filing date is not unlawful or criminal, as long as one pays those taxes with interest and penalties and otherwise complies with any additional filing and payment requirements imposed by the revenue officer.

During an April 13, 1999 telephone call regarding G&M's outstanding payroll tax payments, Gilmore explained to a revenue officer that he was mailing checks and hoped to borrow $100,000 from a bank for other payments; in response, the revenue officer imposed a new payment deadline and advised Gilmore that the "enforcement actions" the IRS might pursue if he did not meet that deadline were the issuance of a Notice of Intent to Levy (referenced in the transcript as an L1058) and/or filing of a Notice of Federal Tax Lien (or NFTL).  (GX42 at 23–24.) Likewise, during an April 28, 2003 field visit to address multiple late payroll tax

---

[1] Pursuant to 26 U.S.C. § 6672, a TFRP is a monetary penalty assessed directly against the person responsible for an entity's payroll taxes, under certain circumstances, for nonpayment of those taxes.  *See* https://www.irs.gov/businesses/small-businesses-self-employed/employment-taxes-and-the-trust-fund-recovery-penalty-tfrp.

payments, the revenue officer (a) explained the IRS collection process, including liens, levies, and the assessment of a TFRP against the firm's officers; (b) set a new deadline for full payment of all outstanding amounts; and (c) advised that the IRS would file an NFTL and a Notice of Intent to Levy if the firm missed that deadline. (GX42 at 76–77.)   Similar communications occurred periodically over the next several years.  (*See, e.g.*, GX42 at 109–10 (during a February 20, 2005 telephone call, the revenue officer advised G&M's accountant that the IRS would begin levying property if new deadlines were not met).)  Through these and many similar communications recorded on the G&M IRS transcripts (GX41 and 42), the IRS led Gilmore to believe that his failure to pay G&M's payroll taxes on the return filing deadline was lawful and non-criminal as long as he paid those taxes with interest and penalties by the deadlines imposed by the IRS.

After she was assigned to the G&M case on June 29, 2009 (GX42 at 181), IRS Revenue Officer Miriam Popowitz ("Popowitz") cooperated with G&M and Gilmore as her predecessors had done.  On her first field visit to G&M on July 8, 2009, Popowitz advised Gilmore that if he did not pay G&M's late payroll taxes by the date he promised, the IRS might file a lien or assess a TFRP against him personally.  (GX42 at 183 ("Discussed potential of lien filing & TFRP for prior periods if not paid when promised to cust ser rep, officer had called into SC.").)  The IRS transcript entry for that visit gives no indication that Popowitz advised Gilmore

15

that it was unlawful or criminal to not pay over payroll taxes on the return-filing deadline.

The first time Popowitz ever suggested that any conduct related to G&M's payroll taxes could potentially be unlawful or criminal was during a field visit two years later, on May 23, 2011.  (GX41 at 13.)  During that visit, Popowitz explained that if G&M did not become deposit compliant, the IRS would compel it to meet certain additional requirements such as opening a special bank account for payroll tax deposits and making monthly (rather than quarterly) reporting.  Popowitz warned of the potential for criminal prosecution if G&M failed to comply with those additional reporting and payment requirements should they be imposed.  (*Id.* ("Explained if corp does not become deposit compliant, RO will begin procedures requiring the set up of a special bank acct for federal tax deposits & changing corps filing requirements to monthly.  Explained the related fines & criminal prosecution for non compliance.").)

The L903 letter Popowitz delivered and read to Gilmore at that meeting (GX60A) advised him that criminal prosecution was possible if the IRS imposed, and he failed to comply with, such additional requirements. (*See* GX41 at 13 ("Hand delivered L903 to Mr. Gilmore & secured his signature on RO's copy.").)  That letter began by noting that G&M had not timely deposited federal employment taxes "as required by deposit rules set forth in Employment Tax Regulations section 31.6302,"

16

and warned that if the firm did not comply with those rules in the future, the IRS

would "consider stricter enforcement procedures," including filing a federal tax lien,

seizing or levying G&M's property, and requiring the firm to file its employment

tax returns monthly.  (GX60A.)  Then, in a stand-alone paragraph, the letter warned

that if G&M did not begin meeting its payroll tax deposit obligations, the IRS might

impose "special bank deposit requirements," which it explained as follows:

> Under the provisions of the law for special bank deposit requirements,
> we may also require you to deposit your withheld taxes in a special
> bank account within 2 banking days after you pay employees their
> wages.  These deposits would remain in the bank account until paid
> over to the Internal Revenue Service.  ***Under the law we may charge
> you criminal penalties, such as a fine up to $100,000 and up to one
> year in jail upon conviction, if you don't comply with the special bank
> deposit requirements***.

(GX60A (emphasis added).)  Thus, far from putting Gilmore on notice that failing

to pay payroll taxes by the return filing deadline is a crime or is otherwise unlawful,

as the Government argued at closing (4/12/19 Tr. at 80:11–82:4), the IRS's 2011

L903 letter caused him to believe that he would only be engaging in criminal or

unlawful behavior if G&M failed to comply with the special bank deposit

requirements (if and when the IRS imposed them).

Approximately three months later, on August 11, 2011, Popowitz advised

Gilmore that because G&M had continued to pay its payroll taxes late, the IRS was

imposing those special bank deposit and monthly reporting requirements.  (GX41 at

23.)  Those requirements remained in place until May 17, 2013, when Popowitz

17

closed the case because G&M had "come into deposit compliance for a 1 year period." (GX41 at 46.) She reopened the case on July 1, 2013, after G&M again failed to make its payroll tax deposits by the filing date. (GX41 at 48 ("They were previously on an L903 and stayed compliant for 1 year. As soon as the 1 year monitoring requirement expired with quarter ending 01–201212 once again they began late deposits.").)

On July 8, 2013, shortly after reopening the G&M case, Popowitz made another field visit to the firm's offices. During that meeting, which lasted more than an hour, Popowitz reviewed with Gilmore, *inter alia*, payroll deposit requirements and payment "notice routine," and explained that if the firm failed to make its payments by the deadline set forth in the notices she provided, the IRS would file a Notice of Federal Tax Lien against it. (GX41 at 50.) Though Popowitz again mentioned potential criminal liability, she did <u>not</u> state or suggest that Gilmore would be committing a crime or otherwise acting unlawfully if he did not pay over the firm's payroll taxes by the return-filing deadline, as charged in Counts 4 and 5. To the contrary, she warned him that the IRS would file an NFTL if payment was not received by the 11th day after she gave the firm a balance-due notice, and thus gave him to believe that criminal prosecution could result only if the firm did not make its payment before that date:

> This meeting lasted over 1 hour reviewing over the deposit requirements, responsibility, IRS processes, notice routine, warned if

> any liabilities, bal dues even for P&I only accrue, NFTL would be filed
> on day # 11. Discussed all quarterlies through 06/30/2014 need to be
> sent to RO w/copies proof of EFTPS. Warned Mr Gilmore that criminal
> prosecution could be end result if full compliance is not adhered to.

(*Id.*)  That explains why, as G&M bookkeeper Sean Waldron ("Waldron") testified at trial, the firm was always careful to pay its payroll taxes with interest and penalties on the last day before a lien would be placed.  (4/8/19 PM Tr. at 95:13–15.)  As Waldron explained, it was important for the firm to avoid the placement of a lien "[b]ecause we didn't want to be in the newspaper.  We didn't want -- we didn't want it to be late.  We didn't want it to go unpaid."  (*Id.* at 95:21–25.)

The L903 letter Popowitz gave Gilmore at the July 8, 2013 field visit reinforced his view that it was only unlawful or criminal to fail to meet additional deadlines and requirements imposed by the IRS to ensure payment of payroll taxes that were already late.  Specifically, the first paragraph of that 2013 L903 letter—in words identical to those in the 2011 L903 letter—noted that G&M had not "deposited federal employment taxes as required by deposit rules set forth in Treasury Regulation Section 31.6302," and warned that "[i]f you do not comply with these rules in the future, we must consider stricter enforcement procedures."  (GX63A.)  And like the earlier L903, the 2013 letter listed the potential stricter enforcement procedures: federal tax liens, levy and seizure of assets, a civil enforcement lawsuit, and a trust fund recovery penalty against Gilmore personally.  (*Id.*)  Finally, the 2013 IRS letter warned that civil litigation and/or criminal

19

prosecution were possible if Gilmore did not comply with the IRS's ongoing efforts to collect the late payroll taxes:

> If there is continued non-compliance, we may consider pursuing a suit for civil injunction under Internal Revenue Code Section 7402(a) or criminal prosecution under Title United Stated Code (USC) 18 and/or Title 26 USC for willful failure to collect or pay the tax.
>
> A suit for civil injunction is filed in federal district court against a business and/or its principals or owners. A civil injunction may, among other things, require compliance with the federal employment tax laws, forbid the further accumulation of unpaid federal employment taxes, and forbid the assignment of any property or the disbursements of any amounts until the amounts required to be withheld from wages are, in fact, paid to the IRS.
>
> Criminal charges could be pursued based on the failure to adhere to the reporting and payment requirements mandated by the Internal Revenue Code. Convictions under Titles 18 and 26 may include substantial fines and terms of imprisonment.

(*Id.*)

Contrary to the Government's argument at closing (4/12/19 Tr. at 80:11–82:4), this letter did <u>not</u> put Gilmore on notice that it was unlawful or criminal to not pay G&M's payroll taxes on the return filing date. It had precisely the opposite effect: to reinforce Gilmore's pre-existing good-faith belief—based on his then seventeen-year relationship with the IRS and the 2011 L903 letter—that it was not unlawful or criminal to not pay payroll taxes on the return filing deadline, provided those taxes were ultimately paid with interest and penalties. The IRS's point to Gilmore was always that payroll taxes had to be paid by the deadline for filing a federal tax lien, not that he was committing a crime by not paying them by the return-

20

filing deadline.  As a result, as far as Gilmore knew, paying his firm's payroll taxes with interest and penalties by the 10th day after receiving a balance-due notice from the IRS was "adher[ing] to the reporting and payment requirements mandated by the Internal Revenue Code."

### D. The IRS Itself Did Not Believe That Gilmore's Late Payments Were Unlawful Or Criminal.

At trial, Popowitz testified that G&M consistently failed to pay its payroll taxes on the return filing date and that when it did, she would give Gilmore a balance-due notice indicating the amount due and warn him that if G&M did not pay the full amount by the date set forth in the notice, the IRS would file a Notice of Federal Tax Lien.  (4/5/19 Tr. at 180:24–181:18.)  The IRS's Internal Revenue Manual ("IRM"), which "is the primary, official compilation of instructions to [IRS] staff that relate to the administration and operation of the IRS," *see* IRM, § 1.11.2.2, expressly required Popowitz to provide Gilmore with such notice before filing a federal tax lien for any unpaid late payroll taxes:

> The Service is required to make reasonable efforts to contact the taxpayer before filing an NFTL. The efforts to contact the taxpayer are to advise that an NFTL may be filed if full payment is not made when requested. Issuance of the statutory assessment notice and the balance due notices sent during the collection process constitute reasonable efforts as each of these notices provide 10 or more days for the taxpayer to pay the liability in order to avoid additional penalty and interest charges.

IRM, § 5.12.2.2. Thus, the IRS's own official instructions require its revenue officers to make reasonable efforts to contact a taxpayer before filing a federal tax lien, and note specifically that balance-due notices of the type Popowitz and other revenue officers provided Gilmore on innumerable occasions over the course of two decades constitute such reasonable notice. On March 6, 2014, approximately five months after learning that the IRS was conducting a criminal investigation of Gilmore, Popowitz advised IRS Special Agent Joseph Novi ("Novi"), who was conducting that criminal investigation, that IRM § 5.12.2.2 required her to provide Gilmore with balance-due notices before filing a federal tax lien.[2]  (GX41 at 59 (3/6/14 entry).)

Popowitz also testified that G&M would consistently pay its payroll taxes by the date set forth in the balance-due notice, thereby avoiding the filing of a tax lien:

> Q:  Okay. And when that happened, how long after that face-to-face meeting – just routinely, or if it happened differently on different occasions, you can tell me that.  But was it – did it follow a pattern of

---

[2] Popowitz discovered that Novi was conducting a criminal investigation of Gilmore on November 5, 2013, when researching why Gilmore's 2012 personal income tax payment, which she knew he had made, had not yet posted to the IRS's system. (GX27 at 5 (11/5/13 entry).)  Ultimately, she learned that that payment, and many others, had not posted because IRS Criminal Investigation had placed a criminal "-z freeze" on Gilmore's account.  (GX27 at 6 (12/4/13).)  Thereafter, Popowitz and Novi communicated frequently regarding Gilmore, as Popowitz attempted to help Novi develop his criminal case. (*See, e.g.,* GX27 at 6, 8, 11, 14, 15; GX41 at 58, 59, 64, 70, 74, 79.)  As detailed further below, beginning in early April 2015, Novi began instructing Popowitz to cease routine collection action, including the filing of a Notice of Intent to Levy.  (GX27 at 16–17 (4/2/15 and 4/6/15 entries).

after there was non-compliance, you made your visit to 10 Allen Street in Toms River, met with Mr. Gilmore, right?

A: Uh-huh, yes.

Q: And Mr. Gilmore – and you tell him, you're late, you've got to pay. What would happen?  How long after those meetings would the payment be made with interest and penalties?

A: After I dropped off the final notice and demand because he wasn't always there at the times I went there.  After I dropped it off, for the most part, the full payment was received before day number 11 when the government can file a notice of federal tax lien.

(4/5/19 Tr. at 181:19–182:8.)   G&M bookkeeper Waldron confirmed on direct examination that the firm's practice for years was to not pay payroll taxes on the return due date and to instead pay them with interest and penalties by the date set forth in the balance-due notice provided by Popowitz (or her predecessors) in order to avoid a federal tax lien.  (4/9/19 PM Tr. at 94:7–95:15.)  Waldron further testified that, because he had observed it happen year after year, he believed it was acceptable to pay payroll taxes late, as long as you paid the appropriate interest and penalties:

Q: Did you believe that it was acceptable to the IRS to pay these payroll taxes late provided you paid interest and penalties?

A: Yes. I watched it happen for years.

Q: [What] do [you] mean when you say I watched it happen? Explain that.

A: They were always paid late. They were paid late on the last day the entire time I was there and am still there.

(*Id.* at 96:1–8.)

The IRS transcripts demonstrate that, like Waldron and Gilmore, Popowitz and her IRS superiors believed it was neither unlawful nor criminal for Gilmore not

23

to pay his firm's payroll taxes by the return filing date as long as he paid them, with interest and penalties, by the date set forth in the IRS's balance-due notice. When she reopened the G&M case in July 2013, Popowitz consulted with her Group Manager to ascertain whether, because G&M was paying its payroll taxes late but before the balance-due notice deadline, she could even pursue *civil* enforcement:

> RO has also consulted w/GM regarding course of action. These corp officers are knowledgeable in the tax process. They are aware of the TFRP assessments & immediately pay prior to the service being able to assert. They were previously on a L903 and stayed compliant for 1 year. As soon as the 1 year monitoring requirement expired with quarter ending 01–201212 once again they began late deposits. Now it seems that they are depositing all payroll taxes and the only balance remaining is the penalty. They filed 01–201303 timely so a Failure to File timely could not be assessed. *They paid the failure to deposit timely penalty while in the notice routine so it didn't go to the RO whom they are well aware would file a NFTL.*
>
> Referrals for Civil Enforcement clearly note exhausting all administrative actions such as levies, liens, trust fund assertion or collecting from taxpayers with minimal equity.
>
> At this time if the corp continues to operate like it did in 01–201203 and only accrues a FTD pen & pays within notice routine .......
>
> *Would RO still have recourse for civil enforcement??*

(GX41 at 48–49 (7/2/13 entry) (emphasis added).) The answer: Gilmore's long-standing practice of late payment with penalties and interest did not warrant even civil enforcement:

> Consulted w/GM Advisory regarding civil enforcement, civil injunction. GM Advisory informed RO this case would not get accepted by DOJ because all administrative enforcement levies, liens TFRP needs to be exhausted. If corp does pay tax & then pays the pen & inter, they are paying and not pyramiding.

24

(GX41 at 51 (7/16/13 entry).)

In a transcript entry documenting a March 6, 2014 communication with Novi regarding his criminal investigation, Popowitz reiterated the IRS's conclusion that, because Gilmore was paying G&M's payroll taxes late but before the deadlines set forth in the notices she was sending him, he was not even subject to administrative collection actions:

> This corp officer George Gilmore was personally served a L903, & was advised in detail about staying FTD compliant, filing compliant & advised if any bal dues accrue a NFTL will be filed.  This corp is fully knowledgeable in the deposit requirements, filing requirements and notice routine.  ***What they have now begun to do is fall behind on the FTD****s, but eventually deposit the full amount prior to the filing deadline of the 941 return for the respective quarter, which they do file timely. **Then when they receive the first notice for the FTD penalty & any interest assessed they pay that penalty through EFTPS within the 10 day limitation RO has for filing the NFTL.***  RO has previously consulted w/Advisory GM if she has any recourse for civil injunctions and was advised no, because all enforcement tools have to be exhausted prior to any referrals. ***RO does not even get to the point of TFRP because the corp files the FTDs that are required … late.***

(GX41 at 59 (3/6/14 entry) (emphasis added).)  Similarly, when memorializing a February 12, 2015 discussion with Novi, Popowitz outlined G&M's numerous failures in 2014 to make timely payroll tax deposits and noted that the firm was paying its outstanding payroll taxes by the due date she provided, thereby preventing the IRS from pursuing enforcement actions.  (GX41 at 74 (2/12/15 entry) ("Corp has been working the system, paying the tax prior to the due date to avoid govt pursuit of civil injunction against responsible officer.").)  Finally, in a transcript entry

25

summarizing a December 17, 2015 conversation with Novi, Popowitz expressed her understanding that the firm was making its payroll tax payments on the last possible date set forth in the balance-due notices (which she inaccurately described as "the date the return was due," a deadline she testified G&M virtually never  honored) because it believed that by doing so, it would avoid being guilty of failure to pay those taxes as required by law:

> Corp was not FTD compliant for nearly 18 years. As a result of the issuance of L903 RO did get corp into compliance for the 1 year period. Since then case has reactivated for FTD alerts after the one year monitoring period ended. What the corp started doing was making their FTDs at the end of the quarter on the date the return was due so ***they would not be guilty of failure to pay employment taxes***.

 (GX41 at 87 (12/17/15 entry) (emphasis added).)

The trial evidence clearly established Gilmore's good-faith belief that he was not violating the tax laws by failing to pay G&M's payroll taxes by the filing deadline, provided he paid them with interest and penalties by the date set forth in the balance-due notices issued by Popowitz and her predecessors.  The agency charged with responsibility for enforcing the tax code permitted him to proceed in that fashion without even pursuing civil enforcement remedies for eighteen years. Thus, viewing the evidence in the light most favorable to the Government and granting it the benefit of all reasonable inferences, no rational jury could have found beyond a reasonable doubt that the Government negated Gilmore's good-faith belief that failing to pay G&M's payroll taxes for the first and second quarters of 2016 by

26

the return filing deadline was not unlawful or criminal conduct.  As a result, Gilmore

is entitled to a judgment of acquittal under Rule 29 on Counts 4 and 5 of the

Indictment.

## II.  ALTERNATIVELY, THE COURT SHOULD GRANT GILMORE A NEW TRIAL ON COUNTS 4 AND 5 PURSUANT TO RULE 33.

### A. Gilmore Is Entitled To A New Trial On Counts 4 And 5 Because The Jury's Verdict On Those Counts Is Contrary To The Weight Of The Evidence.

On a Rule 33 motion, "the court may vacate any judgment and grant a new

trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  As the Third

Circuit has held:

> A district court can grant a new trial on the ground that the jury's verdict
> is contrary to the weight of the evidence only if it "believes that 'there
> is a serious danger that a miscarriage of justice has occurred—that is,
> that an innocent person has been convicted.'"  *United States v. Santos*,
> 20 F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902
> F.2d 604, 606 (7th Cir. 1990)).  Unlike an insufficiency of the evidence
> claim, ***when a district court evaluates a Rule 33 motion it does not
> view the evidence favorably to the Government, but instead exercises
> its own judgment in assessing the Government's case.*** *See United
> States v. Lacey*, 219 F.3d 779, 783–84 (8th Cir. 2000); *United States v.
> Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).

*United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (emphasis supplied). The

evidence, even viewed in the light most favorable to the Government, established

that Gilmore had a good-faith belief that not paying his law firm's payroll taxes on

the return filing date was not criminal or unlawful, provided he paid those taxes with

interest and penalties.  If the Court does not enter a judgment of acquittal under that

deferential Rule 29 standard—which it should—it can only avoid a serious injustice by ordering a new trial on Counts 4 and 5 as contrary to the weight of the evidence.

### B. Gilmore Is Entitled To A New Trial On Counts 4 And 5 Because The Court Erroneously Refused To Instruct The Jury That To Establish Willfulness, The Government Had To Prove That Gilmore Did Not Have A Good-Faith Belief That His Conduct Was Not Criminal Under The Federal Tax Laws.

Rule 33 requires a new trial when any alleged error or combination of errors substantially influenced the outcome of the trial. *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994); *see also United States v. Tiangco*, 225 F. Supp. 3d 274, 279 (D.N.J. 2016) (observing that "district courts have held that a new trial will be ordered when it is 'reasonably possible that such error, or combination of errors, substantially influenced the jury's decision'" and noting the "discretionary" and "flexible" nature of this determination). Such errors include erroneous jury instructions. *See* 26 Moore's Federal Practice—Criminal Procedure § 633.02 (2019) (citing *United States v. Dobson*, 419 F.3d 231, 239 (3d Cir. 2005)); *United States v. Onque*, 169 F. Supp. 3d 555, 565, 570 (D.N.J. 2015) (analyzing propriety of jury charge when resolving a motion for a new trial). *See generally United States v. Korey*, 472 F.3d 89, 93, 96 (3d Cir. 2007) (explaining that a jury charge that relieves the government from having to prove "every element of the charged offense beyond a reasonable doubt" violates due process and requires reversal unless the government can demonstrate that the error is "'harmless beyond a reasonable doubt'").

28

The instructions central to Gilmore's Rule 29 and 33 motions on Counts 4 and 5—and indeed, to Gilmore's entire trial—were the meaning of the term "willful" and the interdependent definition of "good faith."   As the Third Circuit has explained, "'[w]illfulness' is the voluntary, intentional violation of a known legal duty." *United States v. McGill*, 964 F.2d 222, 237 (3d Cir. 1992).  This "willfulness" element "requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek*, 498 U.S. at 201; *accord United States v. Miller*, 595 F. App'x 166, 168 (3d Cir. 2014); *United States v. Stadtmauer*, 620 F.3d 238, 247 (3d Cir. 2010); *McKee*, 506 F.3d at 245.  "[C]arrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." *Cheek*, 498 U.S. at 202.  Thus, if the Government fails to disprove that a defendant "'had a good faith belief that he was not violating the tax code, regardless of whether that belief was objectively reasonable,'" it has failed to establish that he acted willfully.  *Lynch*, 735 F. App'x at 788–89 ("The burden remains on the Government to disprove the defendant's good faith."); *see also United States v. Schlosser*, 749 F. App'x 145, 146 (3d Cir. 2019) ("[I]f a jury believes that a defendant had a 'good-faith misunderstanding' about the law he

29

disobeyed—even a misunderstanding that was not 'objectively reasonable'—then the Government has failed to carry its burden as to willfulness.").

Here, the Court properly instructed the jury that, to prove that Gilmore acted willfully, the Government had to disprove that he acted in good faith.  (4/12/19 Tr. at 44:25–46:9.)  But it restricted the definition of good faith to Gilmore's honestly held belief that "the tax laws did not make his conduct ***unlawful***," (*id.* at 45:10–11 (emphasis added)), as opposed to ***criminal***, as the Court originally intended and as Gilmore had proposed and argued.  (Gilmore Proposed Jury Instructions [ECF No. 33] No. 24; 4/12/19 Tr. at 207:19–209:1.)  That restriction was a significant legal error requiring a new trial.

The comment to section 6.26.7201–4 of the Third Circuit's Model Jury Instructions explains that a defendant does not act "willfully" when he "honestly believe[s] the tax laws did not make his or her conduct ***criminal***, even if that belief was unreasonable."  (Emphasis added.)  The "willfulness" standard in tax cases thus requires the Government to prove the defendant was aware of the duty defined by "the specific provision of the tax code that he was charged with violating."  *Bryan v. United States*, 524 U.S. 184, 195 (1998) (citing *Cheek*, 498 U.S. at 201).  *See also United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009) ("[I]n some rare instances involving highly technical statutes that present the danger of ensnaring individuals engaged in apparently innocent conduct, such as the federal criminal tax and

antistructuring provisions, 'willfully' has been read to require proof that the defendant actually knew of the specific law prohibiting the conduct.") (citing *Bryan*, 524 U.S. at 194–95). *See also* Comment, Third Circuit Model Jury Instructions § 6.26.7201–4 ("In *Cheek*, the Court reasoned that, because of the complexity of federal tax laws, citizens may honestly not realize their conduct is criminal and thus may innocently believe they are not violating the law.").   This unique danger distinguishes statutes that criminalize tax violations from other criminal statutes, such as those that proscribe the distribution of firearms.   In these latter types of prosecutions, the Government can prove willfulness simply by showing that the defendant "knew that his conduct was unlawful."   *Bryan*, 524 U.S. at 195; *see also Starnes*, 583 F.3d at 210 (explaining that cases have established "at least three levels of interpretation" of the term "willfulness," and that the intermediate level requires the Government to prove only that the defendant had "'knowledge that his conduct was, in some general sense, 'unlawful.'"); *United States v. Kay*, 513 F.3d 432, 448 (5th Cir. 2007) (explaining that "[t]he strictest level of interpretation of criminal willfulness requires that the defendant knew the terms of the statute and that he was violating the statute," and contrasting it with the "'intermediate' level of criminal willfulness," which "requires the defendant to have known that his actions were in some way unlawful.").

31

Here, the Court instructed the jury that Gilmore could be convicted of violating the tax laws if he believed his "conduct [was] unlawful." (4/12/19 Tr. at 45:10–11.) But that standard of willfulness does not apply in criminal tax cases. *Bryan*, 524 U.S. at 195–96; *Starnes*, 583 F.3d at 210; *Kay*, 513 F.3d at 448. Indeed, the Model Instructions preserve the critical distinction among the degrees of willfulness by using the word "criminal" rather than "unlawful" in the context of tax violations. That is because this word, as the drafters explain, tethers the willfulness element to knowledge of the nature of the statute—that is, the ***criminal*** provision— being violated:

> In *Cheek v. United States*, 498 U.S. 192 (1991), the Court reaffirmed its traditional interpretation that "willfully" in federal tax statutes means "voluntary, intentional violation of a known legal duty," and therefore required proof that defendant had actual knowledge that the law imposed a legal duty on him and that he voluntarily and intentionally violated that duty. Accordingly, the Court said that the defendant could not be found guilty if the jury found that he honestly believed the tax laws ***did not make his conduct criminal***, even if that belief was unreasonable. The Court reasoned that, because of the complexity of federal tax laws, citizens may honestly ***not realize their conduct is criminal*** and thus may innocently believe they are not violating the law. ***This specific definition of willfully is included in the specific instructions for tax evasion***, in Chapter 6 of these Model Instructions.

Comment, Third Circuit Model Jury Instructions § 5.05 (emphasis added). *See also United States v. George*, 386 F.3d 383, 392 (2d Cir. 2004) ("As reflected in *Cheek* and *Ratzlaf [v. United States*, 501 U.S. 135 (1994)], the Court has typically read 'willfully' to require a purpose to violate a particular law only in those isolated

32

circumstances where the obscurity or complexity of that particular criminal statute may prevent individuals from realizing that seemingly innocent acts *are, in fact, criminal*.") (emphasis added).

The distinction between a knowing violation of a criminal law and a general duty imposed under other statutes or regulations is particularly pronounced with respect to 26 U.S.C. § 7202.  That is because § 7202's criminal penalty is what distinguishes it from 26 U.S.C. § 6672, which imposes only civil penalties—specifically, the Trust Fund Recovery Penalty—for conduct described in materially identical terms.[3] By eliminating any distinction between knowledge of a duty arising from a criminal statute and one arising from an administrative regulatory scheme, the Court's good-faith instruction not only contravened *Bryan*, but also impermissibly allowed criminal liability to be imposed beyond the text of § 7202—which, unlike other criminal laws, does not extend criminal liability to violations of other statutory provisions or regulations.  *Compare* 15 U.S.C. § 78ff (imposing

---

[3] *Compare* 26 U.S.C. § 7202 ("Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, *be guilty of a felony* . . . ." (emphasis added)) *with* 26 U.S.C. § 6672(a) ("Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax. . .  shall, in addition to other penalties provided by law, *be liable to a penalty equal to the total amount of the tax* . . . not collected, or not accounted for and paid over. . . ." (emphasis added)).  *See also McLain v. McLain*, No. 16-cv-36, 2018 U.S. Dist. LEXIS 36696, at *11 (D. Mont. Jan. 17, 2018) ("§ 6672 tracks the wording of § 7202.").

criminal penalties on one who willfully violates the enumerated provisions of the Securities Exchange Act or, *inter alia*, "any rule or regulation thereunder the violation of which is made unlawful"); *see generally United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (explaining that a criminal statute must be interpreted "strictly to determine the scope of the forbidden conduct," with ambiguities "resolved in favor of the defendant." (internal quotation marks omitted)).

Nor can the Government show that this instructional error was harmless. *See United States v. Mitchell*, 145 F.3d 572, 578 (3d Cir. 1998) ("It is the government's burden of persuasion on whether an error is harmless"). The testimony and evidence at trial demonstrated that while the IRS never told Gilmore that it was unlawful or criminal to not pay G&M's payroll taxes by the return due date, it did advise him that continued non-payment could result in various civil and administrative remedies or penalties, with criminal penalties resulting only as a last resort—in other words, that criminal liability could only result if civil remedies had first been exhausted. The Government nonetheless expressly invited the jury to find Gilmore guilty on Counts 4 and 5 if it found that he believed he had to pay payroll taxes in conformity with ***any*** of the duties imposed upon him, civil or criminal. (*See* 4/12/19 Tr. at 80:20–81:25 (referring to the "duty" to pay payroll taxes as described in various IRS interactions "since the 90s" and through discussions and correspondence with Popowitz, including letters sent in 2011 (GX60A) and 2013 (GX63A)); *id.* at

34

179:10–15 (referring to the general "duty to pay [G&M's] payroll taxes," as explained to Gilmore by Popowitz); GX60A (referring to the duty to deposit federal employment taxes pursuant to IRS regulations and the ability of the IRS to take various civil remedial measures); GX63A (referring to the duty to deposit federal employment taxes pursuant to IRS regulations and the ability of the IRS to take various civil remedial measures, while noting the potential for criminal prosecution if there is "continued non-compliance").)

There is thus at least a reasonable doubt—if not a near certainty—that the jury would not have found Gilmore guilty had it been properly instructed on the "willfulness" element and the interdependent concept of "good faith."  The jury's verdict on Counts 4 and 5 must accordingly be set aside and a new trial ordered.

## III. GILMORE IS ENTITLED TO A JUDGMENT OF ACQUITTAL ON COUNT 6 BECAUSE NO RATIONAL JURY COULD HAVE FOUND BEYOND A REASONABLE DOUBT THAT HE KNOWINGLY MADE A FALSE STATEMENT FOR THE PURPOSE OF INFLUENCING OFB'S ACTION ON HIS LOAN APPLICATION.

To convict Gilmore of violating 18 U.S.C. § 1014 by knowingly making a false statement to OFB, the Government was required to prove that he (1) made a false statement to the bank; (2) knew the statement was false when he made it; and (3) did so for the purpose of influencing its decision to approve the refinancing of his home mortgage loan.  *Williams v. United States*, 458 U.S. 279, 284 (1982); *United States v. El-Ghazali*, 142 F. App'x 44, 45 (3d Cir. 2005).  For purposes of

§ 1014, a false statement is one that has "the capacity to influence" the bank to which it is made.  *United States v. Ryan*, 828 F.2d 1010, 1018 (3d Cir. 1987) (quoting *United States v. Goberman*, 458 F.2d 226, 229 (3d Cir. 1972)), abrogated on other grounds by *United States v. Wells*, 519 U.S. 482, 486 n.3 (1997).  Such a statement is criminal only if the speaker knows the falsity of what he says and intends it to influence the institution.  *Wells*, 519 U.S. at 499.

Here, the jury found Gilmore guilty of making false statements in the URLA he signed on January 22, 2015, at the closing of a residential mortgage loan refinancing.  The alleged false statements were (i) answering "No" when asked, "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond or loan guarantee"; and (ii) failing to disclose in the Liabilities section of the URLA a purportedly personal loan and his unpaid personal income taxes.  (GX713.)  The evidence does not support a finding beyond a reasonable doubt either that Gilmore knew these statements were false when made or that he made them for the purpose of influencing OFB's decision on his loan application.

### A. The Trial Evidence Does Not Support A Finding Beyond A Reasonable Doubt That Gilmore's Statement Regarding Outstanding Federal Debts Was Knowingly False Or Made For The Purpose Of Influencing OFB's Lending Decision.

The evidence showed that Gilmore spoke with OFB loan originator Hoyt to begin the mortgage loan application process by telephone in November 2014.

(4/8/19 PM Tr. at 8:14–19; 13:14–17.)  During that call, Hoyt filled out a URLA. (GX712.)  That form, published by Freddie Mac and Fannie Mae, is "designed to be completed by the applicant(s) with the Lender's assistance."  (*Id.*; GX713.)  Hoyt testified that he filled out the URLA based on information Gilmore provided. (4/8/19 PM Tr. at 9:11–12; 15:24–16:11.)  Both Gilmore and Hoyt signed the initial URLA electronically on November 21, 2014.  (GX712; 4/8/19 PM Tr. at 17:11–22.)

As part of the application process, OFB required Gilmore to submit additional forms and information, including a form entitled "Purpose of Refinance Letter" that stated the purpose of the loan.  (GX714.)  Gilmore signed the form and submitted it to OFB on November 24, 2014, stating that his purpose in refinancing the property was "to pay construction costs, reimburse for construction costs, ***pay taxes, [and] pay off existing debt***."  (GX714 (emphasis supplied); 4/8/19 PM Tr. at 14:12–13.) Hoyt testified that after November 21, 2014, OFB underwriters reviewed and updated the URLA.  (4/8/19 PM Tr. at 18:17–19:16.)  OFB presented the updated URLA to Gilmore to sign at the loan closing on January 22, 2015.  (*Id.* at 21:17–19.)

Section VIII(F) of the URLA asked: "Are you presently delinquent or in default of any Federal debt, or any other loan, mortgage, financial obligation, bond, or loan guarantee?"  (4/8/19 PM Tr. at 20:9–18.)  Hoyt testified that he checked the "No" box based on information Gilmore provided.  (*Id.*)  The underwriter, Lisa Rogers, who admitted that she had no direct contact with Gilmore during the

37

underwriting process (*id.* at 79:10–12), testified to her understanding that any unpaid taxes would call for an affirmative answer to that question, (*id.* at 77:7–9). She also testified that she relied on Hoyt to put the appropriate data into the URLA. (*Id.* at 80:4–7.)

In addition to the completed application, Hoyt testified that OFB requires borrowers to submit their personal tax returns for two years. (*Id.* at 9:24.) Gilmore complied with that requirement, submitting his Form 1040s for 2012 and 2013. (DX359-G; DX359-A; 4/8/19 Tr. at 48:10–14.) Gilmore also complied with OFB's request that he sign an authorization for the bank to secure the transcripts of his 2012 and 2013 federal tax returns directly from the IRS. (DX361.) OFB used the Form 4506-T Gilmore signed to request and receive those transcripts on December 8, 2014. (4/8/19 Tr. at 48:15–18; DX361.) The Form 1040 Gilmore submitted to OFB for the tax period ending December 31, 2013, which Gilmore had filed on October 15, 2014, showed a tax due and owing of $493,526. (DX359-A.)

The check Gilmore wrote to the IRS for $493,526 to pay his 2013 taxes was drawn on the Gilmores' joint checking account at OFB. (GX13A.) OFB returned that check for insufficient funds on October 16, 2014, (GX13); Gilmore's OFB checking account statement for that period reflected the bank's assessment of a $35.00 fee against the Gilmores because the check was returned for insufficient funds, (GX701, US_Gilmore_0065464). Rogers testified that the record of the

dishonored check was not in her residential loan file, but would have been in the bank's deposit services file.  (4/8/19 PM Tr. at 82:25–83:22.)

The transcript for the 2013 tax return, which OFB received on December 8, 2014, pursuant to the Form 4506-T Gilmore provided OFB in connection with his application (DX361), showed "no record of return filed." (DX359-B.)  The evidence showed that—unbeknownst to Gilmore—the tax return and dishonored check did not appear on the IRS transcript because Gilmore's account with the IRS was still in "unpostable status" at the time of the request due to the IRS's pending criminal investigation.  (GX27 at 12–13.)  Although Rogers testified that she reviewed tax transcripts to make sure "the bottom line of what was reported on the tax return is the bottom line that's on the transcript," (4/8/19 PM Tr. at 93:8–94:5), she admitted that the IRS had no record of Gilmore's 2013 return being filed as of December 8, 2014, (*id.* at 94:10–23).  Rogers also testified that she did not review the personal financial statements Gilmore had previously submitted to the bank (*id.* at 85:1–10), or the *Purpose of Refinance Letter* he submitted, in which he stated that the purpose of the loan was in part to pay taxes and existing debt, (*id.* at 86:4–11).

Viewing this evidence in the light most favorable to the verdict, no rational jury could have concluded that Gilmore made a false statement to the bank regarding the status of his 2013 federal income taxes for the purpose of influencing its lending decision.  Indeed, that charge should not even have been submitted to the jury, given

39

that Gilmore's actions were at a minimum as consistent with innocence as with guilt. *McKee*, 506 F.3d at 235; *D'Amato*, 39 F.3d at 1256.  However viewed, the evidence simply does not support a rational conclusion that Gilmore's negative response to the question, "*Are you presently delinquent or in default of any Federal debt, or any other loan, mortgage, financial obligation, bond, or loan guarantee?*" was a false statement made for the purpose of influencing OFB's lending decision.  As discussed in Section IV.B below, the URLA, Section VIII(F) cannot form the predicate for a prosecution under § 1014 because it is fundamentally ambiguous.  *Ryan*, 828 F.2d at 1015.  The term "federal debt" is commonly understood ***not*** to encompass tax liabilities, and there was no evidence that Hoyt, Rogers, or anyone else at OFB ever communicated to Gilmore that the question should be answered in the affirmative if he had unpaid taxes.

Even if the URLA's federal debt question could form the basis of a valid § 1014 charge, and it cannot, the evidence supported a finding that Gilmore did ***not*** intend to influence OFB's lending decision with a misleading answer regarding his tax liability.  Gilmore's handwritten statement of the purpose of the refinancing, which he submitted after Hoyt completed the original URLA (GX712) and before OFB presented him with the final URLA at closing (GX713), clearly stated that one of his purposes for refinancing the property was to "pay taxes," (GX714).  Gilmore provided OFB with an authorization to secure a transcript of his 2013 taxes directly

40

from the IRS, at a time when he knew his tax payment to the IRS had been dishonored and had no reason to believe the transcript would not reflect that fact. (DX361.)  He also knew that the dishonored check had been drawn on his OFB account, and that his checking account statement at OFB reflected a charge for the returned check.  (GX13; GX13A; GX701.)  Finally, although Hoyt himself could not remember telling prosecutors that Gilmore said he had a $300,000 tax liability, Hoyt admitted that he had no reason to believe that statement was inaccurate.  (4/8/19 PM Tr. at 24:10–17.)

In short, the only conclusion supported by the evidence is that Gilmore did not intend his declaration on URLA Section VIII(F) to convey that he had no unpaid federal taxes.  There is no evidence that he made that statement with the purpose to influence OFB's lending decision or to deceive it regarding his tax status.

### B. The Trial Evidence Does Not Support A Finding Beyond A Reasonable Doubt That Gilmore's Statement Regarding Other Liabilities Was Knowingly False Or Made For The Purpose Of Influencing OFB's Lending Decision.

The second theory of Count 6 liability the Government presented to the jury— that Gilmore intentionally concealed a personal loan he received from Orlovsky in 2007 by failing to amend the liability section on the URLA to reflect it—is equally unsupported.  The evidence demonstrated that from its inception and for many years thereafter—including 2014 and 2015, when he made the OFB application—Gilmore

treated that $400,000 loan as a G&M liability that did not need to be separately listed as a personal liability on Section VI of the URLA.

As Hoyt testified, OFB automatically populates the liabilities section of the URLA based on information the bank obtains from credit reporting agencies. (4/8/19 PM Tr. at 11:7–9; 12:6–13:4; 18:4–11.)  Hoyt testified that in taking applications over the phone for residential mortgages, he would rely on the credit report rather than ask borrowers about any other loans they had; in keeping with that practice, he did not ask Gilmore about any other loans when taking his application. (*Id.* at 51:15–52:6.)

Although Hoyt testified that Gilmore did not disclose a personal loan Orlovsky made to him (*id.* at 22:9–15), the evidence made clear that Gilmore did not believe this was the type of liability that should have been disclosed in connection with this personal loan application.  Hoyt testified that commercial loans Gilmore had taken out would not appear on his personal loan application because the bank would consider the law firm to be paying the loans out of business income.  (*Id.* at 63:7–17.)

In the case of the Orlovsky loan, the evidence showed that although George and Joanne Gilmore signed a promissory note with Dale and Carole Orlovsky dated November 26, 2014 (GX3003-C), and although Orlovsky testified that he made the loan to Gilmore personally, the $400,000 check Orlovsky actually wrote more than

42

seven (7) years earlier, on August 14, 2007, was from his law firm's trust account to G&M. (GX3003-A; 4/08/19 AM Tr. at 125:24–25, 126:18–127:1.) In addition to being paid to G&M, that loan was repaid by the firm for more than ten (10) years— up to and including the period when Gilmore applied to OFB to refinance his home mortgage in late 2014 and early 2015. (GX3003-B at 6–8; GX3003-B1.)

Hoyt testified that the 2015 application was not Gilmore's first application with OFB, and that he had been involved in an application submitted in 2012. (4/8/19 PM Tr. at 30:18–31:2.) Hoyt testified that Kelly Siegfried ("Siegfried") was Gilmore's commercial contact at the bank during that prior time period and that before this mortgage loan, most of Gilmore's business with OFB had been commercial. (*Id.* at 31:15–21.) Hoyt also testified that OFB, as an institution, was fully familiar with Gilmore's finances for a long period of time before the 2015 application. (*Id.* at 32:21–25.) Hoyt further testified that it was his practice to look into a prospective borrower's file to see what other business he had done with the bank before undertaking to complete and consider a loan application. (*Id.* at 34:2–6.)

Siegfried testified that she was employed at OFB from 2007 to 2014. (4/9/19 PM Tr. at 43:6–7.) While Siegfried was at OFB, Gilmore consistently kept his personal and corporate tax returns on file with the bank. (*Id.* at 44:6–8.) He also submitted personal financial statements containing schedules of his personal assets

and liabilities in connection with commercial loan applications.  (*Id.* at 44:9–12; DX351; DX352.)   When G&M applied for a commercial loan from Two River Community Bank in October 2014, the firm submitted detailed schedules of outstanding liabilities, including loans to the firm.  (DX358 at 54, 57.)

In sum, the evidence did not support a jury finding that Gilmore intentionally failed to amend the list of liabilities OFB placed on the URLA to include the Orlovsky loan for the purpose of influencing the bank's lending decision.  Rather, Gilmore properly excluded the Orlovsky loan from that list because he always treated that loan as an obligation of the law firm that was properly disclosed in connection with commercial loan applications, not personal loan applications like the January 2015 OFB mortgage loan refinancing.

## IV. ALTERNATIVELY, GILMORE IS ENTITLED TO A NEW TRIAL ON COUNT 6.

For the reasons stated in Section III, Gilmore is entitled in the alternative to a new trial on Count 6 under Rule 33 because the verdict was undeniably contrary to the objectively weighed evidence.  He is also entitled to a new trial because of the errors and irregularities discussed below, which infected the verdict.

### A. The Government Violated Gilmore's Right To Due Process By Failing To Correct The Bank Officer's False Testimony In Support Of That Count Of Conviction.

The Government violates due process "when it knowingly presents or fails to correct false testimony in a criminal proceeding."  *Haskell v. Superintendent Greene*

44

*SCI*, 866 F.3d 139, 145–46 (3d Cir. 2017) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *Giglio v. United States*, 405 U.S. 150, 153 (1972); and *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004)). Accordingly, "'the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Haskell*, 866 F.3d at 146 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). "The same result obtains when the [Government], although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Id.* (quoting *Giglio*, 405 U.S. at 153). The Third Circuit in *Haskell* explained that courts apply a "strict" standard of review to perjured testimony claims, "'not just because [those claims] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.'" *Id.* (quoting *Agurs*, 427 U.S. at 104).

Thus, a defendant is entitled to a new trial if he can establish that "(1) [a witness] committed perjury, (2) the [Government] knew or should have known that the testimony was false, (3) the false testimony was not corrected, and (4) there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury." *Haskell*, 866 F.3d at 146 (citing *Lambert*, 387 F.3d at 242; *see also United States v. Harmon*, 681 F. App'x 152, 155 (3d Cir. 2017); *United States v.*

45

*Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008)).  As the Third Circuit made clear in

*United States v. Harris*, 498 F.2d 1164 (3d Cir. 1974), the prosecution's duty to

correct false testimony arises not only when a witness commits the crime of perjury,

but whenever a witness's testimony is untrue:

> We do not believe [] that the prosecution's duty to disclose false
> testimony by one of its witnesses is to be narrowly and technically
> limited to those situations where the prosecutor knows that the witness
> is guilty of the crime of perjury.  Regardless of the lack of intent to lie
> on the part of the witness, *Giglio* and *Napue* require that the prosecutor
> apprise the court when he knows that his witness is giving testimony
> that is substantially misleading.  This is not to say that the prosecutor
> must play the role of defense counsel, and ferret out ambiguities in his
> witness' responses on cross-examination.  However, when it should be
> obvious to the Government that the witness' answer, although made in
> good faith, is untrue, the Government's obligation to correct that
> statement is as compelling as it is in a situation where the Government
> knows that the witness is intentionally committing perjury.

*Id.* at 1169.  More recently, the Third Circuit reaffirmed this principle in *Stadtmauer*,

explaining that in *Harris*, the court "reasoned [] that the prosecution's duty to

disclose false testimony should not be 'narrowly and technically limited to those

situations where the prosecutor knows that the witness is guilty of the crime of

perjury'" because "'when it should be obvious to the Government that the witness'

answer, although made in good faith, is untrue,' it has an obligation to correct that

testimony."  *Stadtmauer*, 620 F.3d. at 269 (quoting *Harris*, 498 F.2d at 1169).

Applying those principles here, Gilmore's conviction on Count 6 must be

reversed because Hoyt testified falsely about Gilmore's disclosure of his existing tax

liabilities, and the prosecutors knew about that false testimony but failed to correct it.  Although Gilmore signed and dated the Purpose of Refinance Letter (GX714) to OFB on November 24, 2014—three days *after* Hoyt completed the URLA based on their telephone conversation (GX712)—AUSA Suh elicited testimony from Hoyt that he understood the term "pay taxes" as disclosed on that form to mean that Gilmore was going to use some of the loan proceeds "to pay taxes that were going to be coming due in the following year."  (4/8/19 PM Tr. at 14:20–15:4.)  Hoyt further testified on direct examination that Gilmore did not indicate that he had unpaid back taxes.  (*Id.* at 15:5–7.)  Based on their direct participation in an interview with Hoyt on August 15, 2017, both AUSA Suh and AUSA Skahill (who was also at counsel table) knew that testimony was false, that Gilmore had in fact told Hoyt that he had a significant tax liability at the time of the application, and that Hoyt did not know whether it had been paid.  (DX546 (August 15, 2017 memo of investigation).)  Yet neither AUSA Suh nor AUSA Skahill rose to correct Hoyt's false trial testimony.

On cross-examination, Hoyt testified that at the time OFB approved the refinance application, he was not aware that Gilmore had a $300,000 tax liability.  (4/8/19 PM Tr. at 23:6–9.)  Again, neither AUSA Suh nor AUSA Skahill rose to correct this false testimony.  Hoyt claimed that his memory was not refreshed by reading the memorandum of investigation memorializing his statement to SSA

Mahoney, AUSA Suh, and AUSA Skahill in August 2017 (*id.* at 23:19–24:13; 26:12–22; 54:15–24), but admitted that he had no reason to believe the statement in the interview memo (*viz.*, "Hoyt believed that Gilmore said he had a $300,000 tax liability"), was inaccurate (*id.* at 24:10–17).   Under the law of this circuit, Gilmore is entitled to a new trial on Count 6 because, in violation of due process, (1) Hoyt testified falsely about Gilmore's disclosure of an existing tax liability at the time of his OFB application; (2) AUSAs Suh and Skahill knew the testimony was false; (3) the false testimony was not corrected; and (4) the false testimony undoubtedly affected the judgment of the jury.

> **B. One Of The Alternative Theories On Which The Court Submitted Count 6 To The Jury—Gilmore's Purportedly False Statement About Federal Debt—Was Fundamentally Ambiguous And Therefore Insufficient To Justify A Conviction.**

The prosecution tried Count 6 on the theory that the URLA Gilmore submitted to OFB was false in two respects.  First, the prosecution argued that Gilmore lied by failing to list the Orlovsky loan as a liability in Section VI of the URLA. (4/12/19 Tr. at 83:6–18.)  Second, the prosecution contended that Gilmore falsely declared, in response to Section VIII(F), that he did not have any delinquent federal debt.  (*Id.* at 83:19–84:5.)  The jury returned a general verdict of guilty on Count 6, making it is impossible to know which factual theory formed the basis of the verdict.  As the Third Circuit explained in *Ryan* when reversing the judgment of conviction under § 1014 and remanding for a new trial, "a conviction under a given count must be

reversed if the count was submitted to the jury on alternative theories, one of which, in retrospect, was insufficient to justify a conviction." *Ryan*, 828 F.2d at 1015 (citing *United States v. Dansker*, 537 F.2d 40, 51 (3d Cir. 1976)).  Gilmore's conviction on Count 6 in this case must be reversed because the statement on the URLA concerning whether he was delinquent or in default on any "Federal debt" does not supply a legally permissible theory on which to ground a conviction under 18 U.S.C. § 1014.

As a general rule, the fact that there is some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statements prosecution.  *See United States v. Slawik*, 548 F.2d 75, 86 (3d Cir. 1977); *United States v. Long*, 534 F.2d 1097, 1101 (3d Cir. 1976).  In most cases it is for the petit jury to decide which construction the defendant placed on the question.  *Slawik*, 548 F.2d at 86.  But if a question is excessively vague or "fundamentally ambiguous," the answer to such question may not, as a matter of law, form the basis of a perjury or false statements prosecution.  *United States v. Serafini*, 167 F.3d 812, 820 (3d Cir. 1999).  This rule of fundamental ambiguity serves two purposes:  "(1) to preclude convictions that are grounded on little more than surmise or conjecture, and (2) to prevent witnesses (or loan applicants) from unfairly bearing the risks associated with the inadequacies of their examiners, and thereby to encourage participation in the judicial (or banking) system."  *Ryan*, 828 F.2d at 1015; *see also United States v. Hird*, 913 F.3d 332, 347 n.23 (3d Cir. 2019).

"A question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (quoting *United States v. Lattimore*, 127 F. Supp. 405, 410 (D.D.C. 1955)). "[A] question is 'not amenable to jury interpretation . . . when it is entirely unreasonable to expect that the defendant understood the question posed to him.'" *Serafini*, 167 F.3d at 820 (quoting *Ryan*, 828 F.2d at 1015). In determining whether a question is so vague as to be fundamentally ambiguous, the Court may not consider the question in isolation, *see Lighte*, 782 F.2d at 375, but must look to the context of the question and the answer, "as well as other extrinsic evidence relevant to [the defendant's] understanding of the questions posed." *United States v. Culliton*, 328 F.3d 1074, 1079 (9th Cir. 2003).

To prove that Gilmore knowingly made a false statement, the Government "must negative any reasonable interpretation that would make the defendant's statement factually correct." *United States v. Bryant*, 556 F. Supp. 2d 378, 444 (D.N.J. 2008) (quoting *United States v. Race,* 632 F.2d 1114, 1120 (4th Cir. 1980) (internal quotation marks omitted). "This is so because one cannot be found guilty of a false statement" when the statement is "within a reasonable construction." *Bryant*, 556 F. Supp. 2d at 444 (quoting *Race*, 632 F.2d at 1120).

Applying these principles, the court in *United States v. Naegele*, 341 B.R. 349 (D.D.C. 2006), dismissed three counts of an indictment brought against the defendant under 18 U.S.C. § 152, which criminalizes false statements made in connection with a bankruptcy proceeding under Title 11, based on a finding that the question to which defendant gave an allegedly false response was fundamentally ambiguous.  The indictment charged Naegele, an attorney, with making false statements regarding his law firm's income for three years on a Statement of Financial Affairs form submitted in a personal bankruptcy proceeding.  *Id.* at 356. The form directed Naegele to state "the gross amount of income the debtor had received" from his business.  Naegele argued that the instruction was fundamentally ambiguous because it readily lent itself to the interpretation that it called for disclosure of the gross amount he received from the law firm (which is what he disclosed), rather that the gross income of the firm itself.  *Id.*  The court agreed and dismissed the relevant counts of the indictment.  *Id.* at 357.

Similarly, in *United States v. Watts*, 72 F. Supp. 2d 106 (E.D.N.Y. 1999), the district court granted defendants' Rule 29 motion for a judgment of acquittal based on false statements allegedly made on a URLA in violation of § 1014.  The court determined that the statement that was the subject of the § 1014 was fundamentally ambiguous and that even if it was not, the evidence was not sufficient to prove that the statement was false.  *Id.* at 109.  The specific statement at issue in *Watts* was a

portion of the URLA that called upon defendants to state the purpose for which they would use the loan proceeds. *Id.* at 110. According to the government, the defendants knowingly made a false statement when they checked both the "to be made" and "made" boxes when stating that the purpose of the refinancing was for renovations and improvements to their residence totaling more than $200,000. The evidence showed that defendants had made home improvements worth approximately $200,000 before the loan closed, but did not spend money on further improvements after the loan, instead using the proceeds to invest in another property. *Id.* The false statement alleged by the prosecution was that defendants intended to make unspecified improvements at an unspecified cost after closing. *Id.* The court granted the motion, finding the statement "too nebulous to escape categorization as a 'fundamentally ambiguous' one." *Id.*

In this case, the meaning of the term "Federal debt" is fundamentally ambiguous and cannot form the basis for a conviction for making a false statement to a financial institution. The phrase is not defined in the URLA.[4] Nor does its context suggest that it includes federal taxes. To the contrary, the phrase is modified

---

[4] Fannie Mae's instructions regarding the meaning of "federal debt" on the URLA make no mention of taxes, stating instead that the question requires a borrower to disclose "if you are delinquent or in default on any debt owed to the federal government (for example, a federally backed student loan, FHA loan, USDA Rural Development loan, Veterans' Administration loan)." Instructions for Completing the Uniform Residential Loan Application, *available at* *https://www.fanniemae.com/content/fact_sheet/urla-instructions.pdf.*

in Section VIII(F) by the traditional commercial and lending obligations with which it is linked—that is, any "other loan, mortgage, financial obligation, bond or loan guarantee." (GX713.)  *Cf. Borough of Westville v. City of Philadelphia*, 89 F. Supp. 3d 636, 640 n.5 (D.N.J. 2015) (explaining that, under the interpretive doctrine of *noscitur a sociis*, "'the meaning of an unclear word or phrase should be determined by the words immediately surrounding it'" (quoting *Soto v. Scaringelli*, 189 N.J. 558, 572 (2007)).  In other words, the inclusion of "Federal debt" within this class of contractually incurred obligations signaled that it was limited to the type of debt incurred in similar consumer transactions (for example, federally backed student loans or SBA loan guarantees), not liabilities incurred under the federal tax laws or other federal regulatory schemes.

That interpretation is consistent with how the term is used in other contexts. As the Supreme Court stated succinctly long ago:   "Taxes are not debts." *Meriwether v. Garrett*, 102 U.S. 472, 513 (1880).  As the Court explained, "[t]axes are imposts levied for the support of the government, or for some special purpose authorized by it," and "[t]he consent of the tax-payer is not necessary to their enforcement."  *Id.* at 513–14.  Debts, by contrast, "are obligations for the payment of money founded upon contract, express or implied."  *Id.* at 513.

Under the FDCPA, a "debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money,

property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). Because that definition at a minimum "contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value," it excludes obligations imposed in non-transactional settings that are assessed for public purposes, such as per capita taxes. *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 358–59 (3d Cir. 2018) (internal quotation marks omitted).

With that test in mind, the Third Circuit has concluded that tax obligations do not constitute debts under the FDCPA because that statute "contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value." *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 401 (3d Cir. 2000) ("We further agree with the district court's conclusion that homeowners' property tax obligations do not constitute 'debts' under the FDCPA."). Other courts have agreed with this conclusion. *See, e.g., Mortland v. IRS*, No. A-03-CA-115-SS, 2003 U.S. Dist. LEXIS 12671, at *10 (W.D. Tex. June 24, 2003) ("Assuming the United States waived its sovereign immunity under the FDCPA, the plaintiffs have failed to state a claim under the FDCPA because unpaid income taxes are not considered debts for purposes of the act."); *Dunlap v. Douglass*, No. 14-cv-0054, 2014 U.S. Dist. LEXIS 112864, at *10–11 (S.D. Ohio Aug. 14, 2014) ("[T]his Court

54

here concludes that income tax liabilities are not 'debt' as defined by the FDCPA."); *Beggs v. Rossi*, 994 F. Supp. 114, 118 (D. Conn. 1997) ("Because the court concludes that the plaintiffs' motor vehicle personal property tax obligations are not 'debts' within the meaning of the FDCPA, the court recommends that the motion to dismiss the plaintiffs' claim under the FDCPA … be granted.").

Gilmore's conviction on Count 6 therefore cannot stand because "a conviction under a given count must be reversed if it was submitted to the jury on alternative theories, one of which, in retrospect, was insufficient to justify a conviction." *Ryan*, 828 F.2d at 1015. *See also United States v. Murphy*, 323 F.3d 102, 110 (3d Cir. 2003) ("We are . . . satisfied that current precedent dictates that, should we find one of the Government's theories of mail fraud legally invalid, we must reverse [defendant's] conviction on the mail fraud counts and remand for a new trial because the jury returned a general verdict.").

In *Ryan*, the court determined that a question on a credit-card application regarding the applicant's previous address was inherently ambiguous and therefore could not be a false statement within the meaning of § 1014. *Ryan*, 828 F.2d at 1015–17. Though the court found sufficient evidence to convict Ryan of other false statements to the bank, it reversed his conviction and remanded for a new trial because the jury might have rested its verdict on the impermissible theory. *Id.* at 1020.

The same result must obtain here.  The Government argued that Gilmore should be convicted on Count 6 because he (i) failed to list the Orlovsky loan as a liability; and (ii) falsely declared that he did not have any delinquent "federal debt." (4/12/19 Tr. at 83:14–20.)  The jury subsequently returned a general verdict finding Gilmore guilty on that count.  (4/17/19 Tr. at 16:9–10.)  Because the "federal debt" theory on which Count 6 was submitted to the jury was legally invalid, the verdict must be set aside and a new trial ordered.  That is the case even if the Court finds there was sufficient evidence for the jury to conclude that Gilmore made a false statement by failing to list the Orlovsky loan among his liabilities on the URLA.

## V.  THE COURT SHOULD GRANT GILMORE A JUDGMENT OF ACQUITTAL ON COUNT 1.

In Count 1 of the Indictment, the Government charged Gilmore with willfully evading the payment of taxes, in violation of 26 U.S.C. § 7201, by committing five affirmative acts of evasion during the calendar years 2013, 2014, and 2015. (Indictment, Count 1, ¶ 5.)  The jury failed to reach a verdict on this count, and the Government has expressed its intention to re-try it.  This Court should now enter a judgment of acquittal on Count 1 because no rational jury could have found Gilmore guilty of the elements of § 7201 beyond a reasonable doubt.  *See* Fed. R. Crim. P. 29(c)(2) (authorizing entry of judgment of acquittal where the jury has "failed to return a verdict"); *accord United States v. Atl. States Cast Iron Pipe Co.*, No. 03-cr-852, 2007 U.S. Dist. LEXIS 56562, at *437 (D.N.J. Aug. 2, 2007).

56

Whether the Government introduced legally sufficient evidence is analyzed by examining whether that evidence could support a verdict on the elements of the offense.[5]   To prove a § 7201 violation, the Government had to prove beyond a reasonable doubt the existence of "1) a tax deficiency, 2) an affirmative act of evasion, and 3) willfulness." *McGill*, 964 F.2d at 329; *accord* Third Circuit Model Criminal Jury Instructions, Instruction No. 6.26.7201.  The affirmative-act element consists of two components: "first, the formation of an intent to evade or defeat a tax; and, second, willfully performing some act to accomplish the intent to evade or defeat that tax."   Third Circuit Model Jury Instructions 6.26.7201–3; *see also McGill*, 964 F.2d at 237–39 ("'[T]he defendant must commit the affirmative acts willfully to be convicted of tax evasion.'" (quoting *United States v. Romano*, 938 F.2d 1569, 1572 (2d Cir. 1991)).  The act, moreover, must be one undertaken "to mislead the government or conceal funds to avoid payment of an admitted and accurate deficiency," such as one that conceals "the taxpayer's ability to pay his or her taxes or [removes] assets from the reach of the Internal Revenue Service." *McGill*, 964 F.2d at 230; *see also Spies v. United States*, 317 U.S. 492, 499 (1943) (explaining that an "affirmative willful attempt may be inferred from conduct such

---

[5] *See, e.g.*, *United States v. McIntyre*, 612 F. App'x 77, 78–79 (3d Cir. 2015) (reviewing sufficiency challenge against the elements of the charged offense); *United States v. Paris*, 578 F. App'x 146, 148 (3d Cir. 2014); *United States v. Hinnant*, 529 F. App'x 217, 220–21 (3d Cir. 2013); *United States v. Farnsworth*, 302 F. App'x 110, 113 (3d Cir. 2008).

as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.").  No such evidence was presented here.

## A. The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Acted With The Intent To Evade Payment Of His Tax Liabilities Permanently.

As an initial matter, the Government did not prove—and did not set out to prove—that Gilmore acted with the intent to evade or defeat payment of his taxes "permanently," rather than temporarily.  *See Edwards v. United States*, 375 F.2d 862 (9th Cir. 1967) (explaining that tax evasion and defeat contemplates "an escape from tax and not merely a postponement of disclosure or payment."), *overruled on other grounds by United States v. Bishop*, 412 U.S. 346 (1973); *see also United States v. Huebner*, 48 F.3d 376, 380 (9th Cir. 1994) (reaffirming the holding in *Edwards* that a defendant does not act with the requisite intent when he seeks a "postponement or delay in payment, consistent with an intent ultimately to make payment"); *United States v. Fisher*, 607 F. App'x 645, 647 (9th Cir. 2015) (distinguishing between an intent to "*delay* payment," which does not give rise to liability under § 7201, and the intent "to evade . . . tax obligations *permanently*" (emphasis in original)); *United States v. De Niro*, 392 F.2d 753, 758 (6th Cir. 1968) ("The gravamen of Section

58

7201 is the specific intent or design to deprive the Government of taxes." (citing *Edwards*, 375 F.2d 862)).  Here as in *Edwards*, the Government introduced evidence that Gilmore at most sought to extend the time to pay his taxes, always intending to pay them in full with interest and penalties—just as he had done for nearly two decades.  *Compare Edwards*, 375 F.2d at 867 (vacating § 7201 conviction where the evidence demonstrated that the defendant sought to take advantage of extension requests but never "intended the permanent evasion" of any taxes owed).  Acquittal is warranted on this basis alone.

## B. The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Acted With The Intent To Evade Or Defeat Payment Of His Taxes Either Permanently Or Temporarily.

Regardless of whether the intent to evade payment must be directed at a permanent or temporary deprivation, the Government failed to introduce legally sufficient evidence that Gilmore formed the intent to accomplish either objective.  Thus, Gilmore would be entitled to a judgment of acquittal even if the principle established in *Edwards* were not dispositive here.

### 1. The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Willfully Misclassified His Shareholder Loans.

The heart of the Government's evasion-of-payment charge was its assertion that Gilmore illegally and intentionally misclassified funds received from G&M as shareholder loans.  (Indictment, Count 1, ¶ 5a, b, e (alleging three affirmative acts

that all reduced to the proper treatment of shareholder loans).)[6]   Yet as the jury

necessarily found when acquitting Gilmore on Counts 2 and 3, the Government

failed to prove that he willfully mischaracterized the loans.   (*See* 4/12/19 Tr. at

34:22–35:3 (explaining that the third and fourth elements of the § 7206(1) offense

required the Government to prove that Gilmore's personal tax forms were materially

false and that Gilmore did not believe that the forms were correct as to that material

matter).)   The jury necessarily made that finding because Gilmore did not dispute

the first two elements of Counts 2 and 3, *i.e.*, that he filed an income tax return and

did so under penalty of perjury.   As a matter of law, this finding collaterally estops

the Government from retrying Gilmore on Count 1 on the basis that he

mischaracterized income as shareholder loans.   *See United States v. Rigas*, 605 F.3d

194, 218 (3d Cir. 2010) ("[T]he government cannot avoid the preclusive effect of a

---

[6] The undisputed evidence demonstrated that G&M properly accounted for all of Gilmore's personal expenses by adding them to his shareholder-loan balance. (4/3/19 AM Tr. at 144:1–11; 4/4/19 AM Tr. at 59:13–60:3; 4/4/19 PM Tr. at 57:17–23; 4/9/19 AM Tr. at 96:14–22; 4/9/19 PM Tr. at 92:13–93:18, 96:9–12.)   The evidence further demonstrated that all of the funds at issue were either reported on Gilmore's personal returns or on G&M's corporate returns.   (*See* 4/9/19 AM Tr. at 93:6–11, 95:1–96:2, 100:14–23, 101:13–24.)   Thus, the only unreported "income" that Gilmore could have received from G&M would have been in the form of shareholder loans.   The Government conceded this point during its closing argument. (*See* 4/12/19 Tr. at 70:14–20 ("The defendant's personal tax returns were materially false because they did not report his income, all the money that the defendant took from his law firm and used for personal expenses.   This again is the money he disguised as shareholder loans.   By disguising the money that way, he disguised income that should have been reported on his tax returns. . . .").

general jury verdict by speculating that the verdict could have been based upon a finding that the government failed to prove elements that were never contested by the defense."). But the evidence from which this finding ineluctably flowed should foreclose the prospect of a retrial now, under Rule 29, because there was legally insufficient evidence that Gilmore willfully mischaracterized the funds at issue as shareholder loans.

The Government's evidentiary failures on its central shareholder-loan theory were legion. The Government's own expert testified that it is not improper for a closely held corporation to make shareholder loans; that loans maintain their status when their principal grows; that loans need not entail written promissory notes, interest components, or ceilings to properly be considered loans; and that shareholder loans do not need to be approved in advance by the IRS. (4/9/19 AM Tr. at 81:7–14, 83:10–84:1; 4/9/19 PM Tr. at 18:23–19:5.) Its witnesses also acknowledged that Gilmore never said he did not intend to repay the loans or that he wanted to disguise their true nature; to the contrary, Gilmore gave every indication that he *did* intend to repay them, and in fact paid $7.8 million into the firm against those loans between the 2010–2015 tax years. (4/3/19 AM Tr. at 83:11–14, 127:5–13, 133:4–12; 4/9/19 AM Tr. at 82:11–16; 4/9/19 PM Tr. at 15:1–5; 4/10/19 Tr. at 38:23–40:8, 70:18–21, 74:21–77:23.) And Gilmore's accountants who prepared and signed the relevant tax returns testified that they did so with full knowledge of the

loans' material facts (*see, e.g.*, 4/4/19 AM Tr. at 69:3–21 (testifying to being aware of the lack of an underlying promissory note, interest payments, repayment schedule, and maturity date); *see also id.* at 57:20–23 (acknowledging receipt of G&M's general ledgers each year)) and that they believed that Gilmore's personal Form 1040s and G&M's corporate Form 1120s truthfully and accurately accounted for the shareholder loans:

> Q.  Would you agree with me, Mr. Hutchins, that the tax returns that you prepared for Gilmore & Monahan and for George Gilmore in Tax Years 2013, 2014, 2015 were true and accurate to the best of your knowledge?
>
> A.  Yes.
>
> * * *
>
> Q. And during the years that you've testified about, you [Mr. Koerner] were the tax preparer, correct?
>
> A. Correct.
>
> Q. And you signed the tax returns, correct?
>
> A. Correct.
>
> Q. And you believed that those tax returns were accurate, correct?
>
> A. Yes, I do.
>
> Q.  You certainly did not sign a tax return that you thought was unlawful, correct?
>
> A. That is correct.
>
> Q. And it was not unlawful to include loans to shareholders on a tax return, was it?
>
> A. It's not unlawful, no.
>
> Q. And, in fact, if it was, you wouldn't have done it, right, you wouldn't have signed it?
>
> A. Correct.

(4/4/19 AM Tr. at 113:16–20; 4/8/19 AM Tr. at 94:9–25; *see also* 4/4/19 AM Tr. at 48:7–12, 70:4–24, 72:2–12, 80:6–18, 91:25–92:14; 4/4/19 PM Tr. at 59:9–60:6; 4/8/19 AM Tr. at 98:22–99:20, 109:23–110:10.)  These accountants at most advised Gilmore that the IRS might take a different view and seek to reclassify the loans as income, with potential adverse tax implications, not that the designation of them as loans was illegal or improper.  (4/4/19 AM Tr. at 53:9–54:18, 56:21–57:7, 68:5–69:2; 4/8/19 AM Tr. at 97:23–98:21, 100:20–25, 101:9–102:5.)

And there is more.  Beyond the lack of evidence demonstrating that Gilmore believed the loans were not properly accounted for, there was no evidence that he made any attempt to conceal the loans or their characteristics from the IRS.  To the contrary, the loans were reported on G&M's Form 1120s year after year, as was the absence of interest payments.  (DX110; DX111; DX112; GX29; GX30; GX31.)  These facts enabled the IRS to observe, as early as 2005, that G&M listed nearly $3 million in shareholder loans without reporting "interest income," (GX42 at 114), and to ask in 2007 whether the "loans to shareholders should be [treated] as wages," (*id.* at 171).  And the IRS was certainly aware by 2015 that G&M had reported total "loans to shareholders" in the amount of $6.9 million.  (GX41 at 81.)  Indeed, Popowitz readily admitted that she determined the "loans to shareholders" figure from G&M's Form 1120s.  (4/8/19 AM Tr. at 79:16–19.)

In light of this evidence, the Government was left to argue that the "concealment" consisted of Gilmore's failure to disclose on his firm's Form 1120s the information used to calculate the shareholder loans.  (4/12/19 Tr. at 180:22–181:13 (arguing that Gilmore committed an affirmative act by failing to disclose the G&M "ledgers" used to calculate the shareholder loans).)  But there was no requirement—or even an opportunity—to list such information on G&M's Form 1120s, as Hutchins admitted.  (4/4/19 AM Tr. at 93:4–20 (testifying that Form 1120 does not provide an opportunity to describe loan characteristics such as interest rates, maturity dates, and debt ceilings).)  To the extent the tax forms required information, Gilmore's accountants provided it, scrupulously and accurately.  (4/4/19 AM Tr. at 66:21–23; 4/8/19 AM Tr. at 106:21–107:7.)  No rational jury could have found that Gilmore committed an affirmative act of evasion by failing to disclose more, because "[o]missions, including failures to report, do not satisfy the requirements of § 7201." *McGill*, 964 F.2d at 233; *see also id.* at 231 ("Only affirmatively evasive acts—acts intending to conceal—are punishable under § 7201."); *accord McKee*, 506 F.3d at 234.

### 2. The Government Failed To Introduce Legally Sufficient Evidence That Gilmore Wrote A Check Or Agreed To Make Good-Faith Payments With The Intent To Mislead Or Conceal Anything From The IRS.

Bereft of legally sufficient evidence to sustain its core theory, the Government's evasion-of-payment charge reduced to two alleged affirmative acts:

(i) Gilmore's act of writing a check to the U.S. Treasury on October 15, 2014, from an account that had insufficient funds; and (ii) Gilmore's alleged misrepresentations to the IRS concerning his ability to make two good-faith payments of $25,000. But there was no legally sufficient evidence to demonstrate that Gilmore undertook either of these acts with the intent to mislead the IRS or conceal assets from it.

A taxpayer does not commit an affirmative act of evasion when his overall conduct demonstrates a lack of intent to mislead government officials. *See Romano*, 938 F.2d at 1573 (holding that "'evasive'" answers initially given by a defendant to customs officers did not amount to an affirmative act where the defendant exhibited an "overall voluntary attitude" and ultimately admitted the total amount of cash he possessed). Here, the context of the October 2014 dishonored check demonstrates that Gilmore did not send that check to mislead the IRS. As an initial matter, the check could not have been used to mislead the IRS because its ability to be honored was readily determinable; the IRS discovered that it was drawn from insufficient funds within the same cycle in which it was received, that is, within a few days. (GX13; 4/2/19 PM Tr. at 98:25–99:18.) The bounced check could therefore only have served to anger the IRS, not to mislead it.

Moreover, the undisputed evidence adduced on Gilmore's direct case showed that he believed Two River Community Bank would extend a loan to G&M that would enable him to make the payment. G&M had applied for that loan on October

8, 2014, (DX358 at 3), a week before the check was written, and Siegfried, the bank officer who advocated for the loan's approval—who had a longstanding relationship with Gilmore from her days at OFB, and who knew the loan would be used to pay taxes, (DX358 at 3; 4/9/17 PM Tr. at 52:15–18)—indicated to Gilmore that the loan would be approved.   (4/9/19 PM Tr. at 68:21–69:5; DX326.)   Monahan shared Gilmore's understanding and also wrote a dishonored check to the IRS with the expectation that the loan would be approved.   (4/3/19 PM Tr. at 13:2–18; 4/5/19 Tr. at 147:9–20; GX41 at 70.)   The only rational inference the jury could have drawn from this evidence is that at the time Gilmore wrote the check, he believed there would be sufficient funds in his account to cover it when it was presented for payment.

The context of Gilmore's good-faith payments also demonstrates that he could not have acted with the intent to mislead or conceal anything from the IRS.   *See Romano*, 938 F.2d at 1573.   To begin with, there was no evidence that Gilmore even set the terms by which these payments were to be made—that is, by certified check. That condition was imposed by Popowitz after Gilmore proposed the payments. (4/5/19 Tr. at 79:21–80:6.)   Moreover, on October 1, 2015—one day after his second $25,000 payment was due—Gilmore advised Popowitz that he had sufficient funds in his deferred compensation accounts (more than $400,000) to cover the good-faith payments he had just failed to make and, indeed, to satisfy the vast majority of his

66

outstanding tax liability.  (GX27 at 22.)  Gilmore subsequently asked Popowitz to have the IRS seize the money in those accounts.  (*Id.*; GX71; 4/5/19 Tr. at 139:10–21, 142:6–11, 143:7–13.)  Popowitz refused to do so, (GX27 at 23), stating that she could not seize those funds because she had not given Gilmore written notice of her intent to do so.  (4/5/19 Tr. at 141:13–143:6, 143:18–24, 144:25–145:11.)  Given Gilmore's request that the IRS immediately seize more than $400,000 from his deferred compensation account on October 1, 2015, to pay his outstanding taxes, his failure to make good on his offer to make two good faith payments of $25,000 each to the IRS on August 31st and September 30th of 2015—before Popowitz insisted that those payments be made by certified check—did not make that offer an affirmative act of evasion.

Because no rational jury could have found that Gilmore committed the alleged affirmative acts of evasion remaining in Count 1—bouncing a check and offering but failing to make two good faith payments to the IRS—with the requisite intent, these acts cannot salvage the Government's evasion-of-payment charge.  This Court should therefore enter a judgment of acquittal on Count 1.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should enter a judgment of acquittal on Counts 4, 5, 6 and 1 of the Indictment or, in the alternative, grant on new trial on Counts 4, 5 and 6 of that instrument.

Dated:  May 13, 2019

Respectfully submitted,
MARINO, TORTORELLA & BOYLE, P.C.
*Attorneys for Defendant George Gilmore*

By:  _____
    KEVIN H. MARINO