UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon.  Anne E. Thompson |
| | : | |
| v. | : | Crim. No. 19-029 (AET) |
| | : | |
| GEORGE GILMORE | : | |

---

BRIEF OF THE UNITED STATES IN OPPOSITION
TO DEFENDANT'S POST-TRIAL MOTIONS
PURSUANT TO FED. R. CRIM. P. 29 AND 33

---

RACHAEL A. HONIG
ATTORNEY FOR THE UNITED STATES
Acting Under Authority Conferred By
28 U.S.C. § 515
United States Attorney's Office
District of New Jersey
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

MATTHEW J. SKAHILL
Deputy U.S. Attorney

JIHEE G. SUH
Assistant U.S. Attorney

THOMAS F. KOELBL
Trial Attorney
United States Department of Justice-Tax Division

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

I.   The Criminal Charges ..................................................................................... 2

II.  Summary of Facts Introduced at Trial .......................................................... 2

    A.   Gilmore and His Control of the Financial Affairs of the Law Firm ............ 2

    B.   Gilmore's Failure to Pay Over Payroll Taxes ............................................... 3

    C.   No Payments of Payroll Taxes for First Two Quarters of 2016 .................. 5

    D.   Gilmore's Failure to Pay Individual Income Taxes ..................................... 6

    E.   Gilmore's Personal Expenditures, Receipt of Monies from the Law
        Firm, and Use of the Law Firm Accounts for Personal Expenditures ........ 11

    F.   Gilmore's January 2015 Refinance of a Mortgage with Ocean First
        Bank ............................................................................................................. 14

III. Procedural History ........................................................................................ 16

ARGUMENT ........................................................................................................ 19

I.   The Applicable Legal Standards .................................................................... 19

    A.   The Rule 29 Standard .................................................................................. 19

    B.   The Rule 33 Standard .................................................................................. 21

II.  Gilmore Is Not Entitled To A Judgment Of Acquittal Or New Trial On
    Counts 4 and 5 ............................................................................................... 23

    A.   Ample Evidence Proves that Gilmore Willfully Failed to Pay Over
        Payroll Taxes ............................................................................................... 23

        1.   Ample Evidence Proves That Gilmore Acted Willfully .................. 23

        2.   A Rational Jury Easily Could Have Rejected
            Gilmore's Claim, Advanced Through Attorney
            Argument, That He Had a Good Faith Belief That His
            Conduct was Lawful ....................................................................... 28

    B.   The Court Properly Instructed the Jury on Good Faith ............................... 31

i

     C.     The Jury's Verdict Was Not Contrary to the Weight of the Evidence ....... 36

III. Gilmore Is Not Entitled To A Judgment Of Acquittal Or A New Trial
On Count 6 ............................................................................................. 37

     A.     There Was Ample Evidence that Gilmore Made False Statements on
a Loan Application to Ocean First Bank ...................................... 37

          1.     Gilmore's Affirmation in Section IX of the URLA
Was A False Statement that He Knowingly Made For
the Purpose of Influencing the Bank's Lending
Decision ............................................................................. 38

          2.     The Jury Rationally Rejected Gilmore's Argument that
the Orlovsky Loan Was Not the Type of Liability That
Needed to Be Disclosed… ................................................. 38

          3.     Gilmore Knowingly Provided a False Statement in
Response to Question f For the Purpose of Influencing
Ocean First Bank's Lending Decision .............................. 40

          4.     Gilmore's Rehashed Arguments From the Trial
Concerning His Response to Question f Do Not
Provide a Basis for Overturning the Jury's Verdict ......................... 42

          5.     Gilmore's Untimely Contention that Question f is
Fundamentally Ambiguous Is Meritless .......................... 45

     B.     Gilmore Also Is Not Entitled to a New Trial on Count 6 ........... 48

          1.     There Was No Due Process Violation ............................... 48

          2.     Gilmore Waived Any Claim Under Rule 12(b)(3) to
Attack Count 6 as Ambiguous and, In Any Event, His
Legal Challenge Regarding Ambiguity Is Meritless ....................... 52

IV. Gilmore Is Not Entitled To A Judgment Of Acquittal On Count 1 ............................ 56

     A.     Ample Evidence Proved Gilmore's Willful Evasion of Payment .............. 57

          1.     Gilmore Made Misrepresentations to the IRS,
Including False and Misleading Statements
Concerning His Ability to Pay and Assurances of
Payment............................................................................. 58

          2.     Gilmore Falsely Pledged to Pay $50,000 Toward His
2013 Tax Debt................................................................... 60

3.      Gilmore Misrepresented That He Would Use
        Retirement Assets To Pay His Substantial Tax Debt ...................... 63

4.      Gilmore Submitted a $493,526 check to the IRS
        Drawn From a Personal Bank Account With
        Insufficient Funds in an Effort to Mislead the IRS.......................... 65

5.      Gilmore Misled the IRS and Concealed the Existence
        of Funds Available to Pay His Outstanding Tax
        Liabilities by Using Law Firm Funds for Personal
        Expenses and Taking Sham Loans from the Firm......................... 68

B.      Gilmore's Rule 29 Motion Should Be Denied Because  Section 7201
        Has No Permanence Requirement ............................................. 71

CONCLUSION ............................................................................. 73

# TABLE OF AUTHORITIES

Cases                                                                                     Page(s)

*Ashe v. Swenson,*
   397 U.S. 436 (1970) ................................................................................ 70

*Baskerville v. United States,*
   Civil No. 13-5881 (PGS), 2018 WL 5995501 (D.N.J. Nov. 15, 2018) ...................... 52

*Cheek v. United States,*
   498 U.S. 192 (1991) .......................................................................... 24, 32

*Currier v. Virginia,*
   138 S. Ct. 2144 (2018) .......................................................................... 70

*Edwards v. United States,*
   375 F.2d 862 (9th Cir. 1967) .................................................................... 72

*Gov't of the V.I. v. Derricks,*
   810 F.2d 50 (3d Cir. 1987) ...................................................................... 21

*Greenberg v. United States,*
   46 F.3d 239 (3d Cir. 1994) ...................................................................... 23

*Griffin v. United States,*
   502 U.S. 46 (1991) .............................................................................. 54

*Lee v. United States,*
   951 F. Supp. 79 (W.D. Pa. 1997) ................................................................ 27

*Meriwether v. Garrett,*
   102 U.S. 472 (1880) ............................................................................ 47

*Tapia v. Tansy,*
   926 F.2d 1554 (10th Cir. 1991) ............................................................. 50, 51

*United State v. McGill,*
   964 F.2d 222 (3d Cir. 1992) ...................................................................... 71

*United States v. Amirnazmi,*

648 F.Supp.2d 718 (E.D.Pa.2009),
    aff'd, 645 F.3d 564 (3d Cir. 2011) ......................................................... 23

*United States v. Ashfield,*
    735 F.2d 101 (3d Cir. 1984) ..................................................................... 20

*United States v. Bell,*
    584 F.3d 478 (2d Cir. 2009) ..................................................................... 22

*United States v. Blanchard,*
    618 F.3d 562 (6th Cir. 2010) .................................................................... 27

*United States v. Boccone,*
    556 Fed. App'x. 215 (4th Cir. 2014) ...................................................... 26

*United States v. Boisseau,*
    841 F.3d 1122 (10th Cir. 2016) ......................................................... 58, 61

*United States v. Brodie,*
    403 F.3d 123 (3d Cir. 2005) ............................................................... 20, 21

*United States v. Caballero,*
    277 F.3d 1235 (10th Cir. 2002) ................................................................ 52

*United States v. Claxton,*
    685 F.3d 300 (3d Cir. 2012) ..................................................................... 20

*United States v. Dansker,*
    537 F.2d 40 (3d Cir. 1976) ................................................................. 57, 68

*United States v. DeMuro,*
    677 F.3d 550 (3d Cir. 2012) ............................................................. passim

*United States v. Diamond,*
    788 F.2d 1025 (4th Cir.1986) ................................................................... 26

*United States v. Dunnigan,*
    507 U.S. 87 (1993) ................................................................................... 50

*United States v. Fattah,*
    Crim. No. 14-409, 2015 WL 132412 (E.D. Pa. Jan. 9, 2015) ................... 46

v

*United States v. Fernandes,*
    272 F.3d 938 (7th Cir. 2001)...................................................................... 19

*United States v. Ferriero,*
    Crim. No 13-592 (ES), 2015 WL 77373410 (D.N.J. Dec. 1, 2015)
    *aff'd*, 866 F.3d 107 (3d Cir. 2017),........................................................ 21, 53

*United States v. Fisher,*
    No. 13–30363, 607 F. App'x 645 (9th Cir. Apr. 14, 2015) ........................... 72

*United States v. Flores,*
    454 F.3d 149 (3d Cir. 2006)...................................................................... 20

*United States v. Friedland,*
    660 F.2d 919 (3d Cir. 1981)...................................................................... 22

*United States v. Gorrell,*
    __F.3d__, 2019 WL 1890971 (10th Cir. Apr. 29, 2019) ............................... 69

*United States v. Greenspan,*
    ___ F.3d. ___, 2019 WL 1984187 (3d Cir. 2019).......................................... 48

*United States v. Guidry,*
    199 F.3d 1150 (10th Cir. 1999).................................................................. 26

*United States v. Harris,*
    498 F.2d 1164 (3d Cir. 1974)..................................................................... 50

*United States v. Hazelrigg,*
    654 F. App'x 341 (9th Cir. 2016)................................................................ 62

*United States v. Jewell,*
    614 F.3d 911 (8th Cir. 2010)..................................................................... 72

*United States v. Johnson,*
    302 F.3d 139 (3d Cir. 2002)...................................................................... 21

*United States v. Lewis,*
    447 Fed. App'x. 310 (3d Cir. 2011) ........................................................... 22

*United States v. Lord,*

404 Fed. App'x. 773 (4th Cir. 2010) ...................................................... 26, 27

*United States v. Lore,*
430 F.3d 190 (3d Cir. 2005) ................................................................. 19

*United States v. Lynch,*
735 F. App'x 780 (3d Cir. 2018) .......................................................... 23

*United States v. Martinez,*
69 Fed. App'x. 513 (3d Cir.2003) ....................................................... 23

*United States v. McNeill,*
887 F.2d 448 (3d Cir. 1989) ........................................................... 20, 29

*United States v. Ozcelik,*
527 F.3d 88 (3d Cir. 2008) ................................................................. 20

*United States v. Petersen,*
622 F.3d 196 (3d Cir. 2010) ............................................................... 32

*United States v. Quinn,*
566 Fed. App'x. 666- (10th Cir. 2014) ............................................ 34, 35

*United States v. Reilly,*
33 F.3d 1396 (3d Cir. 1994) ................................................................ 46

*United States v. Ringwalt,*
213 F. Supp. 2d 499 (E.D. Pa. 2002) .................................................. 62

*United States v. Rosenfield,*
469 F. 2d 598 (3d Cir. 1972) .............................................................. 36

*United States v. Ryan,*
828 F.2d 1010 (3d Cir. 1987) ......................................................... 46, 55

*United States v. Salahuddin,*
765 F.3d 329 (3d Cir. 2014) ............................................................... 21

*United States v. Sandini,*
888 F.2d 300 (3d Cir. 1989) ............................................................... 20

*United States v. Scanzello,*

832 F.2d 18 (3d Cir. 1987) ..................................................................... 20

*United States v. Silveus,*
542 F.3d 993 (3d Cir. 2008) ................................................................. 21

*United States v. Stadtmauer,*
620 F.3d 238 (3d Cir. 2010) ...................................................... 49, 50, 51

*United States v. Syme,*
276 F.3d 131 (3d Cir. 2002) ............................................................ 54, 55

*United States v. Tarnopol,*
561 F.2d  (3d Cir. 1977) .......................................................................... 55

*United States v. Thornton,*
1 F.3d 149 (3d Cir.1993) ...................................................................... 22

*United States v. Threadgill,*
No. 13–5897, 572 Fed. App'x. 372 (6th Cir. 2014) ................................. 69

*United States v. Vas,*
497 Fed. App'x. 203 (3d Cir. 2012) ...................................................... 22

*United States v. Vastola,*
989 F.2d 1318 (3d Cir. 1993) ........................................................... 54, 55

*United States v. Voigt,*
89 F.3d 1050 (3d Cir. 1996) ............................................................ 30, 31

*United States v. Wanland,*
657 F. App'x 631 (9th Cir. 2016) ......................................................... 62

*Yeager v. United States,*
557 U.S. 110 (2009) .............................................................................. 70

<u>Statutes</u>

18 U.S.C. § 2 .......................................................................................... 2

18 U.S.C. § 1014 ....................................................................... 2, 37, 38 53

26 U.S.C. § 7201 ................................................................... 2, 56, 71, 72

26 U.S.C. § 7202 ........................................................................... 2, 23, 27, 34

26 U.S.C. § 7206(1) ................................................................................... 2

Internal Revenue Code, Section 7402(a) ......................................................... 25

Rules

Fed. R. Crim. P. 12(b)(3)(B)(v) ................................................................. 53

Fed. R. Crim. P. 12(c)(3) .......................................................................... 53

Fed. R. Crim. P. 29.......................................................................... i, 1, 19, 20

Fed. R. Crim. P. 33 ................................................................................ 1, 21

Fed. R. Crim. P. 52(b) ............................................................................. 48

Other Authorities

Model Crim. Jury Instr. 9th Cir. 9.37 ............................................................ 72

## PRELIMINARY STATEMENT

The United States submits this brief in opposition to defendant George Gilmore's motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, or, alternatively, a new trial pursuant to Fed. R. Crim. P. 33.[1]

Gilmore was convicted because overwhelming evidence of his protracted history of flouting his federal tax obligations convinced the jury of his guilt. This included (but was hardly limited to) his failure to account for and pay over payroll taxes and multiple false statements on a bank loan application. The Court should deny Gilmore's Rule 29 motion because ample evidence—by the close of the Government's case-in-chief and by the close of all of the evidence—proved (1) his willful failure to account for and pay over payroll taxes for the first two quarters of 2016 (Counts 4 and 5), and (2) his knowing false statement on a loan application to Ocean First Bank in January 2015 (Count 6). Moreover, despite the jury's inability to reach a unanimous verdict on whether Gilmore evaded payment of his income taxes for 2013-2015 (Count 1), there was sufficient evidence that he committed that offense as to permit a retrial, notwithstanding the jury's acquittal on Counts 2 and 3 for Gilmore's filing false tax returns for 2013 and 2014. Thus, Gilmore is not entitled to acquittal on Count 1.

This Court should also deny Gilmore's motion for a new trial pursuant to Rule 33. The jury's verdicts were not against the weight of the evidence, and there were no trial

---

[1] The Government incorporates by reference its arguments in opposition to Gilmore's initial Rule 29 motion made at the close of the Government's case-in-chief and renewed at the close of all evidence. *See* 4/9/19 (P.M.) Tr. at 29:7-38:10; 4/10/19 Tr. at 106:1-6. The Court reserved decision on both motions.

errors that individually or collectively denied him a fair trial on Counts 4, 5, and 6.

## STATEMENT OF FACTS

### I.     The Criminal Charges

On March 7, 2019, the grand jury returned the operative Superseding Indictment

against Gilmore, charging him with six counts:

- Count 1 alleged that Gilmore evaded the payment of federal income taxes for calendar years 2013, 2014, and 2015, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2.

- Counts 2 and 3 alleged that Gilmore filed a false federal personal income tax return for 2013 and 2014, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2.

- Counts 4 and 5 alleged that Gilmore failed to collect, account for, and pay over payroll taxes for the employees of the law firm of Gilmore & Monahan, P.A. (the "law firm") for tax quarters ending March 31, 2016 and June 30, 2016, in violation of 26 U.S.C. § 7202 and 18 U.S.C. § 2.

- Count 6 alleged that Gilmore knowingly made false statements in a loan application to Ocean First Bank in January 2015, in violation of 18 U.S.C. § 1014 and § 2.

ECF #18.

### II.    Summary of Facts Introduced at Trial

#### A.     Gilmore and His Control of the Financial Affairs of the Law Firm

Gilmore was a lawyer and one of two name partners and shareholders of the law

firm. *See, e.g.,* 4/3/19 (A.M.) Tr. at 34:3-4, 35:9-16; Government Exhibit ("GX") 29, GX-

30, GX-31 (law firm's corporate tax returns).  The other was Thomas Monahan.  4/3/19

(A.M.) Tr. at 35:9-16, 36:13.  Although Gilmore and Monahan were 50/50 partners and

shareholders of the law firm, Gilmore exercised primary control over the financial affairs

of the law firm.  *Id.* at 36:7-22.  Gilmore made the financial decisions for the law firm,

decided how money would be spent and how bills would be paid, and handled the preparation and filing of tax returns on behalf of the law firm, including the payment of payroll taxes on behalf of the law firm employees. *Id.* at 45:22-46:2.

### B.    Gilmore's Failure to Pay Over Payroll Taxes

Gilmore had a long history of interacting with the Internal Revenue Service ("IRS") dating back to 1997, concerning the law firm's failure to timely pay over payroll taxes on behalf of the law firm employees. *See, e.g.*, GX-41, GX-42; 4/5/19 Tr. at 27:18-24.  Miriam Popowitz, a Revenue Officer for the IRS, was responsible for contacting taxpayers to secure unfiled tax returns and unpaid balances, educating taxpayers about their filing and payment obligations, and pursuing civil enforcement remedies.  She was assigned to ensure the law firm's compliance with payroll tax deposit requirements in 2009 after receiving a failure to deposit alert, or "FTD alert" that the law firm had failed to make required payroll tax deposits for its employees for two quarters. *See, e.g.*, 4/5/19 Tr. at 16:22-17:17, 23:24-24:17.  The civil enforcement remedies consisted of a federal tax lien (notice to creditors of unpaid tax amount owed by taxpayer), levy (seizure of money from a taxpayer's bank account for the unpaid tax amount), and summons (legal document ordering taxpayer to submit documentation or prepare a return or financial statement). *See, e.g., id.* at 17:15-19:20.

Popowitz repeatedly advised Gilmore of his payroll tax payment obligations and the consequences of non-compliance.  The suggestion that Gilmore—a lawyer—was unaware that criminal liability could result from his non-payment of taxes, ECF #93 at 12–14, is not true.  The evidence showed that Popowitz directly notified Gilmore that non-compliance

3

could result in criminal prosecution.  On July 8, 2013, Popowitz met with Gilmore at his

office and read him a letter (GX-63-A), which contained a specific warning that he could

face **criminal prosecution** for continued non-compliance and even referenced Title 26 of

the United States Code, under which Gilmore ultimately was charged.  Popowitz secured

Gilmore's signature on the letter after giving him an opportunity to ask questions.  GX-41

(ICS Transcript History regarding July 8, 2013 filed visit) at 50; 4/5/19 Tr. at 51:10-11,

54:10-55:10.[2]

Throughout their many interactions, Popowitz never told Gilmore that it was

acceptable to make untimely payments of payroll taxes for his employees.  *See id.* at 59:6-

8.  In addition, none of the written materials provided to Gilmore by Popowitz indicated

that it was acceptable for an employer to make untimely deposits as long as penalties and

interest were paid.  *See, e.g.*, GX-60-A, GX-60-B, GX-60-C, GX-63-A.[3]  In fact, Popowitz

_____

[2] The Court received four ICS Transcript histories into evidence: GX-27 and GX-28 are
the ICS histories for George and Joanne Gilmore personally with GX-27 covering July 11, 2013
to December 10, 2018 and GX-28 consisting of the archived history.  GX-41 and GX-42 are the
ICS histories for the law firm with GX-41 covering February 19, 2011 to January 23, 2019 and
GX-42 consisting of the archived history.  Popowitz memorialized her interactions with Gilmore
in these ICS histories.  Popowitz explained, as to the ICS Transcript histories, that it was her
responsibility "[t]o accurately document phone conversations, field visits, office visits,
interactions with the taxpayer, correspondence received from the taxpayer, any letters issued,
justification for the actions."  4/5/19 Tr. at 21:23-22:1.  At trial, Popowitz referred to these
transcript histories, which memorialized Gilmore's misrepresentations to her, at the time he
made them.  *See id.* at 23:8-11.

[3] On May 23, 2011, Gilmore was advised about his obligations and consequences for
continued non-compliance.  *See, e.g.*, GX-60-A (May 23, 2011 Letter from IRS notifying
Gilmore of his failure to deposit federal employment taxes as required by deposit rules set forth
in tax regulations, warning about possible tax lien and levy, and attaching Notice 931 which set
forth "Deposit Requirements for Employment Taxes" and specified that "You are required to
deposit 100% of your tax liability on or before the deposit due date").  At the May 23, 2011
meeting, Popowitz also provided Gilmore with written guidance regarding his payroll tax
obligations.  GX-60-B (brochure explaining electronic payment of payroll tax deposits); GX-60-

testified that during the course of monitoring the law firm compliance, she imposed a monthly deposit schedule in an attempt to remedy the law firm's untimely deposits. 4/5/19 Tr. at 35:23-25.

### C.    No Payments of Payroll Taxes for First Two Quarters of 2016

Gilmore's non-compliance with payroll tax payment requirements continued beyond July 2013.  Despite repeated warnings from Popowitz to make timely payroll deposits, despite receiving literature from the IRS explaining to him his responsibilities to timely deposit and pay over the taxes, and even after signing a document (GX 63-A) explicitly telling him that he could face **criminal prosecution** for willful failure to collect or pay the tax, Gilmore continued to ignore the IRS's directives, including in the first two quarters of 2016, by making no deposits or payments toward the payroll taxes owed for these quarters.  4/2/19 (P.M.) Tr. at 74:5-16, 75:16-76:5; GX-35 (Form 941 Employer's Quarterly Federal Tax Return for first quarter of 2016 covering January through March); GX-36 (Form 941 of the law firm for second quarter of 2016 covering March through June); GX-37 (IRS Transcript reflecting no payments made by the law firm toward the total $121,028.45 liability reflected for quarter 1); GX-38 (IRS Transcript reflecting no payments made by the law firm toward the total $146,116.17 liability for quarter 2).[4]

---

C (brochure explaining federal tax deposits, which included instructions to "[m]ake the deposit any time by the due date" and that "[t]hese taxes need to be paid as they become due in order to avoid a penalty.").

[4] The $121,028.45 and 146,116.17 total liabilities do not include the penalties for failing to make timely deposits in the quarters and the subsequent penalties and interest for not paying thereafter.  The employees' trust fund potion of these taxes in 2016 was $88,603.11 for the first quarter and $109,777.80 for the second quarter for a total of $198,380.91.  GX-5000-C.

For these two quarters, one of Gilmore's accountants prepared Forms 941 with instructions to the law firm on filing the returns and making payments by the due dates, but the law firm did not pay over any of the payroll taxes. *See, e.g*, GX-35; GX-36; 4/4/19 (P.M.) Tr. at 45:3-52:22 (accountant Van Pell's testimony regarding his preparation of the Forms 941). Gilmore did not make the required deposits during the respective pay periods despite Popowitz's repeated instructions to do so. GX-41 at 13-50.

In fact, the law firm not only failed to make deposits during the pay period as required or pay at the time the Form 941s were filed, the law firm simply failed to pay the payroll taxes period. This resulted in the IRS filing Notices of Federal Tax Lien ("NFTL") on October 17, 2016 for the second quarter of 2016 and on January 9, 2017 for the first quarter of 2016. The NFTL's set forth a total unpaid balance of assessment of $290,522.21 at the time of the filings. *See* GX-51 (NFTL filed on October 17, 2016); GX-50 (NFTL filed on January 9, 2017); 4/5/19 Tr. at 116:24-117:5.

### D.   Gilmore's Failure to Pay Individual Income Taxes

Gilmore also did not pay the very substantial taxes due and owing that were reported on his individual federal tax returns (Form 1040s) for 2013, 2014, and 2015, as set forth below:

| Tax Year | Approximate Date of Filing[5] | Tax Reported Due and Owing |
|---|---|---|
| 2013  (GX-10) | October 16, 2014 | $493,526 |

---

[5] Gilmore, upon signing the returns, dated them October 15, 2014, October 15, 2015, and October 15, 2016.  The approximate date of filing refers to the date that the IRS received the returns.  *See* GX-13, GX-14, GX-15 (IRS Account Transcripts)

| 2014  (GX-11) | October 19, 2015 | $321,470 |
| 2015  (GX-12) | October 20, 2016 | $311,287 |

GX-5000-A.  Each of the Forms 1040 was filed on extension, but Gilmore made no estimated tax payments and did not pay the taxes reported due and owing on his returns upon filing the returns or afterwards.  GX-13, GX-14, GX-15 (IRS Literal Transcripts); 4/12/19 (P.M.) Tr. at 63:24-65:10, 65:17-23, 76:8-17.  Gilmore included a $493,526 check dated October 15, 2014, and drawn on his personal bank account, when he filed his Form 1040 for 2013, but that check bounced due to insufficient funds.  GX-13-A; 4/2/19 Tr. at 59:16-60:4, 62:1-10.  Remarkably, at the time Gilmore submitted the bounced check for his 2013 taxes, he had no more than $2,500 in the account from which the check was drawn and typically had average monthly balances in that account of only a few thousand dollars in 2014.  4/9/19 (A.M.) Tr. at 13:24-14:14.

On the same day that Gilmore dated and mailed his $493,526 check for his 2013 tax return, he signed an application to *apply* for a loan from Two River Community Bank. 4/9/19 (P.M.) Tr. at 70:19-71:21; DX-323.  At the time, Gilmore wrote the $493,526 check, he was dealing exclusively with Kelly Sigfried, the bank's "relationship manager," who testified that she could not approve a loan and that she made that clear to Gilmore.  4/9/19 Tr. (P.M.) at 79:7-16; 85:25-86:2.  Sigfried testified that as of October 15, 2014, the bank's vice president, who ultimately would need to approve or deny the loan, had not made any decision on Gilmore's just signed application.  *Id.* at 73:5-11.  Sigfried testified that loans typically take a couple weeks to be approved or denied, which happened in this case.  *Id.*

at 76:1-5.  Sigfried testified that on October 29, 2014 the bank ultimately denied the loan

because:

> Number one, inconsistencies with tax returns preclude the
> bank from determining the firm's actual debt service and the
> ability to service the debt. Number two, approximately
> $5,900,000 in assets with the law firm are owed by
> shareholder.  The ability to repay this debt is in question, and
> if deducted from capital, would make the firm insolvent.

*Id.* at 75:9-10, 16-21.  Following his bounced check, Gilmore submitted no additional

checks or payments toward his 2013 tax obligation in 2014, 2015, or 2016.  For his 2014

and 2015 tax returns, Gilmore did not include any payments when he filed the returns or at

any time thereafter in 2014, 2015, or 2016.  4/2/19 (P.M.) Tr. at 64:3-10, 65:17-23.

Popowitz sought to have Gilmore pay his unpaid individual income taxes and had

been monitoring his compliance with individual income tax return filing and payment

requirements.  4/5/19 Tr. at 59:9-12.  Gilmore had a long history of filing his individual

income tax returns on extension without making estimated tax payments, filing the returns

in October without making payment of the taxes due and owing, and then seeking an

extension for payment after filing the returns.  *Id.* at 61:9-25.  To ensure that Gilmore filed

and paid his 2013 taxes on time and because of the frequency of his failure to pay the taxes

owed, Popowitz informed Gilmore that a notice of federal tax lien would be filed on the

eleventh day if a tax liability accrued without payment made.  4/5/19 Tr. at 62:20-63:1,

74:21-23.  In addition, Popowitz sent written instructions to Gilmore to file his Form 1040

with full payment by October 15, 2014.  *Id.*; GX-65.  Gilmore did not inform Popowitz that

the check that he sent with his 2013 tax return on October 15, 2014 had bounced and did

not have any conversations with her about it.  4/5/19 Tr. at 65:15-17, 66:12-13, 70:5-7.

Unlike Monahan, who had also bounced a check for the payment of his 2013 taxes, Gilmore

did not call Popowitz to let her know the check bounced or to offer any explanation.  4/5/19

Tr. at 65:24-66:3, 103:13-24.  Instead, Gilmore called the IRS Service Center even though

Popowitz was the revenue officer to which tax returns and payments would have to be

addressed and she had specifically instructed Gilmore to deal with her and not the Service

Center.  4/5/19 Tr. at 66:17-22, 70:8-14.  Popowitz filed a notice of federal tax lien for the

unpaid 2013 taxes on March 9, 2015.  GX-47.

Afterwards, Popowitz had conversations with, and received voicemails from

Gilmore about his unpaid income taxes for 2013 and 2014, and she sent him information

about what he owed and when his already late payments were due.  GX-66 (Summary of

Taxpayer Contact), GX-67 (July 30, 2015 Letter regarding outstanding balance for 2013

taxes); GX-68 (Summary of Taxpayer Contact instructing Gilmore to submit Form 1040

for 2014 with full payment by certified funds by October 15, 2015); GX-27 at 20-23 (ICS

History concerning conversations or voicemails on August 13, 2015, August 31, 2015,

October 1, 2015, October 19, 2015); 4/5/19 Tr. at 77:10-22, 82:19-83:14, 89:14-90:11,

91:21-92:7.

On August 13, 2015, after being informed that he owed the IRS approximately

$568,720.92 for tax year 2013, including penalties and interest, Gilmore spoke to Popowitz

and requested an installment payment agreement, indicating that someone would lend him

$200,000 and that he had to come up with the other $350,000.  4/5/19 Tr. at 73:1-16, 77:10-

25; GX-27 at 20; GX-67.  He said the lien would have to be released, and added that he

would submit a $25,000 check at the end of August and then another $25,000 at the end of

September.  4/5/19 Tr. at 77:10-22; GX-69 (Summary of Taxpayer Contact).  Popowitz

explained to Gilmore that in order to obtain an installment payment agreement, he would

need to complete a "Form 433A," which provides financial information concerning the

taxpayer, and in response, Gilmore said he would need extra time to complete it and needed

his accountant to help him fill out the form.[6]  4/5/19 Tr. at 77:18-78:14; GX-74 (Form

433A). Gilmore never completed the form.  4/5/19 Tr. at 79:16-17.

Gilmore also never submitted the two pledged payments of $25,000 or the $200,000

that he had said someone would lend him.  4/5/19 Tr. at 82:14-83:11.  With respect to the

$25,000 promised payments, on August 31, 2015, Gilmore left a voicemail for Popowitz

indicating that he would be dropping off the first payment of $25,000 at the end of the next

week. GX-27 at 21.  He also left a voicemail that he would be sending the second payment

of $25,000 by the end of September 2015. *Id.*  Consistent with his prior history, Gilmore

did not make any of these promised payments. *Id.*; 4/5/19 Tr. at 82:20-83:11.

On October 1, 2015, Gilmore indicated he had sufficient assets in his and his wife's

401k accounts and in his deferred compensation account to pay his unpaid taxes.   In

response, Gilmore was advised by Popowitz to consult with his accountant regarding the

use of his retirement accounts to pay his taxes because of the tax implications of making

withdrawals from retirements accounts.   Gilmore indicated he would do so.   He also

indicated that he was unsure he could make full payment by October.  4/5/19 Tr. at 90:2-

---

[6] An IRS Form 433A collects a taxpayer's personal information, employment
information, financial information, assets, and equity.  GX-74.

8; GX-27 at 22-23.

On October 19, 2015, Gilmore spoke to Popowitz again. He told her he had two checks for $500,000 and would send her information concerning his retirement accounts, which he subsequently faxed to her on October 19, 2015. GX-27 at 23; GX-71. On November 30, 2015, Gilmore withdrew funds from his and his wife's 401k retirement accounts and obtained a net amount of $88,000, which he deposited to his Ocean First Bank account. He did not use any of that money to pay the IRS for his 2013, 2014, or 2015 personal income tax obligations, despite his pledge to do so. GX-3700; GX-5008. After October 19, 2015, Gilmore made no further contact with Popowitz. GX-27. In 2018, Gilmore borrowed $50,000 from his deferred compensation account. GX-3800.

Gilmore never told Popowitz that he was using the law firm accounts to pay for personal expenses and never revealed that he was using his law firm credit card for personal expenditures. 4/5/19 Tr. at 101:16-24, 102:5-11, 102:22-103:9; 4/8/19 (A.M.) Tr. at 66:15-21. Also, he never asked whether he could use his law firm accounts or credit card to make a payment for back taxes. 4/5/19 Tr. at 101:19-21, 101:25-102:14, 103:10-12.

### E. Gilmore's Personal Expenditures, Receipt of Monies from the Law Firm, and Use of the Law Firm Accounts for Personal Expenditures

Gilmore received many checks from the law firm made out to him or checks made out to cash without any taxes withheld, in addition to his salary. *See, e.g.*, 4/8/19 (A.M.) Tr. at 88:23-89:12 (Gilmore's prior accountant, James Koerner, explaining Gilmore's compensation from the law firm); 4/9/19 (A.M.) Tr. at 36:4-38:4 (IRS Revenue Agent Bert Balbas testifying about law firm checks to cash and law firm checks to Gilmore). These

11

checks to cash and checks to Gilmore without any tax withholdings were classified as loans or shareholder loans on the law firm ledger (within a section called the "1240 account"), and some of these amounts were later classified as "director's fees" on Gilmore's tax returns. *See, e.g.*, 4/3/19 (P.M.) Tr. at 107:7-10; 112:17-114:6 (Hutchins, Gilmore's previous tax preparer, explaining some of the monies that Gilmore received from the law firm that were classified as shareholder loans and had no taxes withheld were later reported as director's fees on Gilmore's tax returns); GX-413 (law firm ledger showing 1240 account).

In addition, Gilmore used law firm monies to pay personal bills, such as his and his wife's personal credit card bills, and the law firm credit card for personal expenditures. *See, e.g.*, GX-413, GX-414, GX-5011, GX-5012, GX-5013, GX-5014, GX-5016. Gilmore classified these monies as loans on the law firm ledger, specifically, within the "1240 account" and "1245 account" sections of the law firm ledger. *See, e.g.*, GX-413, GX-414; 4/9/19 (A.M.) Tr. at 29:2-38:22 (Balbas explaining these ledger accounts). By mid-July 2016, the combined balances of these loan accounts exceeded $9 million, *see, e.g.*, GX-413, GX-414, an amount that was nearly double the yearly gross receipts of the law firm in 2013 through 2015. GX-29, GX-30, GX-31. Two of Gilmore's prior accountants, Koerner and Hutchins (who had prepared the Forms 1040s for 2013, 2014, and 2015), had warned Gilmore to take more compensation in the form of salary with taxes withheld rather than continuing to receive monies from the law firm (with no taxes withheld) which Gilmore classified as loans from the law firm. *See, e.g.*, 4/3/19 (P.M.) Tr. at 111:9-16; 4/4/19 (A.M.) Tr. at 21:1-7, 45:12-16, 106:13-15; 4/8/19 (A.M.) Tr. at 91:9-23.

12

Gilmore spent lavishly on personal expenditures from 2014 to 2016, during the years when payment of his substantial income taxes for 2013-2015 were due. *See, e.g.*, GX-5001–07 (summary charts concerning various types of personal expenditures). These expenses included, but were not limited to, the following:

| Type of Expenditure | Amount |
| --- | --- |
| Home Mortgage Payments | Over $700,000 |
| Retail Store Credit Cards | Over $150,000 |
| Luxury Accommodations in Vail, CO | Over $80,000 |
| Steinway Piano Payments | Over $20,000 |
| House Construction and Remodeling | Over $380,000 |
| Art, Antiques and Collectibles | Over $520,000 |

GX-5001. From 2014 through 2016, Gilmore amassed approximately $1,475,092.61 in expenses on personal credits cards, and $408,674.93 in expenses on personal Diners Club cards. GX-5012, GX-5013. Gilmore purchased various types of art and antiques, completed construction on his mansion and all the while evaded his responsibility to pay the IRS.

During the time when Gilmore's payroll taxes were due, January 1, 2016 through July 31, 2016, Gilmore did not turn over his employees' money that he was expected to hold in trust. Instead, he authorized the law firm to pay approximately $271,009 in personal credit card expenses for him and his family to seven different credit card companies. GX-5016. Notably, had Gilmore chosen to not prioritize his discretionary lavish spending on just these credit card bills alone over paying the employee payroll taxes, he could have paid the entire payroll tax balance due and owing for the first and second quarters of 2016, with money remaining.

13

### F.    Gilmore's January 2015 Refinance of a Mortgage with Ocean First Bank

In January 2015, Gilmore obtained over a half-million dollars from Ocean First Bank as part of a cash out refinance on a home mortgage loan for $1,500,000 for his primary home in Toms River.  GX-715 (HUD-1 Settlement Summary); GX-717 (Ocean First Bank records showing receipt of $572,661.22 from the cash-out portion of the refinanced mortgage loan).  Gilmore began applying for this home mortgage in November 2014 and signed the final updated loan application form, called a Uniform Residential Loan Application ("URLA"), in January 2015 ("January 2015 loan application").   GX-712 (November 2014 URLA); GX-713 (January 2015 URLA).

The URLA form required information about the applicant's assets and liabilities. GX-713.  The section for listing liabilities (Section VI) instructed the borrower to list "all outstanding debts" and the declarations section of the application (Section VIII) consisted of a list of questions with boxes to be checked off as "yes" or "no" concerning certain liabilities of the applicant, including a question (itemized as question "f".) that asked: "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee?" Section IX of the application was entitled "Acknowledgement and Agreement" under which the borrower signed.   Part of the acknowledgement and agreement stated:

> Each of the undersigned specifically represents to Lender . . . that: (1) the Information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in . . . criminal penalties . . . .

GX-713.

At the time that Gilmore signed and submitted the January 2015 loan application providing that the information provided in the application was true and correct as of the date set forth opposite his signature (GX-713), Gilmore still had not paid his delinquent federal income taxes due and owing for 2013, which was $493,526, and had not submitted any other check or payment to the IRS after bouncing the $493,526 check. Gilmore's response to Question f, however, was "no." In addition, at the time of the January 2015 loan application, Gilmore had an outstanding personal debt of $400,000 from a loan that he took from Dale and Carol Orlvosky ("the Orlovsky loan"). GX-3003-C; 4/8/19 (A.M.) Tr. at 126:1-129:15 (testimony of Dale Orlovsky concerning the loan). The promissory note identified Gilmore and his wife as the borrowers and Orlvosky and his wife as the lenders. Orlovsky clearly testified that he loaned **Gilmore** the money and not Gilmore's law firm:

> Q:   Mr. Orlovsky, who did you loan this money to, Mr. Gilmore or to Gilmore and Monahan?
>
> A:   George Gilmore.

4/8/19 (A.M.) Tr. at 140:22-24. Orlovsky wanted to ensure that Gilmore was personally liable under the promissory note instead of Gilmore's law firm in the event that the law firm dissolved. *Id.* at 129:3-9. Gilmore did not report the $400,000 Orlvosky loan or the $493,526 debt he owed to the IRS on the URLA and disclosed neither to Hoyt when reviewing the loan application with him. GX-712, GX-713, 4/8/19 (P.M.) Tr. at 15:5-11, 22:6-15, 68:9-69:13.

15

Bradley Hoyt, a loan officer at Ocean First Bank, dealt with Gilmore in connection with the loan application and spoke to Gilmore by phone to take the application. 4/8/19 (P.M.) Tr. at 9:8-9, 15:17-19:8. Lisa Rogers, a residential mortgage underwriter at Ocean First Bank, handled part of the underwriting process for the loan. 4/8/19 (P.M.) Tr. at 70:13-18; 72:16-21. These bank officers expected Gilmore, the borrower, to provide true and correct information on the URLA and to disclose information about liabilities that were not reflected on the credit reports. 4/8/19 (P.M.) Tr. at 69:14-16 (Hoyt stating that it was the responsibility of the borrower to provide true and correct information on a loan application); *id.* at 20:23-24 (Hoyt explaining the significance of the Acknowledgement and Agreement section in the URLA, specifically, that "[i]t's to let the borrower know that we need to know everything, and make them aware of it."); *id* at. 74:8-75:21 (Rogers explaining that the bank relied on the applicant to truthfully disclose liabilities that may not appear on a credit report and that full disclosure of liabilities was required to assess the applicant's debt to income ratio).

## III.   Procedural History

On January 18, 2019, Gilmore had his initial appearance and arraignment on the initial indictment. Gilmore, through his counsel, exercised his right to have his trial as quickly as possible, within 70 days of his arraignment. 1/18/19 Tr. at 10:22-25 ("I don't intend to move to dismiss any part of their misbegotten indictment . . . put up in 70 days or the case gets dismissed. If they're not ready to go in 70 days, they should dismiss the case. If they are ready to go in 70 days, we should go in 70 days . . . [s]o no, I don't want to wait."). Defense counsel acknowledged the legal sufficiency of the indictment, asserted

16

there was no novel question of law, and stated he would not submit any pretrial motions other than motions in limine. *See* 1/18/19 Tr. at 12:4-8 ("In terms of substantive motions that would – that this Court would have to have under consideration for some protracted period of time, there will be none. The[ir] indictment states a claim on which relief can be granted. Their indictment states a crime."); *id.* at 9:21-22 ("The notion that there are novel questions in fact or law? No, there are not."). Thus, the Court set a trial date of Friday, March 29, 2019 (which was later moved slightly to Monday, April 1, 2019).

Prior to trial, the Court adjudicated a number of pretrial and in limine motions: the Government's motion to inquire concerning defense counsel's potential conflicts of interest (ECF #11); the Government's motion to exclude Gilmore's proposed expert witness concerning Gilmore's purported hoarding disorder (ECF #17); Gilmore's cross motion to exclude details concerning his personal expenditures (ECF #25); and the Government's motion in limine to preclude him from arguing or presenting evidence regarding possible alternative administrative or civil remedies in lieu of criminal prosecution (ECF #28). With regard to defense counsel's potential conflict, the Court found that if a conflict were to exist, Gilmore and the witnesses waived the conflict. ECF #23. The Court excluded Gilmore's hoarding defense and permitted the Government to admit evidence of Gilmore's spending. ECF #31. With regard to the Government's motion in limine, Gilmore stated that he "[did] not intend or argue or present evidence that the IRS 'could have or should have resolved this case using civil or administrative remedies, rather

than criminal prosecution.'"[7]  ECF #29.  Gilmore reserved the right to present his good faith defense, which he did at trial.  ECF #29.

Jury selection began on April 1, 2019, and trial commenced the next day.  The Government presented 20 witnesses, including, but not limited to, IRS representatives; Gilmore's name law firm partner, Monahan; his prior accountants who helped prepare his tax returns; the project manager who worked on construction of his home; various artists and vendors whose goods and services Gilmore purchased; and individuals who had loaned Gilmore money.  The Government also presented a substantial number of exhibits consisting of IRS records, law firm records, accountants' record, Gilmore's financial records and other records concerning Gilmore's substantial personal expenditures, assets, and loans.  The defense presented a case beginning on April 9, 2019.  The presentation of all evidence concluded on April 10, 2019.

At the conclusion of the Government's case and again at the conclusion of trial, Gilmore moved for a judgment of acquittal pursuant to Rule 29.  The Court reserved on Gilmore's motions, noting: "I think this case is a case for the conscience of the community.  And it's very fact sensitive.  It is a jury case of interpretation and community judgment."

---

[7] Notwithstanding, Gilmore, in his closing argument, repeatedly argued that this was a civil case making such statements as (1) "Ladies and gentlemen, this entire case is a civil dispute masquerading as a criminal case," 4/12/19 Tr. at 15-16; (2) "Take it to a civil proceeding.  Don't tell me that you're going to take the liberty away from a person based on that kind of nonsense," *Id.* at 113:22-24; (3) They can come in and say reclassify and then you have to reclassify, or you say let's fight that out in a civil courtroom; I think you are wrong.  Okay.  Have that battle.  But don't tell me, don't take the square peg of a criminal -- of a civil case and try to jam it into the round hole of a criminal case, because a man's life is on the line," *Id.* at 114:21-115:2; and (4) "If I seem a little outraged at what's gone on here, it's because it's not my custom to defend criminal charges in civil cases.  I feel like I've wandered onto the set of the wrong movie."  *Id.* at 166:9-12.

*See* 4/9/19 (P.M.) Tr. at 39:17-23; 4/10/19 Tr. at 106:8-11.

On April 12, 2019, after summations, the jury began its deliberations. On April 17, 2019, the jury found Gilmore guilty on Counts 4, 5, and 6 and acquitted him on Counts 2 and 3. The jury was unable to reach a unanimous verdict on Count 1. ECF #87.

On May 1, 2019, Gilmore filed a notice of motion for an acquittal on Counts 1, 4, 5, and 6 pursuant to Rule 29 and a motion for a new trial on Counts 4, 5, and 6 pursuant to Rule 33. ECF #92. On May 13, 2019, Gilmore filed a brief in support of his post-trial motions. ECF #93.[8]

For the reasons that follow, Gilmore's motions should be denied.

## **ARGUMENT**

I.      **The Applicable Legal Standards**

A.      **The Rule 29 Standard**

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Lore*, 430 F.3d 190, 203-04 (3d Cir. 2005) (quotation omitted); *see also United States v. Fernandes*, 272 F.3d 938, 943 (7th Cir. 2001) ("a challenge to the sufficiency of the evidence is an uphill battle").

In considering a Rule 29 motion, "a court 'must be ever vigilant in the context of

---

[8] References to page numbers in Gilmore's post-trial brief are to the ECF stamped pages in the document.

Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.'" *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). Instead, the Court "must view the evidence and the inferences logically deducible therefrom in the light most favorable to the government," *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989), and must resolve all credibility issues in the government's favor, *see United States v. Scanzello*, 832 F.2d 18, 21 (3d Cir. 1987). Under Rule 29, the Court's inquiry is "limited to determining whether the conclusion chosen by the factfinders was *permissible.*" *United States v. Ashfield,* 735 F.2d 101, 106 (3d Cir. 1984) (emphasis added). The Court must uphold the jury's verdict as long as "any rational trier of fact could have found proof of guilt [] beyond a reasonable doubt based on the available evidence." *United States v. Claxton*, 685 F.3d 300, 305 (3d Cir. 2012) (quotation omitted).

Further, "the government's proof need not exclude every possible hypothesis of innocence." *United States v. Ozcelik*, 527 F.3d 88, 94 (3d Cir. 2008) (quotation omitted). Accordingly, "[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." *United States v. Sandini*, 888 F.2d 300, 311 (3d Cir. 1989) (quotation omitted).

This Court reserved decision on the Rule 29(a) motion Gilmore made when the Government rested and on the renewed Rule 29 motion Gilmore made at the close of all evidence. That requires this Court to address the sufficiency of the evidence in two discreet

steps. First, this Court must determine if the evidence the Government presented in its case-in-chief was legally sufficient. If it was, it must then determine whether that evidence, plus the evidence presented during the defense case, was legally sufficient. *See United States v. Brodie*, 403 F.3d 123, 133–34 (3d Cir. 2005); *see also United States v. Ferriero*, Crim. No 13-592 (ES), 2015 WL 7737341, at *2 (D.N.J. Dec. 1, 2015) (analyzing Rule 29(a) motion separately from Rule 29(c) motion), *aff'd*, 866 F.3d 107 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1031 (2018).

### B.      The Rule 33 Standard

Federal Rule of Criminal Procedure 33(a) provides that the district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When evaluating a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). However, the authority to grant a new trial pursuant to Rule 33 is limited to those instances where the Court "believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (quotation omitted). "Thus, motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quotation omitted); *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008); *Gov't of the V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

Although the Court has the authority to determine whether, for example, a

Government witness's credibility was so impeached that his testimony should be disregarded entirely, the jury's apparent decision to credit that testimony despite impeachment efforts is a relevant consideration under Rule 33. *See United States v. Friedland*, 660 F.2d 919, 931-32 (3d Cir. 1981). *See also United States v. Vas*, 497 Fed. App'x. 203, 206 (3d Cir. 2012) (unpublished) (affirming district court's denial of Rule 33 motion despite minor inconsistencies and weaknesses in Government witnesses' testimony); *United States v. Lewis*, 447 Fed. App'x. 310, 314 (3d Cir. 2011) (unpublished) (affirming district court's denial of Rule 33 motion where defendant enjoyed ample opportunities to impeach the Government's cooperating witnesses at trial). In any event,

> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the totality of the case.

*United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (per curiam) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

A district court also has authority under Rule 33 to grant a new trial for errors occurring during trial that affected its outcome. A court may grant a motion for new trial if it finds errors occurred during the trial and these errors "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir.1993) (quotation omitted). Harmless errors that do not deprive a defendant of a fair trial provide no basis for granting a defendant's Rule 33 motion. *Id*. The defendant bears the burden of proving a new trial should be granted,

and must therefore show "(1) that error occurred at trial, and (2) that error had a substantial influence on the verdict." *United States v. Amirnazmi*, 648 F.Supp. 2d 718, 720 (E.D. Pa. 2009), *aff'd*, 645 F.3d 564 (3d Cir. 2011). Motions for a new trial are disfavored and "only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 Fed. App'x. 513, 516 (3d Cir.2003) (unpublished).

## II.     Gilmore Is Not Entitled To A Judgment Of Acquittal Or New Trial On Counts 4 and 5

### A.     Ample Evidence Proves that Gilmore Willfully Failed to Pay Over Payroll Taxes

Counts 4 and 5 charged Gilmore with willfully failing to pay over payroll taxes withheld from the employees of Gilmore & Monahan, in violation of 26 U.S.C. § 7202, for the tax quarters ending March 31, 2016 and June 20, 2016. ECF #18 at 8-9. To prove Counts 4 and 5, the Government had to adduce sufficient proof that: (1) Gilmore had a duty to account truthfully for and pay over payroll tax, (2) Gilmore knew he had a duty to account truthfully for or pay over payroll tax, and (3) Gilmore willfully failed to account truthfully for or pay over payroll tax. Court's Instructions to Jury, 4/12/19 Tr. at 36:17-37:9; *see also United States v. Lynch*, 735 Fed. App'x 780, 788 (3d Cir. 2018) (unpublished) (citing *Greenberg v. United States*, 46 F.3d 239, 243 (3d Cir. 1994)). In his Rule 29 motion, Gilmore does not appear to take issue with the proof relating to the first two elements of this offense, but he contends that there is insufficient evidence that he acted willfully. He is wrong.

### 1.     Ample Evidence Proves That Gilmore Acted Willfully

Willfulness, as defined by this Court to the jury and consistent with the Third Circuit

model instructions in tax cases, is "a voluntary and intentional violation of a known legal duty." 4/12/19 Tr. at 33; *see* Third Circuit Model Instruction, 6.26.7201-4; *Cheek v. United States*, 498 U.S. 192, 201 (1991). A defendant's conduct is "not willful if he acted through negligence, mistake, accident, or...due to a good faith misunderstanding of the law." 4/12/19 Tr. at 33:18-20. A person acts in good faith when he has an honestly held belief, opinion, or understanding that the tax laws did not make his conduct unlawful, even though the belief, opinion, or understanding turns out to be inaccurate or incorrect. *Id.* at 45:8-12. If the defendant made an honest mistake or had an honest misunderstanding about his duties under the tax laws, then he did not act willfully. A belief need not be objectively reasonable to be held in good faith and a defendant does not have the burden of proving good faith. *Id.* at 45:13-16, 21-23. The Government's burden was to prove beyond a reasonable doubt every element of the offense, including willfulness. *Id.* at 46:1-3. Thus the Government was required to show that Gilmore knew his legal duty to pay over the employment taxes when due and that he voluntarily and intentionally violated that legal duty. There was ample evidence at trial that Gilmore's conduct was willful and that he did not act in good faith.

First, the Government submitted overwhelming evidence that Gilmore was aware that he had a legal obligation to timely pay over to the IRS the employment taxes collected by his law firm from its employees and that he intentionally failed to do so. Over the course of nearly two decades, Gilmore received numerous notices, verbally and in writing, from the IRS about the unpaid taxes and his duty to pay them. Most significantly, IRS Revenue Officer Popowitz told Gilmore of his duty to pay over the employment taxes, explicitly

24

informing him that he could be subject to criminal prosecution for his failure to do so. In particular, on July 8, 2013, Popowitz met with Gilmore to discuss his law firm's continued failure to timely pay over payroll taxes. 4/5/19 Tr. at 49:15-16. During this meeting, Popowitz reviewed with Gilmore payroll tax requirements and specifically warned him that continued noncompliance could result in criminal prosecution. 4/5/19 Tr. at 50:12-51:11. Indeed, Popowitz provided Gilmore these warnings in writing:

> If there is continued non-compliance, we may consider pursuing a suit for civil injunction under Internal Revenue Code Section 7402(a) **or criminal prosecution under Title United State[s] Code (USC) 18 and/or Title 26 for willful failure to collect or pay the tax**.
>
> …
>
> **Criminal charges could be pursued based on the failure to adhere to the reporting and payment requirements mandated by the Internal Revenue Code. Convictions under Titles 18 and 26 may include substantial fines and terms of imprisonment**.

(GX-63A) (emphasis added). Popowitz explained that she read these warnings to Gilmore, gave him an opportunity to ask questions and then secured his signature after having reviewed the letter with him:

Q:    And who else signed it?

A:    Mr. Gilmore.

Q:    Now did you read this document to Mr. Gilmore?

A:    Yes, I'm required to.

Q:    Did he have an opportunity to ask you any questions?

A:    Yes.

25

Q:     Do you recall if he had any questions?

A:     No.

Q:     And was it signed after it was read to him?

A:     Yes.

4/5/19 Tr. at 55:1-10.[9]

The jury had much more than evidence simply showing that the defendant knew of

his tax obligations but failed to meet them.  The record shows that Gilmore willfully chose

to pay other substantial discretionary personal expenses rather than remitting to the IRS

the payroll taxes withheld from his employees' wages and that this was significant evidence

of his willfulness.  *See, e.g., United States v. DeMuro*, 677 F.3d 550, 558 (3d Cir. 2012)

(evidence of personal spending can be relevant to rebut defendant's claim that he did not

act willfully); *United States v. Boccone*, 556 Fed. App'x. 215, 239 (4th Cir. 2014)

(unpublished) ("The intentional preference of other creditors over the United States is

sufficient to establish the element of willfulness") (quotation omitted); *United States v.*

*Lord,* 404 Fed. App'x. 773, 779 (4th Cir. 2010) (unpublished) ("Such acts, of paying wages

---

[9] Not only was Gilmore informed on innumerable occasions of his duty to pay
over employment taxes, the evidence at trial revealed that Gilmore himself was an
attorney, who oversaw the firm's financial operations.  That alone would enable a
rational jury to infer that Gilmore knew of his obligation to pay over the employment
taxes, and could understand what Popowitz meant when she told him he could face
criminal prosecution.  *United States v. Guidry*, 199 F.3d 1150, 1157–58 (10th Cir. 1999)
(willfulness inferred in part from accounting background and experience of defendant);
*United States v. Diamond*, 788 F.2d 1025, 1030 (4th Cir.1986) (substantial circumstantial
evidence, such as defendant's education and professional experience, supported
conclusion that defendant intended to file false returns). This was not a case of a good
faith misunderstanding of a complicated tax law provision. To the contrary, the evidence
proved Gilmore knew and understood the law, but repeatedly chose to disregard it.

26

and of satisfying debts to creditors in lieu of remitting employment taxes to the IRS, constitute circumstantial evidence of a voluntary and deliberate violation of § 7202"); *Lee v. United States*, 951 F. Supp. 79, 83 (W.D. Pa. 1997) ("It is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern—the government cannot be made an unwilling partner in a floundering business.") (internal citation omitted). Gilmore did not simply prefer other creditors of his law firm to the IRS. Rather, he used the funds available to him to pay for lavish personal expenditures while failing to pay over the payroll taxes. *See United States v. Blanchard*, 618 F.3d 562, 569-70 (6th Cir. 2010) ("If a defendant has made discretionary purchases in lieu of meeting his tax obligations, this is probative of his guilt").

Ample evidence demonstrated that Gilmore intentionally chose to pay for items for himself and his family rather than paying the payroll taxes withheld from his employees' wages. Remarkably, as set forth in Section II of this brief, Gilmore directed the law firm to pay for $271,009 in personal credit card expenses during the relevant seven-month period when his payroll taxes were due, as detailed more clearly below:

| PAYMENTS FROM LAW FIRM OCEAN FIRST BANK ACCOUNT ENDING IN 3906 FOR PERSONAL CREDIT CARD EXPENSES JANUARY 1, 2016 THROUGH JULY 31, 2016 | |
| --- | --- |
| **ITEM** | **AMOUNT** |
| American Express | $224,100 |
| Banana Republic | $2,400 |
| Bloomingdale's | $7,159 |
| Diners Club | $19,500 |
| Macy's | $8,550 |

| Nordstrom | $4,000 |
| Toys R Us | $5,300 |
| **TOTAL EXPENDITURES** | **$271,009.00** |

In other words, Gilmore chose to spend over $271,000 of law firm money on personal credit card payments alone during the time he failed to pay over to the IRS $198,380.91 in payroll taxes. (*See* GX-5000-C; GX-5016). *See, e.g., DeMuro*, 677 F.3d at 558-59 ("evidence that the DeMuros spent money on vacations and other personal items – money that they could have used to pay other taxes – belies their assertions that they were sincerely attempting to pay their back taxes as expeditiously as possible.")

Despite repeated notices and admonitions from the IRS, the uncontroverted evidence at trial was that Gilmore refused to pay over to the IRS payroll taxes withheld from his employees' wages and instead paid other expenses (including personal expenditures) from his law firm's bank accounts. The evidence overwhelmingly established that Gilmore acted willfully.

### 2.  A Rational Jury Easily Could Have Rejected Gilmore's Claim, Advanced Through Attorney Argument, That He Had a Good Faith Belief That His Conduct was Lawful

Gilmore argues that his lengthy history of interactions with the IRS demonstrates that—as a matter of law—he had a good faith belief that his failure to pay over payroll taxes by their due date was lawful.  ECF #93 at 24. That is, Gilmore asks this Court to make conclusions about his state of mind and to draw inferences in his favor, and against the jury's verdict. This, of course, is the exact opposite of the deferential standard that the Court must apply here, and Gilmore's argument must be rejected.

28

Gilmore does not dispute (nor could he) the decades of IRS collection efforts and warnings that he received concerning payroll taxes, or his decision to pay others (including himself) instead of the IRS. Instead, he argues that this evidence proves the opposite of what the jury found. He asserts that his interactions with the IRS "led Gilmore to believe in good faith that failing to pay over payroll taxes on the filing date is not unlawful or criminal, as long as one pays those taxes with interest and penalties and otherwise complies with any additional filing and payment requirements imposed by the revenue officer." ECF #93 at 25.

Gilmore's argument rests not on the record evidence, but on inferences concerning his state of mind that he asks the Court to draw in his favor. For example, he argues, without supporting evidence:

- "Those interactions led Gilmore to believe in good faith that failing to pay over payroll taxes on the filing date is not unlawful or criminal."

- "the IRS's 2011 L903 letter caused him to believe that he would only be engaging in criminal or unlawful behavior if G&M failed to comply with the special bank deposit requirements."

- "The L903 letter Popowitz gave Gilmore at the July 8, 2013 field visit reinforced his view that it was only unlawful or criminal to fail to meet additional deadlines and requirements imposed by the IRS to ensure payment of payroll taxes that were already late."

ECF #93 at 25, 28, 30 (emphasis added).  In the context of Rule 29, it would be completely inappropriate for the Court to draw inferences in Gilmore's and not the Government's favor. *E.g., McNeill*, 887 F.2d at 450 (evidence and inferences therefrom must be viewed in a light most favorable to the Government).

Indeed, Gilmore asks the Court not simply to draw inferences in his favor, but also

to conclude that evidence compels a conclusion contrary to the one the jury drew.  For instance, he asks the Court to conclude, without supporting evidence, that the July 8, 2013 IRS letter informing him that "[c]riminal charges could be pursued" is somehow evidence that Gilmore was unaware he could be prosecuted: the letter, he asserts, "reinforce[d] Gilmore's pre-existing good-faith belief…that it was not unlawful or criminal to not pay payroll taxes on the return filing deadline, provided those taxes were ultimately paid with interest and penalties."  ECF #93 at 31.  Once again, there is no basis for this strained interpretation of the evidence at trial, and certainly no basis to credit this tortured spin under Rule 29 standards.  Moreover, Gilmore was not simply late on these taxes.  He didn't pay them, which resulted in the filing of NFTL's on October 17, 2016 and January 9, 2017. GX-50, GX-51.

Far from addressing "the record in the light most favorable to the prosecution," Gilmore's argument rests on defense counsel's *ipse dixit* assertions of what Gilmore believed, even though there is no evidence of his subjective beliefs in the record. And rather than drawing "all reasonable inferences in favor of the jury's verdict," Gilmore asks the Court to do the exact opposite. The inferences that Gilmore requests that the Court draw from the evidence concerning his purported good faith were argued to, and flatly rejected by, the jury. Gilmore's argument – appropriate for closing argument, but irrelevant in the Rule 29 context – must be rejected by the Court. *See United States v. Voigt*, 89 F.3d 1050, 1091 (3d Cir. 1996) ("Given our deferential standard of review… along with the settled rule that we draw all reasonable inferences in favor of the jury's verdict… we may not substitute our (or Voigt's) judgment for that of the jury; Voigt's legal sufficiency challenge

is essentially a futile attempt to rehash his closing argument.") (citations omitted).

Moreover, Gilmore's claim that the IRS did not believe Gilmore's conduct was criminal is meritless. On the contrary, the IRS warned him that continued non-compliance could result in criminal prosecution. GX-63A, 4/5/19 Tr. at 51:10-11, 54:11-55:10. The IRS made him a monthly filer in an effort to secure compliance. 4/5/19 tr. at 35:23-25. The IRS closely monitored the law firm and never told Gilmore it was permissible to pay late. *See id.* at 59:6-8. To the contrary, the IRS provided him literature and instructions to pay on time. Additionally, Gilmore never told Popowitz that he was spending hundreds of thousands of dollars out of his law firm accounts on himself at the time he failed to make timely deposits and pay over his payroll taxes, information she testified that she would have wanted to know. *See id.* at 102:9-11; 4/8/19 (A.M.) Tr. at 66:15-18, 67:11-14. Gilmore's argument that the IRS did not believe his conduct was criminal is yet again an attempt to ask the Court to view the evidence in the light most favorable to him. That is not the standard. Moreover, it is not consistent with the record and should be rejected by the Court.

**B.    The Court Properly Instructed the Jury on Good Faith**

Gilmore also contends that the Court erroneously instructed the jury on good faith by using the word "unlawful" rather than "criminal" in the Court's instruction. ECF #93 at 39. Gilmore is wrong.

The Court properly instructed the jury on good faith, using the Third Circuit model instruction, which provides that:

A person acts in "good faith" when he or she has an honestly held belief, opinion,

or understanding that *(describe the belief or opinion that is inconsistent with the required mental state, e.g., honest belief about the existence of a fact, honest belief in the truth of statements, honest opinion that acts were not unlawful)*, even though the belief, opinion, or understanding turns out to be inaccurate or incorrect.

Thus, in this case if *(name)* made an honest mistake or had an honest misunderstanding about *(state the belief, opinion or understanding that would be inconsistent with the required mental state)* then *(he) (she)* did not act *(describe the required mental state)*

3d Cir. Model Crim. Jury Instr. § 5.07.

This Court read that instruction nearly verbatim, modified only to make it case-specific:

A person acts in good faith when he has an honestly held belief, opinion, or understanding that the tax laws did not make his conduct unlawful, even though the belief, opinion, or understanding turns out to be inaccurate or incorrect.

Thus, in this case, if the defendant made an honest mistake or had an honest misunderstanding about his duties under the tax laws, then he did not act willfully.

4/12/19 Tr. at 45:8-15.

Gilmore argues that using the word "unlawful" rather than "criminal" was error. ECF #93 at 41.  Not so.  The model instruction specifically contemplates using the word "unlawful," but not "criminal," to define a good faith belief.  *See United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010) ("We have a hard time concluding that the use of our own model jury instruction can constitute error…").

Gilmore nonetheless insists the Court should have deviated from the Third Circuit's model good faith instruction, pointing to the various discussions of *Cheek* in the comments to the model jury instructions for willfulness.  He argues these comments distinguish a

"criminal" degree of willfulness from an "unlawful" degree of willfulness and that, in criminal tax cases, a "criminal" degree of willfulness must be proved. ECF #93 at 43. But a plain reading of those comments discussing *Cheek* demonstrates that Gilmore is wrong.

Gilmore points first to the comment to model instruction § 6.26.7201-4, which is the Third Circuit's model instruction for willfulness in tax cases. That states that "[t]he definition of 'willfully' in tax cases mandates the conclusion that a defendant cannot be found guilty if the jury concludes that the defendant honestly believed the tax laws did not make his or her conduct criminal, even if that belief was unreasonable." 3d Cir. Model Crim. Jury Instr. § 6.26.7201-4. That does not obligate a Court to insert the word "criminal" into a good faith instruction (or any instruction for that matter), because as the comment goes on to explain, *Cheek* reaffirms that willfulness in federal tax statutes simply "means 'voluntary, intentional violation of a known legal duty,'" which is proved by evidence showing the defendant actually knew the law imposed a legal duty and, nonetheless, voluntarily and intentionally violated it. *Id.* The issue, in other words, is awareness of the legal obligation, not that the obligation triggers criminal—as opposed to civil—liability.

Gilmore also points to the comment to the model instruction for willfulness generally, § 5.05. That comment explains that *Cheek* reasoned that, "because of the complexity of federal tax laws, citizens may honestly not realize their conduct is criminal and thus may innocently believe they are not violating the law." 3d Cir. Model Crim. Jury Instr. § 5.05. Thus, the comment instructs that the "specific definition of willfully [] included in the specific instructions for tax evasion" should be used. *Id.* Again, that

33

comment addresses awareness of the legal duty, not that the duty triggers criminal liability if intentionally ignored.

Indeed, even the comment to the model instruction for good faith, § 5.07 does not help Gilmore. That comment, too, instructs that the models for willfulness and good faith should be followed: "In tax cases the trial judge should give Instruction 6.26.7201-4 (Tax Evasion – Willfully Defined), supplemented if need be under the circumstances of the case, by this instruction." 3d Cir. Model Crim. Jury Instr. § 5.07. Once again, it draws no distinction between criminal and civil liability. Nothing in the Third Circuit model jury instructions supports Gilmore's argument that the Court erred by not deviating from those model instructions.

Moreover, under the fact of *this* case, there is no meaningful distinction between the terms "unlawful" and "criminal," despite Gilmore's pained attempts to draw one. The evidence showed that Gilmore clearly knew his conduct was criminal – the IRS warned him in writing specifying the specific titles of the Federal Criminal Code that could apply if he continued to fail to make payroll tax deposits – and secured his signature on the warning letter. His efforts to parse words falls flat

The Tenth Circuit rejected a similar contention in *United States v. Quinn*, 566 Fed. App'x., 659, 666-67 (10th Cir. 2014) (unpublished). In *Quinn*, defendant, a former attorney, was found guilty after trial on multiple counts of willfully failing to pay over payroll taxes in violation of 26 U.S.C. § 7202, among other charges. *Id*. at 661. There, after "nearly a decade of wrangling with" the IRS regarding the payment of employment taxes, a grand jury charged her with the 7202 violations, among others. *Id*. at 662. She

thereafter satisfied her payroll tax debt. *Id.* At trial, she admitted owing the taxes and not

having paid them prior to the indictment, but claimed she had never willfully refused to

pay. "Her defense was simple: she claimed not to know the failure to pay was a crime and

she always intended to pay at some future time when she had the money to do so." *Id.*

Defendant also contended that her gambling addiction prevented her from making a

rational decision to refuse to pay. The issue at trial was whether she had willfully refused

to pay the taxes that she owed. *Id.* The district court instructed the jury on the essential

elements of Section 7206(2), but did not give defendant's requested instruction that she

had a good faith belief her actions were not criminal–a ruling to which she did not object.

*Id.* at 665. But, the failure to give such instruction was raised by her on appeal.

    The Tenth Circuit found no merit in her contention.   The Tenth Circuit first

recounted the district court's instruction:

> An essential element of the crimes charged is that defendant
> must have acted willfully. The word "willfully" means
> voluntarily and intentionally in violation of a known legal duty.
> In other words, the defendant must have acted voluntarily and
> intentionally and with the specific intent to do something she
> knew the law prohibited, or fail to do something she knew the
> law required; that is to say, with intent either to disobey or
> disregard the law.
>
> Conversely, the defendant did not act willfully if you find that
> she acted or failed to act because of negligence (even gross
> negligence), inadvertence, accident, mistake, reckless
> disregard for the requirements of the law, ignorance of the law,
> or a good-faith belief, based on a misunderstanding of the law,
> that she was not violating any of the provisions of the tax laws.

*Id.* at 665-66. The Tenth Circuit, then, among other things, rejected defendant's contention

that the jury should have been instructed that she had to have knowledge of the statutes that

she was charged with violating or the existence or terms of those statutes. *Id.* at 666. Instead, the Section 7206(2) instructions had to "adequately apprise the jury of the *mens rea* element of the offense" and define "each element of the offense clearly and accurately." *Id.* (quotations and citation omitted). The Tenth Circuit found that district court had done so. It further ruled that defendant's claim that she had to actually know of the specific provision that she was charged with violating was incorrect. *Id.* In this regard, the Tenth Circuit specifically cited Third Circuit case law as authority and noted "[I]gnorance of a legal duty is a defense, but the fact the defendant 'was not aware of the criminal penalties' is not." *Id.* at 666 n.11 (quoting *United States v. Rosenfield*, 469 F. 2d 598, 600 n.1, 601 (3d Cir. 1972)). The Tenth Circuit concluded by ruling that the district court's instructions "thoroughly and correctly" informed the jury "of the government's burden *and* [defendant's] theory of defense," *id.* (emphasis added), and that, in any event, defendant admitted knowing her legal duty to timely pay her taxes. *Id.* at 667.

The Court's instructions here reveal that they were similar to the district court's in *Quinn* and were as thorough and correct. Hence, Gilmore's challenge to the Court's good faith instruction is without merit.

### C.    The Jury's Verdict Was Not Contrary to the Weight of the Evidence

Gilmore's motion for a new trial claiming that the verdicts on Counts 4 and 5 were against the weight of the evidence also is without merit. As shown above, there was ample evidence that (1) Gilmore was required to account for and pay over the law firm's payroll taxes and (2) he knew he had a duty to truthfully account for and pay over the payroll taxes--the first two elements of the Section 7206(2) offenses. And, there also was

ample evidence of the final element--his willfulness--as described above, including his substantial personal spending out of the law firm accounts to frequently pay personal expenses instead of paying the substantial payroll tax debt, that he didn't inform his partner that this debt existed, and that he was warned by the IRS that he could face criminal prosecution.  This was relevant evidence of substantial weight, *see, e.g.*, *DeMuro*, 677 F.3d at 558-59, and of such quality and quantity that it would be impossible to find on this record that there was a serious danger that these verdicts on Counts 4 and 5 were a "miscarriage of justice," and that an innocent person had been convicted.  To the contrary, the evidence proved that Gilmore committed the payroll tax offenses charged in Counts 4 and 5.

## III.   Gilmore Is Not Entitled To A Judgment Of Acquittal Or A New Trial On Count 6

### A.   There Was Ample Evidence that Gilmore Made False Statements on a Loan Application to Ocean First Bank

Count 6 charges Gilmore with making false statements in a loan application to Ocean First Bank, in January 2015, for the purpose of influencing the actions of the bank upon his application for a home mortgage loan, in violation of 18 U.S.C. § 1014 and § 2.  Section 1014 makes it a crime to "knowingly make[] any false statement or report . . . for the purpose of influencing in any way the action of any institution the accounts of which are insured by the Federal Deposit Insurance Corporation (FDIC) . . . upon any application [or] loan."  The Government adduced ample evidence at trial that: (1) Gilmore made or caused to be a false statements relating to an application to a bank for a loan, namely, the false statements on the January 22, 2015 URLA; (2) Gilmore acted knowingly;

(3) the false statements were made for the purpose of influencing the bank's actions on the loan application; and (4) Ocean First Bank was then insured by the FDIC.  *See* 4/12/19 Tr. at 39:16-24 (Court's instruction on essential elements of § 1014 offense).

1.  **Gilmore's Affirmation in Section IX of the URLA Was A False Statement that He Knowingly Made For the Purpose of Influencing the Bank's Lending Decision**

Ample evidence permitted a rational jury to conclude that Gilmore's affirmation in Section IX—that he provided true and correct information in the URLA—was a knowingly false statement Gilmore made with the purpose of influencing the bank's lending decision.

Gilmore did not disclose to Hoyt at least two outstanding liabilities that Gilmore had as of January 22, 2015 totaling over $800,000.  4/8/19 (P.M.) Tr. at 15:5-7, 22:13-15. Gilmore, as the borrower, was responsible for reviewing the information the URLA and providing any additional information required by the application.  *Id.* at 69:14-16.  Thus, the Government adduced ample evidence such that the jury could have rationally concluded that by omitting the Orlovsky loan and his unpaid federal taxes for 2013 in the liabilities section of the URLA, Gilmore falsely affirmed that the information provided in the URLA was true and correct.

2.  **The Jury Rationally Rejected Gilmore's Argument that the Orlovsky Loan Was Not the Type of Liability That Needed to Be Disclosed**

Gilmore rehashes an argument rejected by the jury—that the Orlovsky loan was a commercial loan he had no duty to disclose in the liabilities section of the URLA.  ECF #93 at 52. This argument is meritless.

The evidence clearly showed that Gilmore should have disclosed the Orlovsky loan.

Although he claims now that he did not believe he needed to disclose Orlvosky loan, that is pure attorney argument. There was no evidence at trial that Gilmore did not believe that the Orlovsky loan did not need to be disclosed on the URLA. Although Gilmore claims he did not intentionally fail to disclose the liability because he "always treated" the Orlovsky loan as an obligation of the law firm, the evidence at trial was to the contrary.

First, the promissory note for the Orlovsky loan easily allowed the jury to find that Gilmore was personally liable for the loan. Gilmore and his wife were listed as the borrower, not the law firm. GX-3003-C. That distinction was significant, because the jury obviously knew Gilmore was an attorney who was familiar with legal documents. Further, Gilmore knew the difference between a promissory note that obligated him as opposed to the law firm because he had executed another promissory note from Sally Kalksma specifying that the Gilmore & Monahan partnership (not Gilmore and his wife) was liable to repay it. GX-3007-A (Promissory Note between "Gilmore & Monahan, A Partnership" and Sally Kalksma). The jury rationally could have found that Gilmore intended for and treated the Orlvosky loan to be a personal obligation rather than an obligation of the law firm.

Second, that Gilmore used his law firm bank account to repay this personal loan is meaningless as to whether the Orlovsky loan was a personal loan to Gilmore. The undisputed evidence at trial showed that Gilmore habitually used his law firm bank account as his own personal bank account to pay for his personal expenses and liabilities. Thus, the jury likely concluded that Gilmore's use of his law firm accounts did not alter the fact that the Orlovsky loan was a personal liability.

39

Third, Orlovsky testified that the loan he gave Gilmore was for Gilmore, personally, and not to the law firm.  The promissory note corroborated that testimony, 4/8/19 Tr. at 128:25-129:9, by showing that the Orlovskys were the lenders, not Orlovksy's law firm. GX-3003-C. Thus, a jury rationally could have concluded that the source of the loan check, which was Orlovsky's law firm account, had little or no bearing on whether Gilmore should have disclosed this loan in the URLA.

Lastly, the jury was free to reject Gilmore's arguments related to previous commercial loan applications and his disclosures for other loan applications.  These applications were completed and submitted prior to the mortgage application with Ocean First Bank and the execution of the Orlovsky promissory note.  Thus, contrary to Gilmore's assertion, they do not competently prove that he treated the Orlovsky loan as a law firm obligation and do not undermine the jury's finding that Gilmore should have included it in the URLA's liabilities section and, consequently, that his information was false.

### 3.    Gilmore Knowingly Provided a False Statement in Response to Question f For the Purpose of Influencing Ocean First Bank's Lending Decision

There was ample evidence proving that Gilmore knowingly made another false statement in response to Question f for the purpose of influencing Ocean First Bank's lending decision.  This evidence consisted of undisputed proof that Gilmore owed $493,526 in unpaid federal income taxes for 2013 when he reviewed, signed, and submitted the January 2015 URLA to the bank.  Just a few months earlier, he had bounced a check to the IRS for his 2013 taxes in the amount of $493,526. *See, e.g.*, GX-10, GX-13-A. There also was undisputed evidence at trial that despite knowing what he owed to the IRS and

40

having bounced a near half a million dollar check to the IRS, Gilmore did not disclose his tax debt in the liabilities section (Section VI) of the URLA and responded "no" to Question f in Section VIII of the URLA which asked whether he was delinquent or in default of any "Federal debt . . . financial obligation." GX-713.

The jury also heard from Hoyt, the lending officer who handled Gilmore's application, that Hoyt read this question, along with other questions in the URLA, over the phone to Gilmore and that the response to Question f as well as the responses to the remaining questions in the application, were taken directly from Gilmore. 4/8/19 (P.M.) Tr. at 16:18-17:10; 39:17-24; 68:15-23. Hoyt's testimony showed that Gilmore did not have questions about or confusion over Question f and did not seek to clarify whether he needed to disclose this federal tax debt and financial obligation on the URLA. *Id.* at 22:3-5. Rogers, the bank's underwriter who handled Gilmore's loan application, also testified that the bank would have considered Gilmore's unpaid taxes for 2013 of $493,526 because it directly impacted his debt-to-income ratio and that Question f required disclosure of this debt. *Id.* at 77:1-23.

Hoyt's testimony, Rogers's testimony, and the affirmation in Section IX of the URLA also established that it was Gilmore's responsibility to provide true and correct information on the URLA, not Hoyt's job or the bank's job to sleuth for liabilities that Gilmore did not disclose during his phone conversations with Hoyt or that did not appear on his credit report. *See, e.g.*, GX-713 (Section IX - Acknowledgement and Agreement); 4/8/19 Tr. at 69:14-16; 74:3-18; 77:1-23. There was also undisputed evidence at trial that Gilmore completed the URLA for the purpose of obtaining a mortgage loan for $1,500,000

41

which had a cash-out provision that would provide him with over a half-million dollars in cash from the approval of the loan, and that Ocean First relied on Gilmore's representations in the URLA to make an accurate assessment of his debt-to-income ratio and to decide whether to approve the loan or not. *See id.* Viewed in a light most favorable to the Government and to the verdict, the foregoing evidence amply establishes that Gilmore falsely answered "no" in response to Question f and did so knowingly and with the purpose of influencing Ocean First Bank's decision on this substantial mortgage loan of $1.5 million.

**4.      Gilmore's Rehashed Arguments From the Trial Concerning His Response to Question f Do Not Provide a Basis for Overturning the Jury's Verdict**

Gilmore nonetheless argues that no rational jury could have concluded that he knowingly answered Question f falsely or for the purpose of influencing the bank's lending decision because: (1) Gilmore indicated on the Purpose of Refinance Letter form that part of the stated purpose of the loan was to "pay taxes;" (2) Gilmore submitted his Form 1040s for 2012 and 2013 to Ocean First Bank; (3) Gilmore authorized the bank to secure transcripts of his 2012 and 2013 federal tax returns, which showed "no record of return filed" for his 2013 tax return; (4) the bounced check to the IRS was drawn from Gilmore's Ocean First Bank account and Gilmore's checking statement reflected a charge for that bounced check; and (5) Hoyt said he no reason to believe that an MOI by law enforcement of an interview with Hoyt on August 15, 2017, which stated that Gilmore told Hoyt that he had a $300,000 tax liability, was inaccurate. ECF #93 at 47-52.

These are exactly the same arguments Gilmore made to the jury, who rejected them.

It was rational for the jurors to do so because Gilmore's response on the Purpose of Refinance Letter form indicating that part of the purpose of the loan was to "pay taxes" reveals nothing about his unpaid federal tax debt of $493,526 for 2013. A rational jury easily could have concluded that the words "pay taxes" did not disclose Gilmore's supposed then-existing intent to pay his unpaid debt to the IRS. Given the many possible meanings of "pay taxes" – federal taxes, state taxes, individual taxes, corporate taxes, employee payroll taxes, upcoming or past overdue taxes – this statement on the Purpose of Refinance Letter does not establish that Gilmore could not have intended to mislead the bank as a matter of law. Indeed, Hoyt testified that he understood "pay taxes" on the Purpose of Refinance Letter to refer to **upcoming** taxes. 4/8/19 (P.M.) Tr. at 14:10-25. Gilmore completed this Purpose of Refinance Letter, on November 24, 2014, (GX714), *after* Hoyt had gone over Question f with Gilmore on the phone and Gilmore responded "no" to the question and did not disclose any overdue unpaid federal income taxes to Hoyt. 4/8/19 (P.M.) Tr. at 13:21-15:7; GX-712 (November 2014 URLA, signed November 21, 2014); GX-713 (January 2015 URLA). Moreover, when Gilmore spoke to Hoyt on the phone about the purpose of the cash-out refinance, Gilmore did not indicate he had back taxes that had not been paid. 4/8/19 (P.M.) Tr. at 14:17-15:11. Accordingly, the trial evidence hardly compelled the conclusion that "pay taxes" meant unpaid past due taxes, such as Gilmore's 2013 federal income taxes. Thus, a jury could rationally have credited Hoyt's testimony that he thought Gilmore meant upcoming taxes.

Similarly unpersuasive is Gilmore's submission of his 2012 and 2013 tax returns and authorization for the bank to receive transcripts from the IRS. The tax return for 2013

43

indicated only the amount due and owing and did not reveal whether Gilmore had yet paid the taxes due as of January 2015. 4/8/19 Tr. at 66:23-67:1. The "no record of return filed" indication on the transcript for the 2013 tax return is also irrelevant because there is no evidence in the record that Gilmore believed or knew what the transcript would reveal or that Gilmore knew in advance of authorizing the release of the transcript that it would indicate "no record of return filed." Also, a rational jury could have concluded that "no record of return filed" did not reveal that Gilmore still owed $493,526 in unpaid federal income taxes for 2013. Thus, Gilmore's submission of his tax returns to the bank and authorization for the bank to receive the transcript of his 2013 tax return from the IRS do not undermine the sufficiency of the evidence that he knowingly made a false statement in response to Question f and did so to influence the bank's lending decision.

Equally weak is Gilmore's reliance on the fact that the bounced check for $493,526 to the IRS was drawn on Gilmore's Ocean First checking account and that his account statement reflected a fee for the bounced check. Gilmore's post-trial brief conclusorily asserts that this evinces Gilmore's intent not to mislead the bank about his unpaid federal taxes. ECF #93 at 49-50. To reach this conclusion, Gilmore relies on the flawed premise that the bank could have and should have figured out from the bounced check that Gilmore's 2013 federal taxes had not yet been paid and, therefore, Gilmore could not have intended to mislead the bank when he answered "no" in response to Question f. This was not the bank's obligation.

Gilmore's argument also mistakenly assumes that there was only one conclusion for the bank to make from the bounced check – that the 2013 federal income taxes went unpaid.

44

However, the bank had no way of knowing whether Gilmore made up for the bounced check through other accounts or had reached an agreement with the IRS about paying the unpaid taxes after the bounced check. Indeed, it was relying on Gilmore, the borrower, to provide accurate information about his financial obligations. Thus, there is no basis for concluding that because the bounced check was issued from Gilmore's account with Ocean First Bank, he must not have intended to convey to the bank that he had no unpaid federal taxes.

Gilmore's argument about the significance of a $300,000 tax liability that Hoyt reportedly heard about from Gilmore is also unavailing. Hoyt testified that he did not recall Gilmore telling him about a $300,000 tax liability, and that the only tax liability that Hoyt believed Gilmore had at the time was for upcoming taxes due and that Gilmore never disclosed any past, unpaid tax liability. 4/8/19 (P.M.) Tr. at 15:5-11, 23:6-18, 24:10-13, 28:21-23, 68:9-69:1. And even if Gilmore indeed had discussed a $300,000 tax liability with Hoyt, that has no bearing on the unpaid, past tax liability at issue for Question f – the unpaid taxes of $493,526 for 2013. Needless to say, $300,000 is not $493,526. In fact, $300,000 is actually closer to what Gilmore owed for 2014 ($321,470), not 2013. Thus, whether Gilmore had indicated to Hoyt that he had a $300,000 tax liability does not compel a conclusion contrary to the one the jury reached.

### 5.    Gilmore's Untimely Contention that Question f is Fundamentally Ambiguous Is Meritless

Gilmore also levels a brand new claim that Question f is "fundamentally ambiguous." Never mind that this new argument improperly asserts, at the Rule 29 stage,

a Rule 12(b)(3)(B) claim about the sufficiency of the Superseding Indictment.[10]   The argument also fails on the merits.

Although Gilmore asserts that "federal debt" is not commonly understood to encompass a nearly half-million dollar delinquent tax liability, no testimony or exhibits support that contention.  Moreover, that is not a legal question; whether ambiguity led to a false answer is for the jury to decide. *See, e.g., United States v. Reilly*, 33 F.3d 1396, 1418 (3d Cir. 1994) ("W[]hen there is "some ambiguity[,] ... [n]ormally, it is for the petit jury to decide which construction the defendant placed on the question.") (quoting *United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987)); *United States v. Fattah*, Crim. No. 14-409, 2015 WL 132412, at *3 (E.D. Pa. Jan. 9, 2015) ( "In our view, any ambiguity in the form [for Small Business Administration loan] is for the jury to decide.").

Moreover, Gilmore's characterization of Question f as fundamentally ambiguous ignores the entirety of Question f and the ample evidence at trial showing that it was relatively straightforward.  Gilmore notes that "the Court may not consider the question in isolation . . . but must look to the context of the question and the answer," ECF #93 at 61, but disregards that standard by ignoring the term "financial obligation" in Question f.  He fails to explain how an unpaid tax debt of nearly a half a million dollars could not be construed as a financial obligation.  The lack of ambiguity could not be clearer when reviewing the trial record as a whole, as this Court must.  Rogers, a residential mortgage underwriter at Ocean First Bank, testified that unpaid taxes are expected to be reported in

---

[10] *See infra* at 52-56.

response to Question f.  4/8/19 (P.M.) Tr. at 77:7-14.  Her explanation of the debt-to-income ratio that the bank relies on in assessing an applicant's ability to repay provides context for Question f, namely, that any significant personal liability, even for unpaid taxes, would need to be disclosed by the applicant.  In addition, Hoyt explained that he filled out the response to Question f based on Gilmore's response to that question and that Gilmore did not ask whether he had to answer yes because of federal income taxes that he still owed for 2013.  *Id.* at 22:3-5.  Indeed, there was no evidence at trial nor even arguments by defense counsel that Gilmore was confused or unclear about Question f.  Defense counsel did not ask any of the bank officers whether there was any confusion about Question f. Nor did defense counsel ask whether the few examples given by Fannie Mae of federal debt or the definition of debt in the Federal Debt Collection Fair Practices Act (FDCPA) which governs abusive debt collection practices by debt collectors in the United States (not the IRS), resulted in any confusion about how to reply to Question f or permitted Gilmore to not disclose his delinquent debt or financial obligation (nearly half a million dollars in back taxes) to Ocean First Bank.[11]

Also, the evidence at trial showed that Gilmore knew that he had recently bounced a check to the IRS for $493,526 for his 2013 taxes and that he was aware of the possibility of the IRS imposing a tax lien because of his unpaid 2013 taxes.  The jury also heard

---

[11] Gilmore cites other inapposite authority as well in asserting that the term "Federal debt" is fundamentally ambiguous, including *Meriwether v. Garrett*, 102 U.S. 472 (1880), an irrelevant Supreme Court case from 1880 that had nothing to do with whether unpaid federal income taxes should be disclosed as a delinquent federal debt or financial obligation on a URLA.

evidence that Gilmore needed cash and was denied a loan from Two River Community Bank shortly before he applied for the mortgage loan from Ocean First Bank because of his substantial liabilities.  Thus, a jury could have inferred that Gilmore was well aware of the significance of the $493,526 debt to the IRS and the need to disclose it in response to Question f, but that he chose not to do so to avoid the risk of having his loan disapproved.

Thus, viewing the evidence and the inferences logically deducible therefrom in the light most favorable to the verdict, a rational fact finder certainly could have found that Gilmore knowingly made a false statement by responding in the negative to Question f for the purpose of influencing the bank's lending decision.

### B.      Gilmore Also Is Not Entitled to a New Trial on Count 6

Gilmore argues that a new trial on Count 6 is warranted because: (1) Hoyt allegedly gave false testimony that the Government failed to correct; and (2) the term "Federal debt" on Question f was fundamentally ambiguous and therefore insufficient as a matter of law to justify a conviction.  Neither argument has merit.

### 1.      There Was No Due Process Violation

Gilmore asserts that the Government knowingly failed to correct supposedly false testimony by Hoyt about what he knew concerning Gilmore's federal tax liability for 2013.[12]  ECF #93 at 55-59.  Not so.

---

[12] Defense counsel did not raise this claim during the trial, including while Hoyt was testifying or even soon afterwards, and did not raise it during summations either. Arguably, having taken his chances with the jury, and having deprived this Court of the opportunity to cure any error, Gilmore should have to satisfy the more demanding plain error standard. *See* Fed. R. Crim. P. 52(b); *see also United States v. Greenspan*, ___ F.3d ___, 2019 WL 1984187, at *15

eosin

To begin, Gilmore cites *United States v. Stadtmauer*, 620 F.3d 238 (3d Cir. 2010). But the Third Circuit there *flatly rejected* a due process claim similar to Gilmore's. To succeed on a claim that the Government violated the defendant's due process rights by failing to correct false testimony at trial, Gilmore bears the burden of establishing that: (1) Hoyt testified falsely; (2) the Government knew or should have known that Hoyt did so but failed to correct his testimony; and (3) there is reasonable likelihood that the false testimony could have affected the verdict. *Stadtmauer*, 620 F.3d at 267. Gilmore's due process claim fails on all three prongs.

First and foremost, Gilmore has failed to prove Hoyt testified falsely. Specifically, Gilmore relies on a law enforcement MOI, dated August 15, 2017. It stated, "Hoyt believed that Gilmore said he had a $300,000 tax liability."

Gilmore argues that Hoyt testified falsely when he responded on cross examination that he was not aware that Gilmore had an outstanding tax liability of $300,000 at the time the loan was approved. The information in this MOI, however, does not make Hoyt's testimony false. The MOI was not adopted by Hoyt. Nor was it a recorded statement of what he said. Even if it were, it is does not establish that Hoyt lied rather than honestly did not recall what he said to law enforcement in 2017 or whether Gilmore told him about a $300,000 tax liability.

*Staudtmauer* is on all fours. When a witness testifies about not recalling making a statement contained in a law enforcement memorandum that is inconsistent with the

---

(3d Cir. 2019) ("we correct errors only when justice warrants doing so, not when the evidence is overwhelming and essentially undisputed, and certainly not when a litigant sandbags").

witness's trial testimony, that does not establish that the witness has committed perjury. *Staudtmauer*, 620 F.3d at 268. Even when the witness denies making such a statement and there are inconsistencies between law enforcement's notes and the witness's recollection of his statement, that does not prove the witness perjured himself. *Id.*; *see also United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (a witness does not commit perjury if his false testimony is the result of confusion, mistake, or faulty memory); *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony.").

Here, Hoyt did not even deny making the statement attributed to him in the MOI and testified that he had no reason to believe that the MOI was inaccurate (which defense counsel even relied on during summation, *see* 4/12/19 Tr. at 166:19-21). Hoyt's testimony was that he did not recall it. That comes nowhere close to perjury. Accordingly, Gilmore's *Napue* argument fails at its inception because Gilmore has failed to prove that Hoyt testified falsely.

As for the second prong of the *Stadtmauer* test, Gilmore has not demonstrated that the Government knew or should have known that Hoyt provided any false testimony. Hoyt's answer—that he did not recall a statement attributed to him in the MOI—does not mean that the trial AUSAs knew that Hoyt *did* recall having made the statement. *Stadtmauer*, 620 F.3d at 268. As with the Government witness's testimony in *Stadtmauer*, the circumstances of Hoyt's testimony "are far afield from the witness's testimony in *Harris*, where it was undisputed that the prosecutor had personal knowledge that the

witness's answers were not correct." *Id.* (citing *United States v. Harris*, 498 F.2d 1164, 1164, 1168 (3d Cir. 1974)). Just as "there was no way for the prosecutor to know" whether the Government's witness in *Stadtmauer* was giving false testimony when he denied, or could not recall making, certain statements attributed to him contained in law enforcement's notes, there was no way for the Government to know, here, whether Hoyt was lying when he stated that he did not recall making the statement concerning Gilmore's tax liability contained in the August 15, 2017 MOI. *Id.* (citing *Tapia,* 926 F.2d at 563). Thus, Gilmore's claim that the Government knew Hoyt's testimony was false is, as it was in *Stadtmauer*, simply unsupported by the record.

So is Gilmore's conclusory assertion that the purportedly false testimony "undoubtedly affected the judgment of the jury." While Hoyt said he did not recall the statement contained in the MOI concerning a $300,000 tax liability of Gilmore, he also said he had no reason to believe that the MOI was inaccurate. 4/8/19 Tr. at 24:10-17. Defense counsel even pointed this out and read the statement in the MOI about the $300,000 tax liability in summation. 4/8/19 (P.M.) Tr. at 23:13-17; 4/12/19 Tr. at 165:20-24. Simply put, defense counsel got the content of the MOI before the jury and was able to use it argue that Gilmore did not intend to mislead the bank.

At any rate, the jury was hardly compelled to accept that argument. The record shows that Gilmore's undisclosed tax liability at the time of the January 2015 loan application was $493,526 for his 2013 federal income taxes, not $300,000, which was closer to the amount of his upcoming taxes due for calendar year 2014. Thus, the jury rationally could have concluded that even if Gilmore had in fact mentioned a $300,000 tax

51

liability to Hoyt, that was consistent with the rest of Hoyt's testimony that Gilmore discussed paying only upcoming taxes due, not unpaid back taxes. Alternatively, the jury rationally could have concluded that a disclosure of a $300,000 tax liability was actually a further false statement by Gilmore because he had owed far more than that for 2013. Also, in addition to all of this, there at least was another false statement on the form that had nothing to do with tax debt – the statement regarding the existence of the Orlovsky loan debt. Thus, Gilmore cannot show that Hoyt's supposedly false testimony affected the verdict. *See Baskerville v. United States*, Civil No. 13-5881 (PGS), 2018 WL 5995501, at *46-47 (D.N.J. Nov. 15, 2018) (finding that petitioner failed to show there was reasonable probability that purported false testimony of a witness could have changed the outcome of the proceeding and therefore rejecting claim that government knowingly presented or failed to correct false testimony).

In sum, Gilmore's belated claim that the AUSAs misconducted themselves by sponsoring false testimony from Hoyt is baseless, and "baseless allegations of prosecutorial misconduct are not helpful to either the defendants or the profession." *United States v. Caballero*, 277 F.3d 1235, 1250 (10th Cir. 2002).

### 2. Gilmore Waived Any Claim Under Rule 12(b)(3) to Attack Count 6 as Ambiguous and, In Any Event, His Legal Challenge Regarding Ambiguity Is Meritless

Gilmore next argues that one of the two theories of falsity underlying Count 6 was legally invalid because the term "Federal debt" in Question f was fundamentally ambiguous. He then argues that, because Count 6 rested on two legal theories—one valid and one invalid—this Court must award him a new trial because the jury's general verdict

makes it impossible to know whether it relied on the invalid theory.  ECF #93 at 59-67. This argument is (1) waived and (2) meritless.

First, Gilmore's current claim—that the term "Federal debt" as pled in the Superseding Indictment"—is too ambiguous to support a viable false statement claim—posits that Count 6 fails to allege a viable offense.  But such a claim "must" be raised in a pretrial motion.  Fed. R. Crim. P. 12(b)(3)(B)(v). If it is not, a defendant must show "good cause" for failing to raise the claim. Fed. R. Crim. P. 12(c)(3).

Here, Gilmore strategically chose not to move against the indictment pretrial.  His counsel acknowledged at the January 18, 2019 arraignment hearing the legal sufficiency of the indictment, and asserted there was no novel question of law, such as the one he seeks to assert now regarding whether Question f can form the basis of a false statement charge under 18 U.S.C. § 1014. *See* 1/18/19 Tr. at 12:4-8; *see also* 1/18/19 Tr. at 9:21-22.  Defense counsel also emphasized the defense's choice to forego claiming that any part of the indictment, including Count 6, was defective, and preference to go straight to trial within 70 days. *See* 1/18/19 Tr. at 10:22-25 ("I don't intend to move to dismiss any part of their misbegotten indictment . . . put up in 70 days or the case gets dismissed.  If they're not ready to go in 70 days, they should dismiss the case.."); *accord* 1/18/19 Tr. at 11:15-16.

Beyond this calculated strategy, Gilmore makes no effort to show good cause for his failure to raise this facial attack on Count 6 prior to trial.  Having failed to show good cause, this Court should deem Gilmore's claim waived outright.  *See United States v. Ferriero*, 866 F.3d 107, 122 n.17 (3d Cir. 2017) (acknowledging, but declining to reach, question whether lack of good cause under amended version of Rule 12(c)(3) means waiver

or forfeiture).   Having waived the claim that the term "Federal debt" was "fatally ambiguous" as a matter of law, the only challenge open to Gilmore is his Rule 29 clam that no rational juror could have found that he understood Question f to refer to federal taxes. But as explained above in Section A.5 above, there was no evidence introduced on that question.   Viewing the evidence in the light most favorable to the verdict, there was more than sufficient evidence to show that Gilmore reasonably could have understood delinquent "federal debt" or "financial obligation" to include his federal tax liability.

Second, Gilmore's requested remedy of a new trial on Count 6, premised on the fact that the general verdict does not reveal which theory of falsity the jury found, runs counter to settled Supreme Court precedent.[13]   A general verdict on alternative theories of guilt, one of which is sufficient and one of which is insufficient, is presumed to rest on the factually sufficient theory and thus, reversal and a new trial are not required.   *See Griffin v. United States*, 502 U.S. 46 (1991) (If evidence is insufficient to support a conviction on one alternative theory in a count but sufficient to convict on another alternative theory that was charged to the jury in the same count, then a reviewing court should assume that the jury convicted on the factually sufficient theory and should let the jury verdict stand); *United States v. Syme*, 276 F.3d 131, 144-46 (3d Cir. 2002) (explaining the longstanding rule set forth in *Griffin*); *United States v. Vastola*, 989 F.2d 1318, 1330 (3d Cir. 1993) (explaining *Griffin*'s holding that "when a jury returns a general guilty verdict on an

---

[13] This is clear from Gilmore's use of the "fundamental ambiguousness" argument for setting aside the verdict under Rule 29.   *See* ECF #93 at 51.

indictment charging several acts in the conjunctive, the verdict stands if the evidence is sufficient with respect to any one of the acts charged—even though there is no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action.").[14]

Gilmore's argument—that the term "Federal debt" was too unclear for him to understand the question—challenges the sufficiency of the evidence proving that he knowingly provided a false answer to Question f.  None of the terms in this question is a legal term, and whether Gilmore could have been expected to understand that the question covered his unpaid 2013 federal tax liability posed a classic question of fact for the jury. Thus, Gilmore's ambiguity argument is no different than the factual insufficiency claim that the defendant made and that the Third Circuit rejected in *Syme*, 276 F.3d at 144-48 (where defendant was convicted on alternative theories of guilt on fraud and False Claims Act charges and jury returned general verdict, the Third Circuit holds no remedy is required so long as sufficient evidence supported at least one theory of falsity).  Thus, even assuming there was insufficient evidence to prove that delinquent "Federal debt" or "financial obligation" in Question f referred to federal tax liabilities, the jury is presumed to have

---

[14] Gilmore's insistence that the general verdict compels a new trial relies on Third Circuit law decided prior to *Vastola* and *Griffin*, specifically, *Ryan*, which found that where there were two factual theories of guilt (one sufficient and one insufficient) and a jury returned a general verdict, a new trial was required.  *Ryan*, however, was decided in 1987 and relied on *United States v. Tarnopol*, 561 F.2d 474 (3d Cir. 1977) and *United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976), and on a view of the law that the Supreme Court later abrogated in *Griffin*, as explained in *Vastola*. *See Vastola*, 989 F.2d at 1330 (explaining that "it is clear that the Supreme Court has expressly overruled those cases [referring to *Tarnopol* and *Dansker*]") (citation omitted).

convicted on the factually sufficient theory involving Gilmore's affirmation that his application was true and correct despite his omitting personal liabilities (such as the Orlovsky loan) in the liabilities section of the URLA, and setting aside the verdict would not be required. *Id.*

At any rate, as explained in Section A.5 above, there was ample evidence from which a jury could have found that Gilmore understood Question f to require disclosure of federal tax liabilities.  Indeed, the fact that the jury had no questions for Hoyt or Rogers or questions concerning the definition of "Federal debt" in Question f, or otherwise about this question, show that the question is certainly amenable to jury interpretation and not fundamentally ambiguous or excessively vague.

In sum, Gilmore has failed make any showing of any due process violation or any insufficiency of evidence relating to Count 6.  As set forth fully above in Section III.A, there was ample evidence adduced at trial for a jury to rationally conclude that Gilmore made false statements in the URLA, including the false affirmation in Section IX of the application, under which he affirmed he provided true and correct information despite having omitted the Orlovsky loan and 2013 unpaid taxes in the liabilities section of the URLA, and responding "no" in response to Question f despite being delinquent on his unpaid 2013 federal taxes.

## IV.    Gilmore Is Not Entitled To A Judgment Of Acquittal On Count 1

Count 1, on which the jury did not reach a verdict, charged Gilmore with willfully evading the payment of taxes, in violation of 26 U.S.C. § 7201 during calendar years 2013, 2014, and 2015.  Gilmore now moves for a judgment of acquittal on Count 1.  Applying

the Rule 29 standard, and considering the evidence in the light most favorable to the Government, there is ample proof from which a rational trier of fact could find Gilmore's guilt beyond a reasonable doubt on Count 1. As for Gilmore's claim that the Government did not prove that he intended to "permanently" evade or defeat the payment of taxes, the law requires no such intent. Accordingly, the Court should deny Gilmore's motion.

## A.    Ample Evidence Proved Gilmore's Willful Evasion of Payment

The evidence produced at trial as to Count 1 presented sufficient proof from which a rational trier of fact could find the following three essential elements, all of which the Government could prove again at a retrial:

(1)    That Gilmore had a substantial income tax deficiency;

(2)    That Gilmore made an affirmative attempt to evade or defeat the payment of the income tax; and

(3)    That Gilmore acted willfully.

4/12/19 Tr. at 30:12-16 (Court's Instructions to the Jury).

The Government established that Gilmore had a substantial tax due and owing in 2013, 2014, and 2015. Specifically, the Government introduced the relevant tax returns at trial for these years, wherein Gilmore, based on what he determined was income, as opposed to a no-interest loan from his law firm, reported owing the following in taxes:

| Tax Year | Adjusted Gross Income | Tax Due and Owing |
|---|---|---|
| 2013  (GX-10) | $1,633,384 | $493,526 |
| 2014  (GX-11) | $1,312,700 | $321,470 |

| 2015  (GX-12) | 1,259,121 | $311,287 |
|---|---|---|

At trial, Popowitz testified that Gilmore, as of December 31, 2016, owed $670,466.70, $457,771.95, and $320,378.69 respectively for these tax years, which accounted for penalties and interest.  *See* 4/5/19 Tr. at 106:7-23.   Gilmore's substantial income tax deficiency, the first essential element, was uncontroverted.

The trial evidence also demonstrated that Gilmore acted willfully and committed affirmative acts of evasion, of which the Superseding Indictment alleged five:

- Making misrepresentations to the IRS, including false and misleading statements concerning his ability to pay and assurances of payment;

- Submitting a $493,526 check to the IRS for payment of his tax liability for calendar year 2013 drawn from a personal bank account with insufficient funds;

- Concealing his income and the existence of funds available to pay his outstanding tax liabilities by using his law firm bank and credit card accounts to pay for personal expenses and by using his law firm bank accounts to obtain cash;

- Falsely classifying income that he received from the law firm as "shareholder loans;"

- Filing false tax returns that materially understated the true amount of income that Gilmore received.

### 1.    Gilmore Made Misrepresentations to the IRS, Including False and Misleading Statements Concerning His Ability to Pay and Assurances of Payment.

The record is replete with instances of Gilmore making misrepresentations to the IRS about his ability to pay and false assurances of payment, which constituted affirmative acts of evasion.  *See United States v. Boisseau*, 841 F.3d 1122, 1127 (10th Cir. 2016)

(defendant's misrepresentations to an IRS revenue officer that he received no compensation from his law firm, even though defendant's personal expenses were being paid by firm, were affirmative acts supporting his conviction of tax evasion).

Here, Gilmore, while spending hundreds of thousands of dollars on personal expenses during the relevant tax years, made specific false representations to Revenue Officer Popowitz that he would be able to make and would make tax payments on dates certain and then did not do so.  Moreover, Gilmore flatly lied to Popowitz when he told her that he would turn over money from his and his wife's 401k accounts and then instead withdrew the money, paid nothing to the IRS toward his 2013 or 2014 personal income tax obligations, and instead chose to use the money for the personal expenses he prioritized. In so doing, he affirmatively misled the IRS, which meets the affirmative act requirement. *See* 4/12/19 Tr. at 32:3-8 ("The affirmative act requirement can be met by…any conduct the likely effect would be to mislead the Internal Revenue Service…").

Popowitz memorialized her interactions with Gilmore in ICS case history reports, which were moved into evidence at trial.  Popowitz explained, as to the ICS transcripts, that it was her responsibility "[t]o accurately document phone conversations, field visits, office visits, interactions with the taxpayer, correspondence received from the taxpayer, any letters issued, justification for the actions." 4/5/19 Tr. at 21:23-22:1.  At trial, Popowitz referred to these transcripts, which memorialized Gilmore's misrepresentations to her, at the time he made them. *See id.* at 23:8-11.

### 2.    Gilmore Falsely Pledged to Pay $50,000 Toward His 2013 Tax Debt

Popowitz testified that on July 30, 2015, she mailed a letter to Gilmore's address,
which his wife signed for, informing the Gilmores that that they owed the IRS $568,720.92
for tax year 2013, including penalties and interest. 4/5/19 Tr. at 73:1-16; GX-67.  On
August 13, 2015, Gilmore left Popowitz a voicemail message and he called her back.
Popowitz testified about the misrepresentations that Gilmore made, in this conversation:

> Q:    What contact, if any, did you have with Mr. Gilmore on August 13th of 2015?
>
> A:    He had left me a message. I called him back. He was requesting an
> installment agreement.  He said he had somebody who would give him
> 200,000, but he had to come up with the other 350,000.  And he - that the
> lien would have to be released and then he also stated that he had a $25,000
> check he was going to send out the end of August and then another one at the
> end of September.  And I had explained to him about an installment
> agreement.  If he's requesting an installment agreement, the Form 433A
> which is a collection information statement must be completed in its entirety
> with the backup information for the income and expenses.  I also explained
> to him that if he had equity and assets, that the equity and assets would have
> to be considered to be liquidated.

4/5/19 Tr. at 77:10-25; *see also* GX-27 at 20.  Following this conversation, Popowitz
testified that she prepared a Form 9297 Summary of Taxpayer Contact, GX-69, which she
sent to Gilmore by regular mail.  4/5/19 Tr. at 80:17-81:3.  In the document, consistent
with Gilmore's representation, she memorialized his commitment to submit a $25,000
payment by August 31, 2015 and a $25,000 payment by September 30, 2015.[15]  GX-69.

---

[15] These payments were considered "good faith" payments because they were not part of
an initial installment agreement.  4/5/19 Tr. at 82:1-6.  Indeed, Gilmore was not a candidate for
an installment agreement at the time because he consistently failed to complete a Form 433A,
which would have listed his assets to the IRS.  According to Popowitz, Gilmore claimed he

However, Gilmore did not follow through on his pledge to pay and she never received the payments. 4/5/19 Tr. at 82:9-15. Gilmore also continued to mislead Popowitz in his messages and conversations that followed.

For instance, Popowitz testified that she was on vacation from August 14 to September 8, 2015 and that when she returned, on September 11, 2015, she played a voicemail that Gilmore left on August 31, 2015:

> Q:     Now what, if anything, happened on that day [September 11, 2015]?
>
> A:     I had been out on leave from August 14th to September 8th. On September 11th, I retrieved my voice messages. There was a message from Mr. Gilmore on August 31st, 2015 that he was going to be dropping off the first $25,000 payment the end of next week which should be there prior to my return from leave. And there was no payment. I checked with people in the office. There was no payment received because when I'm out, my coworkers have to process any money that's received or any tax returns. Nobody received it, and there were no payments processed to his account. And I checked the IDR database to see if it was sent directly to the service center, and it was not. And then the message also stated that he was going to be sending the second $25,000 payment too by September 30th.
>
> Q:     Did you ever receive any money from Mr. Gilmore by September 30th?
>
> A:     No, I did not.
>
> Q:     Did you ever receive the Form 433A from Mr. Gilmore by September 30th?
>
> A:      No, I did not.

4/5/19 Tr. at 82:19-83:14; GX-27 at 21. Crediting all available inferences in favor of the government, a reasonable jury, in light of Gilmore's false claims, could find Gilmore intended to mislead Popowitz with these repeated false assurances of payment. *See*

---

needed time to complete the Form 433A because of his assets and his CPA was on vacation. 4/5/19 Tr. at 80:7-10.

*Boisseau*, 841 F.3d at 1127 (a jury may find that false statements to an IRS revenue officer constitutes an affirmative act of evasion).

Gilmore's substantial personal spending during this time further demonstrated that his pledged payments were intended to mislead the IRS and conceal his true financial picture because, while Gilmore failed to pay the IRS as promised, he did not stop spending. For instance, on September 19, 2015, Gilmore made a $5,000 credit card purchase at the Scrimshaw Gallery (GX-418 at 94) and on September 23, 2015, Gilmore paid $5,000 toward a bronze George Washington statue (*Id.*, GX-329). Gilmore made these purchases after failing to make a payment to the IRS on August 31, 2015 and shortly before he failed yet again to pay on September 30, 2015. Gilmore had the ability to pay, he chose again and again not to, instead paying others, and he willfully attempted to evade by deflecting Popowitz with promises of payment that he never made. *See, e.g., United States v. Wanland*, 657 F. App'x 631, 635 (9th Cir. 2016) (unpublished) (in evasion of payment case, district court did not abuse its discretion in admitting evidence of defendant's wealth and lifestyle because it was relevant to prove intent and motive to evade taxes); *United States v. Hazelrigg*, 654 F. App'x 341, 343 (9th Cir. 2016) (unpublished) (in tax evasion case, evidence of lavish spending, including admission of photographs of condominium, was relevant to show the ability to pay taxes and affirmative attempts to avoid collection); *United States v. Ringwalt*, 213 F. Supp. 2d 499, 502 (E.D. Pa. 2002) (denying acquittal motion by defendant who was convicted of tax evasion and other tax crimes after trial that featured evidence of defendant's use of his money to support a lavish lifestyle).

### 3.    Gilmore Misrepresented That He Would Use Retirement Assets To Pay His Substantial Tax Debt

On October 1, 2015, after failing to make any effort toward making the good faith payments he promised Popowitz, Gilmore continued to mislead her by falsely telling her that he would pledge money from retirement accounts toward his federal tax debt. Popowitz testified that on October 1, 2015 that she "had received voicemails from him that he had -- that he had sufficient assets in the 401k and deferred compensation to pay his liability." 4/5/19 Tr. at 90:2-4.  Thereafter, Popowitz testified that she spoke with Gilmore on October 19, 2015 and that he sent her a fax that read "In accordance with our conversation today, enclosed are statement of account for deferred compensation plan with MassMutual showing a balance of 419,000 as of October 13th, 2015, 401k and profit sharing plans for George Gilmore and Joanne Gilmore. These funds will be utilized to pay taxes." 4/5/19 Tr. at 95:7-11.  Gilmore's fax was yet another misrepresentation, now in writing to the IRS, as he did not use this money to pay his taxes.

Gilmore argues that by submitting these account statements to the IRS and asking Popowitz to take the money in his deferred compensation account that he did not act to evade. ECF #93 at 78.  However, Gilmore does not address the approximately $120,000 in the two 401k accounts – money that he had access to, did access, and that he did not pay to the IRS to pay down his personal tax debt despite his representations.  Specifically, the uncontroverted trial evidence established the following timeline:

| Date | Activity | Exhibit/Transcript |
|------|----------|-------------------|
| 10/19/15 | Popowitz makes the following entry in her ICS history memorializing a representation | GX-27 at 23 |

| | | |
|---|---|---|
| | that Gilmore made: "Mr. Gilmore will also be faxing copies of two – 401k accounts one each in his name & Joannes (sic) name approx. value = $120,000.  He has to prepare paperwork to withdraw that money.  He is estimating to have the funds available for payment by 11/30/2015 and any other monies available in between he will call RO & fax copy of check being sent." | |
| 11/30/2015 | George and Joanne Gilmore withdrew $110,000 (gross amount) from John Hancock 401K accounts, $88,000 (net amount) | GX-3700; 4/8/19 (P.M.) Tr. at 114:3-7 |
| 12/1/2015 | George and Joanne Gilmore's Ocean First Account ending in 9574 received a $40,000 wire and a $48,000 wire. | GX-5008 |
| 12/2/2015 to 12/29/2015 | Gilmore spent $26,224.51 for mortgage/house payments, $14,800 for house contruction/remodeling/landscaping expenses, $4,595 for model trains, and $6,000 for payments to personal credit cards. | GX-5008 |

After telling Popowitz over the phone and by fax that he would apply this money (an amount well in excess of his proposed good faith payments) to his outstanding tax debt, Gilmore stopped contacting Popowitz, withdrew the money and used it for personal expenditures.  Crediting all available inferences in favor of the Government, there was ample evidence allowing the jury to find that Gilmore affirmatively attempted to mislead Popowitz and did so willfully.[16]

---

[16]   Gilmore's request that Popowitz "take" or "seize" the money in his deferred compensation account does not change the fact that a rational juror could find that Gilmore misled the IRS with respect to the 401k accounts.  Moreover, the evidence demonstrates that Gilmore had

4.     **Gilmore Submitted a $493,526 check to the IRS Drawn From a Personal Bank Account With Insufficient Funds in an Effort to Mislead the IRS**

When Gilmore filed his 2013 tax return on October 15, 2014, he reported owing the IRS $493,526, GX-10, and submitted a check drawn on a personal checking account for this amount, even though the balance in the account, as of October 14, 2015, was $2,434.07. Accordingly, the bank dishonored the check.

The evidence was sufficient for a rational jury, drawing all reasonable inferences and resolving all credibility issues in the Government's favor, to find Gilmore sent that check to mislead the IRS—specifically, to prevent the IRS from filing a notice of federal tax lien. It included Popowitz's testimony that she had instructed Gilmore, prior to October 15, 2014, that she intended to file a notice of federal tax lien for any personal income tax balances he owed. 4/5/19 Tr. at 63:16-24, 74:18-75:1.

On September 19, 2014, Popowitz informed Gilmore orally and in writing to submit his personal income tax return with full payment to the IRS Office in Freehold, New Jersey. GX-65, GX-27 at 11. Popowitz explained why she required Gilmore to submit the return to her instead of an IRS Service Center:

Q:     And why were you requiring that the return be submitted to your office in Freehold as opposed to an IRS service center?

A:     Because when I was reviewing officer's compliance, the officer's compliance, I had noted -- noticed on the system historically for a period of almost ten years, Mr. Monahan and Mr. Gilmore would file their -- they would file an extension to file their tax returns in April to October 15th. They

the ability to borrow up to $50,000 against his account – the total amount of his proposed good faith payment, but he did not do that here. GX-3800, p. 52; 4/8/19 (P.M.) Tr. at 120:6-18.

did not have any estimated tax deposits on file, and when they filed - when they filed the paperwork for an extension of time to file, they're required to pay the estimated tax liability, which was never paid. And then came October 15th, they would file their tax return with the service center, without paying the tax liability, and then after the first notice generated, their -- I saw history entries that they would call the service center, and ask for an extension of time to pay for 60 or 90 days.

4/5/19 Tr. at 61:7-22.

Popowitz further testified that she did this to bring Gilmore into compliance, dispelling the narrative raised throughout the trial and in Gilmore's post-trial motions that the IRS was satisfied with receiving delinquent tax payments or that Gilmore was unaware that taxes are supposed to be paid when they are due. *See id.* at 62. Faced with instructions to pay the IRS in full on October 15, 2014, to send his return directly to Popowitz, and having received notice that the notice of federal tax lien would follow if he did not comply, a rational jury could find that Gilmore purposely submitted the $493,526 check in order to mislead the IRS and delay filing a lien.

Gilmore's effort to mislead Popowitz and avoid the filing of a lien was further evidenced by what he did and did not do after he bounced the check. Gilmore did not contact Popowitz to notify her or explain what happened. 4/5/19 Tr. at 103:23-24. In fact, Popowitz testified that she learned that Gilmore bounced the check on November 19, 2014, over a month later, when she checked the system after Thomas Monahan's check bounced. 4/5/19 Tr. at 65:18-21. She further leaned in February 2015 "that he had called the service center in November requesting an extension of time to pay."[17] Gilmore did this

---

[17] Gilmore, in yet another effort to avoid any personal responsibility, deflects blame to the IRS for his bouncing a nearly half a million dollar check by claiming that

despite Popowitz's clear instructions to contact her and not the service center. 4/5/19 Tr. at 70:8-14.  Thereafter, Popowitz filed a NFTL on March 9, 2015.  GX-47.  Thus Gilmore's bounced check delayed, in part, the NFTL's filing.

Gilmore relies on Kelly Sigfried's testimony to argue that the only "rational inference the jury could have drawn from this evidence is that at the time Gilmore wrote the check, he believed there would be sufficient funds in his account to cover it when it was presented for payment." ECF #93 at 77.  In so doing, Gilmore again asks the Court to view the evidence in the light most favorable to the defense.  That is inappropriate. Moreover, the argument about Gilmore's subjective intent advanced through Sigfried's testimony falls flat.

On October 15, 2014, when Gilmore wrote the $493,526 check, his loan was not approved or even under meaningful review.  In fact, Gilmore was still signing papers associated with the loan application on the day he wrote the check.  4/9/19 (P.M.) Tr. at 71:17-19.  Gilmore was dealing exclusively with Kelly Sigfried, the bank's "relationship manager," who testified that she could not approve a loan and that she made that clear to Gilmore.  *Id.* at 79:7-16; 85:25-86:2.  Sigfried testified that as of October 15, 2014, the bank's vice president, who ultimately would need to approve or deny the loan, had not made any decision on Gilmore's just signed application.  *Id.* at 73:5-11.  Sigfried testified

---

"the check could not have been used to mislead the IRS because its ability to be honored was readily determinable."  ECF #93 at 76.  There is no evidence in the record that Gilmore was familiar with check cycles at the IRS or that he would have any reason to know when Popowitz would ultimately learn that his check was dishonored.

that loans typically take a couple weeks to be approved or denied, which happened in this case. *Id.* at 76:1-5. Sigfried testified that on October 29, 2014 the bank ultimately denied the loan because:

> "Number one, inconsistencies with tax returns preclude the
> bank from determining the firm's actual debt service and the ability to service
> the debt. Number two, approximately $5,900,000 in assets with the law firm
> are owed by shareholder. The ability to repay this debt is in question, and if
> deducted from capital, would make the firm insolvent."

*Id.* at 75:16-21. Gilmore's claim that the only rational inference a jury could draw from the evidence is that Gilmore "believed" there would be sufficient funds in the account to cover the check when presented for payment, ECF # 93 at 77, is flatly contradicted by the timeline presented by the defendant's own witnesses. A rational jury could certainly reject the inference that Gilmore, an attorney, with extensive experience applying for bank credit would believe that a loan that he was signing the application for on October 15 would be reviewed, processed, and approved such that he could write a $493,526 check against a bank account that contained approximately $2,434.07 on the day he wrote the check.

>    **5.    Gilmore Misled the IRS and Concealed the Existence of Funds
>    Available to Pay His Outstanding Tax Liabilities by Using Law
>    Firm Funds for Personal Expenses and Taking Sham Loans from
>    the Firm**

At a retrial on Count 1, a rational jury could find that Gilmore committed one or more of the following affirmative acts related to his payment of personal expenses with law firm money and his failure to declare this benefit as income:

- concealing his income and the existence of funds available to pay his
  outstanding tax liabilities by using his law firm bank and credit card
  accounts to pay for personal expenses and by using his law firm
  bank accounts to obtain cash;

- falsely classifying income that he received from the law firm as "shareholder loans;"

- filing false tax returns that materially understated the true amount of income that Gilmore received.

The jury could rationally find that Gilmore concealed the existence of funds available to pay his outstanding tax liabilities by using his law firm bank and credit card accounts to pay for personal expenses and by using his law firm bank accounts to obtain cash. A jury could make this finding even if they believed that Gilmore did not falsely classify income as shareholder loans or file false returns because even lawful conduct can constitute an affirmative act when done with the intent to evade taxes. *See United States v. Gorrell*, __F.3d__, 2019 WL 1890971, *5 (10th Cir. Apr. 29, 2019) (comingling funds may constitute an affirmative act of evasion, in spite of the defendant's argument that there was a paper trial and nothing was concealed, holding that the question is whether the defendant acted to evade).

In *United States v. Threadgill*, No. 13–5897, 572 Fed. App'x. 372 (6th Cir. 2014) (unpublished), an evasion of payment case, the Court held that by paying for personal expenses out of his law firm bank account the defendant, who was an attorney, acted with an intent to evade. Here, Gilmore, for years, had a steady flow of cash, which he characterized as loans and that he used for all sorts of personal expenses, as demonstrated at trial. Even assuming that this unlimited flow of cash could properly be considered a loan and that a paper trial existed, a rational jury could conclude that Gilmore treated this money as loan to protect it from seizure from the IRS, similar to the defendant in

69

*Threadgill*, so that he could fund his expensive lifestyle. Indeed, a jury could reasonably infer that Gilmore, an attorney, would be well aware that income in his personal accounts could be subject to an IRS levy. Moreover, as established at trial, Gilmore did in fact receive literature from the IRS defining a levy as a legal seizure of an individual's property. *See* GX-63c. Viewing the evidence in the light most favorable to the Government, a rational jury easily could infer that Gilmore spent out of his law firm accounts, at least in part, to hide the source of his payments and to protect himself from personal levies, thereby misleading the IRS.

With regard to the remaining two affirmative acts—falsely classifying income that he received from the law firm as "shareholder loans" and filing false tax returns that materially understated the true amount of income that Gilmore received—the Government acknowledges that, under current Supreme Court precedent, collateral estoppel principles would prevent the Government from relitigating an ultimate issue of fact, as determined by judgment of acquittal, in a second trial for a separate offense. *See Yeager v. United States*, 557 U.S. 110, 119 (2009); *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). However, in light of the Supreme Court's decision last year in *Currier v. Virginia*, 138 S. Ct. 2144 (2018), which suggests that *Ashe v. Swenson*, 397 U.S. 436 (1970), may be open to reconsideration, the Government respectfully preserves the claim that there was sufficient evidence of these two affirmative acts.

A jury could rationally infer that Gilmore falsely classified income as shareholder loans and filed false returns because, among other things:

- Gilmore did not tell Tom Monahan, his law partner, about the scope and extent

70

of the loans; Monahan learned these details from his tax preparer, Robert Hutchins. 4/3/19 (A.M.) Tr. at 82:10-83:1.

- Accountant Hutchins testified that he told Gilmore that he should be taking salary and not calling the disbursement of this money loans. 4/3/19 (P.M.) Tr. at 111:9-16; 4/4/19 (A.M.) Tr. at 21:1-7, 45:12-16, 106:13-15.

- Accountant Koerner testified that he counseled Gilmore the same way. 4/8/19 (A.M.) Tr. at 91:9-23.

- Accountant Hutchins testified that when he counseled Gilmore to take salary and withhold taxes – he responded that they would take care of it next year. 4/4/19 (A.M.) Tr. at 11:3-11.

- Director's Fees were taken meaning that a portion of the purported loan was just reclassified to "income." 4/4/19 (A.M.) Tr. at 11:12-20.

- The purported loans were not arm's length - there was no promissory note, shareholder agreement, interest paid, repayment schedule, documented repayment terms, or ceiling associated with the shareholder loans. 4/9/19 (P.M.) Tr. at 11:23-12:11.

- The law firm only began calculating interest on the shareholder loan balance in 2016 after the issuance of grand jury subpoenas to Accountant Hutchins and after Hutchins met with Gilmore. 4/4/19 (A.M.) at 33:3-11, 36:4-6.

- The balance of these purported loans stretched to over $9,000,000 by July 2016 - that's almost double the amount of gross receipts that the law firm received any one year. GX-29, GX-30, GX-31, GX-5010

Accordingly, a jury, at a retrial on Count 1, drawing all reasonable inferences and resolving all credibility issues in the Government's favor could rationally find that Gilmore misclassified income as "shareholder loans" as a means to evade the payment of taxes.

## B.    Gilmore's Rule 29 Motion Should Be Denied Because Section 7201 Has No Permanence Requirement

Gilmore also argues that the Court should grant him a judgment of acquittal on

Count 1 because the Government did not introduce sufficient evidence that he acted with intent to evade payment of his tax liabilities permanently. ECF #93 at 69.  Gilmore's Rule 29 argument, which is just a repackaging of a proposed jury instruction that this Court already rejected, misstates the law.  The Court's instructions tracked Third Circuit Model Instruction No. 6.26.7201-3, modified to account for *United State v. McGill*, 964 F.2d 222 (3d Cir. 1992), which construed an affirmative act of evasion to include concealing assets from or otherwise attempting to mislead the IRS and were entirely proper.

To support this "permanence" requirement as part of both the actus reus and mens rea required to convict under § 7201, Gilmore cites *Edwards v. United States*, 375 F.2d 862, 867 (9th Cir. 1967), and *United States v. Fisher*, No. 13–30363, 607 F. App'x 645, 647 (9th Cir. Apr. 14, 2015) (unpublished).  Granted, *Edwards* construed § 7201— under the unique facts raised there—as requiring an intent to permanently deprive the IRS of funds (where the defendant-tax preparer filed late returns on behalf of clients, kept the money clients had given him to transmit to the IRS, and claimed he intended to pay the tax due later).  But the Third Circuit's model instruction contains no such requirement, and the Eighth Circuit has rejected *Edwards*, *see United States v. Jewell*, 614 F.3d 911, 923 (8th Cir. 2010), noting that the Ninth Circuit had distinguished *Edwards* based on its unique facts.  Moreover, the Ninth Circuit's Model Instructions contain no such permanence requirement.  Model Crim. Jury Instr. 9th Cir. 9.37 (2018). The Court should reject Gilmore's argument.

## CONCLUSION

For all the foregoing reasons, the United States respectfully requests that the defendant's motion for judgment of acquittal on Counts 1, 4, 5, and 6 of the Superseding Indictment and for a new trial on Counts 4, 5 and 6 of the Superseding Indictment be denied.

<div style="margin-left:40%">

Respectfully submitted,

RACHAEL A. HONIG
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

By:   /s/ Matthew J. Skahill
/s/ Jihee G. Suh
MATTHEW J. SKAHILL
Deputy U.S. Attorney
JIHEE G. SUH
Assistant U.S. Attorney

/s/ Thomas F. Koelbl
THOMAS F. KOELBL
Trial Attorney
U.S. Department of Justice-Tax Division

</div>

Dated:    May 20, 2019